UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
BARBARA HANDSCHU, RALPH DIGIA,
ALEX McKEIVER, SHABA OM, CURTIS :
M. POWELL, ABBIE HOFFMAN, MARK
A. SEGAL, MICHAEL ZUMOFF,                    :
KENNETH THOMAS, ROBERT RUSCH,                       71 Civ. 2203 (CSH)
ANETTE T. RUBENSTEIN, MICHEY       :
SHERIDAN, JOE SUCHER, STEVEN                   MEMORANDUM OPINION
FISCHLER, HOWARD BLATT and         :                 AND ORDER
ELLIE BENZONE, on behalf of themselves
and all others similarly situated,          :

                                Plaintiffs,       :
              -against-

SPECIAL SERVICES DIVISION, a/k/a            :
BUREAU OF SPECIAL SERVICES,
WILLIAM H.T. SMITH, ARTHUR                   :
GRUBERT, MICHAEL WILLIS,
WILLIAM KNAPP, PATRICK                        :
MURPHY, POLICE DEPARTMENT
OF THE CITY OF NEW YORK,                      :
JOHN V. LINDSAY and various unknown
employees of the Police Department acting  :
as under-cover operators and informers,

                                Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

HAIGHT, Senior United States District Judge:

          To paraphrase Longfellow, this is the class action eternal.[1]  There will be a Handschu class

action and a judge of this Court in charge of it for as long as New York City stands, the New York

Police Department ("NYPD") endeavors to balance protection of society with preservation of

individual liberties, and the decision on how that balance should be struck rests with the judicial

branch of government.  Judge Weinfeld was present at the creation of the case 35 years ago.  At this

---

[1]  "This is the forest primeval."  *Evangeline*, Introduction, l.1.

moment, which has lasted for 30 years – eternity is measured in moments – I am responsible for the case.  Other judges of this Court will succeed me.  Disputes between class counsel and the NYPD have arisen in the past.  More will probably arise in the future.  A dispute is before the Court now.

The present dispute is generated by the NYPD's recently implemented practice of videotaping public gatherings and preserving the videotapes.  That practice is described in and carried out pursuant to NYPD Interim Order 47 ("Order 47" or "the Order").  Class counsel now move to enjoin the enforcement of Order 47, on the grounds that it violates guidelines incorporated in a prior order and judgment of this Court, as well as the First Amendment to the United States Constitution.  The Corporation Counsel of the City of New York ("Corporation Counsel"), representing the NYPD, contends that the NYPD's conduct is entirely proper and the class is entitled to no relief.

This particular dispute must be considered in the greater context of the procedural history of the case since its inception.

## I.  PROCEDURAL HISTORY

This action was commenced in 1971.  The plaintiffs, a group of citizens, complained that those in charge of the NYPD at the time were conducting surveillance and intelligence-gathering activities which violated the plaintiffs' rights under the United States Constitution.  The case was assigned to the late District Judge Edward Weinfeld.  The NYPD moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief could be granted.  Judge Weinfeld denied that motion.  *Handschu v. Special Servs. Div.*, 349 F. Supp. 766 (S.D.N.Y. 1972)

("*Handschu I*").  He reasoned that it did not appear "to a certainty that the plaintiffs would be entitled to no relief under any state of facts which could be proved in support of their claim." *Id.* at 771.  By means of that double negative, Judge Weinfeld held that the Handschu plaintiffs' complaint sufficiently alleged a violation by the NYPD of their constitutional rights to withstand dismissal as a matter of law.  In that circumstance, two resolutions were conceptually possible: the plaintiffs would attempt to prove their constitutional claims in support of a dispositive motion or at trial; or the parties would settle the case.

The parties chose the latter course.  Judicial responsibility for the case having passed from Judge Weinfeld to me, I certified the plaintiff class pursuant to Fed. R. Civ. P. 23(a)(b)(1)(A) and 23(b)(2) in an unreported opinion and order dated May 24, 1979.  Thereafter class counsel and the Corporation Counsel negotiated and proposed a settlement of the class action whose terms I approved.  605 F. Supp. 1384 (S.D.N.Y. 1985) ("*Handschu II*").  The Second Circuit affirmed.  787 F.2d 828 (2d Cir. 1986) ("*Handschu III*").

The heart of the settlement lay in the adoption by the NYPD of guidelines governing future police conduct in the relevant areas. Their full text appears in *Handschu II*, 605 F. Supp. at 1420-24. For clarity I will hereafter refer to them as "the Original Handschu Guidelines."  The plaintiff class and the NYPD dwelt together under the Original Handschu Guidelines with a degree of amity and a lack of acrimony that, I am frank to confess, I had neither anticipated nor hoped for.  But then the dreadful and tragic events of 9/11 occurred.  The NYPD, viewing the circumstances in respect of intelligence gathering as having been materially changed, moved this Court for a modification of the Original Handschu Guidelines.  The NYPD's core contention, expressed by Deputy Commissioner Cohen in ¶ 1 of his first affidavit in support of that motion, was that "the continued enforcement of

3

the Guidelines is no longer consistent with the public interest because they limit the effective investigation of terrorism and prevent cooperation with federal and state law enforcement in the development of intelligence."

Class counsel did not contend that in principle no modification of the Original Handschu Guidelines should be considered; on the contrary, and to counsel's credit, they reached out to the Corporation Counsel's office to initiate a dialogue, but nothing came of the overture, and the NYPD made its motion.  Class counsel opposed the motion as made, arguing that the modifications the NYPD suggested were too extreme, and expressing a particular concern that whatever modified Guidelines the Court approved should be specifically incorporated as a part of the Court's Order and Judgment.

 I granted the NYPD's motion to modify the Handschu Guidelines.  273 F. Supp. 2d 327 (S.D.N.Y. 2003) ("*Handschu IV*").  That Opinion and its accompanying Order provided principally that the NYPD must adopt revised guidelines based upon Guidelines which the FBI had issued after 9/11.  Thereafter the NYPD complied with the Court's direction, adopted the FBI Guidelines, and included them in the NYPD patrol guide.  Those adopted and incorporated guidelines instruct all commanding officers of the NYPD about how they are to conduct investigations involving political activity.  Hereafter I will refer to those guidelines, thus adopted and incorporated, as "the Patrol Guidelines."  As further explicated in Part III, *infra*, the Patrol Guidelines, read together with surviving provisions of the Original Handschu Guidelines, comprise what I will refer to as "the Modified Handschu Guidelines."

Class counsel took the position that the Court's Order granting the NYPD's motion to modify the Original Handschu Guidelines should specifically incorporate the Modified Handschu Guidelines

4

into the Order and Judgment, thereby making them a part of the Order and Judgment.  I initially refused that request, but reversed my field when, during the course of protests in the streets of the City during February and March of 2003 concerning the Bush administration's imminent invasion of Iraq, senior NYPD officers misbehaved themselves by ordering that arrested protestors held in precinct station houses be interrogated in inappropriate ways before being released.  Class counsel, having learned of this practice from complaints made by protesters or their attorneys, returned to this Court to request a modification of the modification.  The Corporation Counsel asserted that neither Commissioner Kelly nor Deputy Commissioner Cohen had previously known of the interrogation techniques in question and now had put a stop to them, while professing their belief that the techniques were perfectly proper.  I accepted Kelly's and Cohen's disclaimers of knowledge, but perceiving a lack of discipline on the part of the NYPD in this sensitive area, incorporated the Modified Guidelines into a Second Revised Order and Judgment.  288 F. Supp. 2d 411 (S.D.N.Y. 2003) ("*Handschu V*").  The Partrol Guidelines, which form a part of the Modified Handschu Guidelines thus incorporated, are printed in full at 288 F. Supp. 2d at 420-31.

It is against this background that on September 10, 2004, the NYPD by direction of Commissioner Kelly distributed Order 47 to all commands.  The plaintiff class now moves to enjoin enforcement of Order 47 and the implementation by the NYPD of the procedures the Order directs.  Before deciding this motion, I directed further submissions from the parties about a "Note" appearing on page 2 of Order 47 and quoted in Part II.B., *infra*.  *See* 2006 WL 1716919 (S.D.N.Y. June 21, 2006) (*"Handschu VI"*).  Those submissions having been filed, I now decide the motion by the plaintiff class.

## II.  THE CONTENTS OF ORDER 47

Order 47 is captioned:

> REVISION TO PATROL GUIDE 212-71, "GUIDELINES FOR THE USE OF PHOTOGRAPHIC/VIDEO EQUIPMENT BY OPERATIONAL PERSONNEL AT DEMONSTRATIONS"

The text of the Order begins with this introductory paragraph:

> Recent modifications to the *Handschu* Consent Decree, along with advancements in and the availability of technology to aid in police operations, necessitates that procedures governing the use of video and photography by members of the service be updated.

Those procedures were "updated" by the promulgation of Order 47, a five-page single-spaced document organized under three main headings: "Purpose," "Scope," and "Procedure."   The provisions most relevant to the present motion are quoted in this Part of the Opinion.

### A.     The Purpose of Order 47

That section of Order 47 which explains its "Purpose" reads in full:

> To set forth the permissible operational objectives for which members of the service may use photographic/video equipment to record images in situations outside of ongoing criminal or internal investigations, standard evidence collection or arrest processing procedures; to establish procedures for the approval and use of such equipment; and to establish responsibility for the maintenance, review, storage, and disposition of such images.

Order, at 1.

### B.     The Scope of Order 47

That section of Order 47 which defines its "Scope" begins by stating:

> This procedure establishes permissible operational objectives that authorize and apply generally to the use of video and photography, except in situations involving ongoing criminal or internal

> investigations, standard evidence collection, or arrest processing procedures. This procedure applies to the use of video and photography by members of the service to accurately record police operations and other public activity. Examples of such uses include preparing training materials and monitoring and/or assessing: emergency incidents, traffic control, crowd control (parades, demonstrations, etc.), counter-terrorism, public safety, crime, or disorder conditions, deployment of police resources, etc. . . .

Order, at 1. Expanding upon its core concept of a "permissible operational objective," the next paragraph of the "Scope" section of the Order provides in pertinent part:

> The use of photographic or video equipment by operational personnel to accurately record police operations and other public activity is appropriate if a permissible operational objective exists. Permissible operational objectives include accurately documenting events, actions, conditions or statements made:
>
> a.   during special events, disorder events, arrests, public assemblages or any other critical incident in which such accurate documentation is deemed potentially beneficial or useful; <u>or</u> . . .
>
> c.   when a reasonable belief exists that unlawful activity, terrorist activity or arrest activity will occur. . . .

Order, at 2. The language in subparagraph (a) particularly troubles class counsel.

The section of the Order just quoted in part is followed by an italicized "Note" which reads in pertinent part:

> Pursuant to Modified Handschu Guidelines, the investigation of political activity may only be initiated by and conducted under the supervision of the Intelligence Division. Therefore, members of the service not assigned to the Intelligence Division may not use video recording or photography for the purpose of investigating political activity, without the express written approval of the Deputy Commissioner, Intelligence.

Order, at 2.

**C.**     **The Procedures Created by Order 47**

The section of the Order describing the procedures to be followed begins with this direction:

> When ranking personnel of this Department contemplate the use of photographic or visual recording equipment for a permissible operational objective:
>
> 1.     Submit a report, on Typed Letterhead, to Patrol Borough/Bureau Commander concerned, requesting the deployment of equipment and properly trained personnel.[2]
>
> 2.     Include the following information in the request:
>
>> a.     Date, time and location of incident or event to be recorded, and
>>
>> b.     Identity of the individuals or groups involved (if known), and
>>
>> c.     Specific permissible operational objective(s) to be achieved.

Order, at 2-3 (emphasis omitted).  The commander to whom the request is addressed has the discretion to approve or disapprove it.  *Id*. ¶ 3.a.

Many of the detailed procedures that follow are not relevant to the plaintiff class's present motion.  However, class counsel view with distinct alarm and disapproval the procedures which appear under the caption "UPON COMPLETION OF PHOTOGRAPHING/VIDEOTAPING."  These procedures comprise a series of directions to commanding officers.  I quote them in full:

> 7.     Maintain all photographs/video recordings prepared in connection with this procedure for a minimum of one (1) year from the date the images were recorded.

----

[2]  A Note to this instruction provides that "[i]n emergency situations, requests may be made by telephone, and equipment may be deployed," but a written report must be subsequently submitted.

8

8.   Prepare and maintain a written summary describing the event and activities preserved in each recording, to assist in indexing and retrieval.

9.   Facilitate review of the recorded materials by the ranking officer who initiated the request to determine whether they have value either as evidence of criminal activity or as documentation under a permissible operational objective.

   a.   If the materials contain evidence of criminal activity, they will be considered evidence, and handled accordingly.

   b.   If the materials are deemed valuable for other purposes, for example, litigation, training, after action reports, etc., they will be similarly retrieved in connection with that purpose.

   c.   After one (1) year, materials not meeting the criteria in (a.) or (b.) above may be destroyed. In determining whether materials have such value or may be destroyed (video recordings, discs, etc. may be reused), the Commanding Officer, TARU/Other Designated Unit[3] shall confer with the ranking officer who authorized or requested the taking of video/photographs.

Order, at 4.

## III.  THE MODIFIED HANDSCHU GUIDELINES

The Modified Handschu Guidelines are comprised of two elements: the modified guidelines initially proposed by the NYPD, printed as Appendix A to *Handschu IV*, 273 F. Supp. 2d at 349-51; and the NYPD's adoption of the FBI guidelines for inclusion in the patrol guide, printed as

---

[3]  "TARU" stands for the NYPD's Technical Assistance Response Unit.

9

Appendix A to *Handschu V*, 288 F. Supp. 2d at 420-31 and captioned "Guidelines for Investigations Involving Political Activity" (these are what this Opinion refers to as "the Patrol Guidelines"). *Handschu IV* made it clear that without the inclusion of the Patrol Guidelines into in the NYPD patrol guide, the Court would reject the NYPD's motion to modify the Original Handschu Guidelines.[4]

The Modified Handschu Guidelines, drafted by the NYPD and Corporation Counsel, restate and reaffirm two key definitions contained in the Original Guidelines.   Section II(A) defined "political activity" as: "The exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions." *See Handschu IV*, 273 F. Supp. 2d at 350.  Section II(C) defined "investigation" as "a police activity undertaken to obtain information or evidence."  *Id.*  The modifications proposed by the NYPD left these definitions unchanged.  *Id.* at 350.  In consequence, the application of the Modified Handschu Guidelines is limited to the NYPD's collection of information or evidence in situations where persons are expressing political or social views or associating for that purpose.  This limitation has never changed.[5]

_____

[4] A clarification of the different components of the Modified Handschu Guidelines is important because, as the quotations from the submissions of counsel *infra* show, references are occasionally made to "rules" and to "guidelines" without specifying just what bodies of words counsel are talking about.

[5] This clarification is necessary because the representatives of one side or the other are sometimes prone, for the purpose of beefing up a particular contention, to overstate the prohibitions of the guidelines in effect at the moment.  That temptation is illustrated by an affidavit Deputy Commissioner Cohen submitted in support of the NYPD's motion to modify the Original Handschu Guidelines; Cohen suggested that those guidelines inhibited legitimate police investigative techniques with which the guidelines had precisely nothing to do and upon which they had no effect. *See Handschu IV*, 273 F. Supp. 2d at 339.

The Patrol Guidelines undertake to strike the delicate, sensitive, and vital balance necessary to safeguard both public safety and private rights.  That purpose is articulated in Section I of the Patrol Guidelines, "Statement of Policy," and Section II, "General Principles."  Section I provides in full:

> It is the policy pf the New York City Police Department that investigations involving political activity conform to the guarantees of the Constitution, that care be exercised in the conduct of those investigations so as to protect constitutional rights, and that matters investigated *be confined to those supported by a legitimate law enforcement purpose.*

(emphasis added).  Section II provides in part:

> (1) In its effort to anticipate or prevent unlawful activity, including terrorist acts, the NYPD must, at times, initiate investigations in advance of unlawful conduct.  *It is important that such investigations not be based solely on activities protected by the First Amendment.*

(emphasis added).

The Patrol Guidelines implement that policy and that principle in practice by establishing "three levels of investigative activity" in Section V: "checking of leads," "preliminary inquiries," and a "full investigation."  Section V(A)-(C).  The circumstances justifying each of these levels of investigation are spelled out in detail by the Patrol Guidelines, with varying requirements for authorization up the chain of command; a full investigation, for instance, must be authorized "by the Commanding Officer or Executive Officer of the Intelligence Division or the Commanding Officer of the Criminal Intelligence Section."  Section V(C)(4).  But each level of investigation of a political activity requires some indication of *unlawful* activity on the part of the individual or organization to be investigated.  "Checking of leads," as Section V(A) of the Patrol Guidelines

11

provides, "should be undertaken whenever information is received of such a nature that some follow-up as to the possibility of *unlawful activity* is warranted." A "preliminary inquiry" is undertaken, Section V(B) provides, "where the NYPD receives information or an allegation not warranting an investigation – because there is not yet a 'reasonable indication' of *unlawful activity* – but whose responsible handling requires some further scrutiny beyond the prompt and extremely limited checking out of initial leads." "A full investigation," Section V(C) provides, "may be initiated when facts or circumstances reasonably indicate that an *unlawful act* has been, is being, or will be committed" (emphases added). As I noted in *Handschu IV*, "a salient feature of the [Patrol] Guidelines is that they do not do away entirely with the 'criminal activity requirement' which is a principal cause of the NYPD's dissatisfaction with [the Original] Handschu [Guidelines]." 273 F. Supp. 2d at 346.

Reflecting the heightened post-9/11 concern about terrorism that was the principal justification for modifying the Handschu Guidelines, Section V(D) of the Patrol Guidelines is captioned "Terrorism Enterprise Investigation." According to its preamble, Section V(D) "focuses on investigations of enterprises that seek to further political or social goals through activities that otherwise aim to engage in terrorism through activities that involve force or violence, or that otherwise aim to engage in terrorism or terrorism-related crimes." The Section specifies certain indicia "that the group is pursuing terrorist activities or objectives," recites that "[t]he immediate purpose of a terrorism enterprise investigation is to obtain information concerning the nature and structure of the enterprise" in aid of "the longer range objectives of detection, prevention, and prosecution of the unlawful activities of the enterprise," authorizes certain information-gathering investigative techniques, and provides that, absent exigent circumstances, a "terrorism enterprise

investigation" must be authorized upon a written application to the commanding officer of the Intelligence Division or the Criminal Intelligence Section. Section V(D)(1)-(3). Section V(4) requires that such authorization must be forwarded "for final approval by the Deputy Commissioner for Intelligence."

Section VI of the Patrol Guidelines specifies certain investigative techniques that the NYPD may employ in any investigation conducted under the Guidelines. It is not necessary for present purposes to recite those techniques in detail, but one notices again the emphasis placed upon an *unlawful act* as the justification for the use of a particular investigative technique. Thus Section VI(1) instructs that "[t]he choice of investigative techniques is a matter of judgment, which should take account of: . . . (ii) the intrusiveness of a technique, considering such factors as the effect on the privacy of individuals and potential damage to reputation; (iii) the seriousness of the *unlawful act*; and (iv) the strength of the information indicating its existence or future commission of the *unlawful act*" (emphases added). Section VI(2) sanctions the use of "any lawful techniques consistent with these guidelines in an investigation, even if intrusive, where the intrusiveness is warranted in light of *the seriousness of the crime* or the strength of the information indicating its existence or future commission" (emphasis added).

Section VIII contains further authorizations of NYPD activities and investigative techniques, and is divided between "Counterterrorism Activities," VIII(A), and "Other Authorizations," VIII(B). Section VIII(A)(2) contains a provision upon which the NYPD places considerable reliance in resisting the present motion, and I quote it in full:

> *For the purpose of detecting or preventing terrorist activities*, the NYPD is authorized to visit any place and attend any event that is open to the public, on the same terms and conditions as members of

> the public generally.  No information obtained from such visits shall
> be retained unless it relates to potential unlawful or terrorist activity.

(emphasis added).  While this provision does not directly address videotapes or photographs, the NYPD argues that because "members of the public generally" can videotape or photograph places they visit and events they attend, so can police officers.

These, then, are the relevant provisions of the two components of the Modified Handschu Guidelines.  They were in effect and binding upon the NYPD prior to Commissioner Kelly's promulgation of Order 47.  They remain in effect today.

These preliminary questions having been clarified, I turn to the particular contentions of the parties on the present motion.

## IV.  THE CLAIMS OF THE PLAINTIFF CLASS THAT ORDER 47'S PROCEDURES SHOULD BE ENJOINED

### A.  The Claim of the Plaintiff Class that the Procedures Established by Order 47 and the Police Activities Revealed by the Evidence Violate the Modified Handschu Guidelines

Class counsel's original contention on this motion was that the procedures set forth in Order 47 are contrary to and cannot be reconciled with the pertinent provisions in the Modified Handschu Guidelines.  It follows, the argument continues, that the Guidelines trump the Order and the Court should enjoin the enforcement and implementation of Order 47's procedures.  Specifically, class counsel contended that Order 47's provisions authorizing the NYPD to use video and photographic equipment facially violate the Modified Handschu Guidelines, as do the Order's procedures for retention by the NYPD of the tapes and films created by such use.  As discussed in Part IV.A.4.c., *infra*, subsequently submitted evidence led to a contention by class counsel that the NYPD's

14

activities following promulgation of the Order violated the Guidelines.

Alternatively, class counsel contend that Order 47's provisions and procedures in these areas violate the rights of class members secured by the First Amendment to the United States Constitution. The first of these contentions and the NYPD's responses to it are discussed in Part IV.A. of this Opinion. The second and alternative contention is discussed in Part IV.B.

### 1.    The Claim of the Plaintiff Class that Order 47 Conflicts with the Guidelines

Class counsel contend principally that the restrictions placed upon NYPD conduct by Section VIII(A)(2) of the Modified Handschu Guidelines cannot be reconciled with the less restricted NYPD use of photographic or video equipment and the retention of films and tapes authorized by Order 47.

Section VIII(A)(2), quoted *supra*, provides that "[f]or the purpose of detecting or preventing terrorist activities, the NYPD is authorized to visit any place and attend any event that is open to the public, on the same terms and conditions as members of the public generally. . . ." Order 47 authorizes police use of photographic or video equipment during such attendance "if a permissible operational objective exists." Order 47 does not undertake to define the core phrase "a permissible operational objective." Instead, the Order instructs by example. Thus, in the language upon which class counsel particularly focus, Order 47 recites that "[p]ermissible operational objectives include accurately documenting events, actions, conditions or statements made . . . during special events, disorder events, arrests, public assemblages or any other critical incident in which such accurate documentation is deemed potentially beneficial or useful." Neither does the Order undertake to specify the criteria by which a film or tape's *potential* benefit or usefulness may be measured by the ranking NYPD officer requesting the deployment of the equipment.

15

Mr. Eisenstein, one of the attorneys for the class, stressed that contention in opening his oral argument, which it is useful to quote at some length:

> There is, as I have said, in our view, an irreconcilable conflict between those Guidelines and Interim Order 47. I want to go right to the conflict that I think is the clearest, which emerges from paragraph VIII of the Guidelines, which talks about the ability of the police department. "For the purpose of detecting or preventing terrorist activities, the NYPD is authorized to visit any place and attend any event that is open to the public generally. No information obtained from such visits shall be retained unless it relates to potential unlawful or terrorist activity."

> Interim Order 47, which the NYPD promulgated on September 10th of 2004, asserts the power to videotape political demonstrations whenever the police department considers it, their words, "potentially beneficial or useful," and further asserts the power to retain videotapes of such activity for an indefinite period even if they show nothing but peaceful political protest.

> We submit to the Court that there is no way to square that assertion of power with a rule that says "no information shall be retained unless it relates to potential unlawful or terrorist activity."

> The Court is aware that we come to you at the end of a lengthy process of negotiation marked by letters back and forth which have been appended to the motion papers. We would note that at the beginning of that process there was an acknowledgment by the representatives of the police department [the Corporation Counsel] that there was a conflict between the policy set forth in Interim Order 47 and the rule. But by February of 2005, just over a year ago, even this acknowledgment of the conflict and of the restraint imposed by the Guidelines had disappeared.

> There is a letter, which is in our papers as Exhibit 3, in which [Assistant Corporation Counsel] Ms. Donoghue says with respect to videotaping demonstrations, "It is fairly obvious that the use of such equipment at public events can serve as a deterrent as well as a means of preserving evidence in the event there is an act of terror. Inasmuch as the tapes produced relate to criminal activity or are useful in the deterrence of terrorism, there is no limitation on their retention."

16

What has happened, in our view, in that formulation is that the phrase "relate to terrorism," which is what the rules say, now is asserted to include [what] would constitute a record of terror if it occurred, and thus a videotape of a peaceful demonstration may be retained in spite of the Guidelines, because it would have related to an act of terrorism if an act of terrorism had occurred.

This is a word game, Judge, in our view. Its effect is to treat every demonstration as criminal activity and to deprive the prohibition in the Guidelines of any meaning. . . . It is not surprising, in light of this position, that the litigation position of the NYPD on this motion is that the Guidelines may be ignored with impunity. That is said directly at page 4 of the defendants' memorandum of law, and I am quoting: "There is no obligation under either Modified Handschu or the NYPD Guidelines that investigations of political activity conducted by the NYPD meet any requirement other than what is required by the Constitution."

Transcript of Oral Argument ("Tr."), at 4.

### 2. The NYPD's Response to the Plaintiff Class's Claim of Conflict Between the Guidelines and Order 47

The NYPD's core contention is a syllogism: (1) in the NYPD's investigations of political activity, the Modified Handschu Guidelines do not impose any requirements other than what is required by the Constitution; (2) the NYPD conduct authorized by Order 47 does not violate the Constitution; (3) *ergo*, there can be no conflict between the Guidelines and Order 47. Responding to the subsequently submitted evidence, the NYPD interpret the Guidelines and the Order to allow any investigation that is not labeled as being exclusively "for the purpose of investigating political activity."

As will be discussed more fully *infra*, the NYPD bases its first syllogistic premise upon certain statements this Court made in prior opinions and orders. Thus, Assistant Corporation Counsel Farrell said at the oral argument: "It is the defendants' position that this Court's prior order,

17

the order incorporating the Guidelines and its accompanying decision, made it clear that in order to have a violation of the Guidelines, there has to be a violation of the Constitution." Tr. at 37.  His colleague Ms. Donoghue said later in the argument: "[W]e interpreted your order to mean that with respect to raising a constitutional claim, and only with respect to that, the Guidelines are incorporated" in the Court's order approving the Modified Handschu Guidelines, and that "the very means by which your Honor incorporated it includes limitations which require that a constitutional violation be established."  Tr. at 55, 63.

In these circumstances, the analysis which follows must begin with this Court's consideration of the import and effect of its own prior opinions and orders.  Such judicial introspection is not common, but its necessity in this important and sensitive case is apparent.

### 3.    The Court's Prior Opinions and Orders

This Court's opinion in *Handschu V* granted the motion of the plaintiff class, opposed by the NYPD, to incorporate the Modified Handschu Guidelines into the Court's Order and Judgment. *Handschu V* concluded with a "Second Revised Order and Judgment," whose penultimate decretal paragraph reads as follows:

> . . . [I]t is further
>
> ORDERED, ADJUDGED, AND DECREED, that the Guidelines for Investigations Involving Political Activity referred to in the preceding paragraph of this Second Revised Order and Judgment having declared in their Statement of Policy that such investigations are to conform to the guarantees of the Constitution of the United States, and in order to clarify and enhance the standing and authority of counsel for the plaintiff class to contend, if so advised, that violations of the said Guidelines have deprived a member or members of the plaintiff class of rights or freedoms guaranteed to them by the Constitution, the said Guidelines are, to that extent and for that purpose, incorporated by reference into and made a part of

this Second Revised Order and Judgment. . . .

This decretal paragraph must be read in conjunction with two paragraphs of the *Handschu*

*V* opinion which precede it:

> Having concluded that the plaintiff class is entitled in principle to a
> further revision of the Order and Judgment, it remains to consider
> how this should be accomplished in practice.  Class Counsel, in a
> post-argument letter dated June 2, 2003, offer suggestions which
> seem to me balanced and fair.  Class Counsel propose to leave
> unchanged "the Reservations" paragraph with which the Modified
> Handschu Guidelines appearing in the NYPD Parol Guide
> concludes, but to include in a revised Order and Judgment language
> to the effect that (to quote counsel's letter) "the last paragraph of the
> Guidelines shall be read in light of the fact that the Guidelines are
> incorporated in the Consent Decree, and procedures under the
> Consent Decree may be pursued in case of an alleged violation of the
> Decree."
>
> This approach gives the plaintiff class an increased protection
> warranted by recent events without unfairly burdening the NYPD.
> Retention of the Guidelines' "Reservations" paragraph continues to
> insulate the NYPD from individual legal actions based upon
> perceived failures to follow the Guidelines which do not rise to a
> constitutional level.  Indeed, as with the present order and judgment,
> no liability on the part of the NYPD under a further revised Order
> and Judgment and Guidelines will attach unless a constitutional
> violation does occur; the effect of the revision is to make a violation
> of the Constitution a contempt of the Court's order as well.  That
> consequence should not unduly trouble the NYPD, which I will
> assume is not engaged in thinking up ways to violate the
> Constitution.  Moreover, the history of this class action, going back
> to the entry of the first consent decree in 1985, reflects the parties'
> understanding that Class Counsel, not individual plaintiffs, would
> bring any motion to hold the NYPD in contempt.

288 F. Supp. 2d at 418-19 (footnote omitted).[6]

_____

[6]  The Guidelines' "Reservations" paragraph referred to in that part of *Handschu V* quoted
in text provides in pertinent part: "These guidelines are set forth solely for the purpose of internal
NYPD guidance.  They are not intended to, do not, and may not be relied upon to create any
rights, substantive or procedural, enforceable in law by any party in any matter, civil or criminal,

I confess with some chagrin that while the text of this opinion and its implementing order, read together, may not be as opaque as the irritatingly baffling pronouncements of the Oracle at Delphos, they do not constitute a model of clarity. Corporation Counsel can, and do, find support in the quoted order for the interpretation articulated by Mr. Farrell and Ms. Donoghue, namely, that only a violation of the Constitution can constitute a violation of the Guidelines. Class counsel can, and do, find support in the quoted opinion for their interpretation, namely, that while individuals can complain only of Guidelines violations which also violate the Constitution, class counsel can complain of any material departure by the NYPD from the Guidelines.

While both interpretations may be grammatically permissible, that of class counsel is the correct one. It more accurately captures the nature of the case and its resolution. The Constitution says what it says. Generations of lawyers, judges, and academics earn their daily bread by debating what the Constitution's words mean; but all their learning, piety, or wit may not cancel or add half a line or wash out a word of it. If all the Handschu Guidelines do is forbid NYPD conduct that the Constitution forbids, those involved in the case have been wasting their time. I reject that interpretation. It is entirely appropriate for a consent decree or guidelines such as these to prohibit police activity which the Constitution would allow. Such decisions are found in case law. *See, e.g., Alliance to End Repression v. City of Chicago*, 237 F.3d 799, 802 (7th Cir. 2001) (Posner, J.) ("All this the First Amendment permits (unless the motives of the police are improper or the methods forbidden by the Fourth Amendment or other provisions of federal or state law), but the [original]

---

nor do they place any limitation on otherwise lawful investigative and litigative prerogatives of the NYPD or City of New York." *See* 288 F. Supp. 2d at 431. The intent of this paragraph is to restrict the claims of *individual* parties to police conduct that violates the Constitution. This limitation does not restrict the right of class counsel to claim that the NYPD violated the Guidelines themselves.

decree forbids.") (cited and quoted in *Handschu IV*, 273 F. Supp. 2d at 342-43).  So in the case at bar.  I hold that on a proper reading of this Court's prior opinions and orders, if Order 47 violates the Guidelines, class counsel may complain of that violation, even if the police conduct complained of does not violate the Constitution.  If one prefers constitutional parlance, class counsel have standing to do so.

That result is not changed even if one assumes that, contrary to the holding I have just announced, the only correct reading of the *Handschu V* order requires the NYPD to violate the Constitution in order to violate the Guidelines.  Such an order would have been improvidently made and consequently of no effect: improvident because violative of the Supreme Court's governing decision in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367 (1992).

While Corporation Counsel argue that recent litigated motions have stripped the Guidelines of their character as a "consent decree," both parties have previously and consistently agreed that the Original Handschu Guidelines constituted a consent decree.  That is why this Court's decision in *Handschu IV*, granting the NYPD's motion to amend those Guidelines, turned principally upon whether the NYPD had made the three showings that the Supreme Court in *Rufo* required be made by a party seeking to modify a consent decree over the objections of the other party to it.  *See Handschu IV*, 273 F. Supp. 2d at 336-48.  The second of these showings is derived from the Court's explicit direction in *Rufo* that "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor."  502 U.S. at 391.

Considering this factor in *Handschu IV*, I analogized it to an elevator in a building.  Having expressed the concern that, as proposed by the Modified Handschu Guidelines, "the modification elevator may have descended close to the constitutional floor,"  273 F. Supp. 2d at 344, I rejected

the NYPD's contention that the Guidelines' policy statement that police investigations of political activity will "conform to constitutionally guaranteed rights and privileges" was sufficient to leave the elevator safely and permissibly poised at the second or third landing. On that issue, I wrote in *Handschu IV*:

> Present Handschu is a part of the original consent decree, and the NYPD's motion seeks to modify it by eliminating all restrictions and limitations on police investigative activity other than the constitutional statement. What more could the NYPD do in order to descend all the way to the constitutional floor? The Constitution will continue to provide the benchmarks by which police conduct will be measured; it would do so even if Modified Handschu contained an explicit provision purporting to repeal the Constitution. Conceptually at least, the NYPD could have moved to vacate the consent decree rather than modify it, but it has sought modification, and accordingly the *Rufo* principles apply. I do not think that the Modified Handschu's constitutional policy statement, standing alone, preserves them from a disfavored descent to the constitutional floor.

*Id*. at 345. In *Handschu IV* I gave conditional approval to the Modified Handschu Guidelines because that policy statement did not "stand alone"; it was accompanied by other specific operative provisions whose effect persuaded me to "decline to hold that the Supreme Court's decision in *Rufo* mandates this Court's rejection of Modified Handschu on the ground that the modifications impermissibly conform to the constitutional floor." *Id*. at 348.

Given this Court's rationale in *Handschu IV*, framed in obedience to *Rufo*, the NYPD cannot now be heard to argue that Order 47 is impervious to challenge by class counsel solely because the Order and the police activities it authorizes may not violate the Constitution. That descent to the constitutional floor would run counter to the Supreme Court's decision in *Rufo* and this Court's decision in *Handschu IV*.

22

Consequently, the present motion turns upon whether Order 47 violates the Modified Handschu Guidelines, whether or not it also violates the Constitution.  I begin that analysis with a consideration of the supplemental submissions made by the parties in compliance with the Court's directions in *Handschu VI*.

### 4.    The "Note" in Order 47

#### a.  *The Court's Questions*

I have  previously observed that Order 47 contains a "Note" of seemingly central significance to the issues raised by this motion.  The Note is quoted in Part II.B.  It reminds NYPD officers that under the Modified Handschu Guidelines "the investigation of political activity may only be initiated by and conducted under the supervision of the Intelligence Division," and consequently provides that "members of the service not assigned to the Intelligence Division may not use video recording or photography for the purpose of investigating political activity, without the express written approval of the Deputy Commissioner, Intelligence."

Strangely, even inexplicably, the parties made no reference to the Note or its effect in their briefs and oral arguments.  Accordingly, in *Handschu VI* I directed counsel to file supplemental papers discussing the Note, including in the their submissions answers to the following questions:

> 1.  Since Order 47 was issued, how many requests has the Deputy Commissioner, Intelligence, received from "members of the service not assigned to the Intelligence Division" for his "express written approval" of video recording or photographing political activity?
>
> 2.  How many of these requests has the Deputy Commissioner granted and how many has he refused?
>
> 3.  What criteria does the Deputy Commissioner apply in granting or refusing such requests?

23

4.   Given the fact that the Order 47 Note refers to the Modified Handschu Guidelines and their application to the investigation of political activity, what criteria do members of the service who *are* assigned to the Intelligence Division apply in deciding whether or not to video or record political activity?

5.   What meaning should be ascribed to the phrase "investigation of political activity" as that phrase appears in the Note to Order 47?

2006 WL 1716919, at *4.

### b. *The NYPD's Responses to the Court's Questions*

Under the procedure directed by the Court, the NYPD responded first to these questions. Its response consisted of three sworn declarations and a brief of counsel.  The declarants are John Colgan, an Assistant Chief of the NYPD and the commanding officer of the Department's Counter-Terrorism Bureau; Thomas P. Doepfner, an attorney and Assistant Deputy Commissioner in charge of the NYPD's legal department; and David Cohen, the NYPD's Deputy Commissioner for Intelligence.

Chief Colgan's declaration does not undertake to answer the Court's questions.  His basic point is that "the videotaping of public events serves to help prevent and detect terrorist activity." Colgan Decl. ¶ 2.  Colgan focuses upon the use of video surveillance "to protect the city's critical transportation infrastructure, e.g., bridges/tunnels, and will be implementing plans to locate cameras at high risk public locations throughout the city to improve security at those locations."  *Id*. ¶ 12. Colgan's declaration continues:

Large public events such as the New Year's eve celebration and demonstrations present desirable targets because they concentrate a large number of people in a small area, in close proximity to multiple large buildings and/or symbolic targets.  For example, demonstrations have taken place at Times Square, the Stock Exchange, the United Nations, Foley Square and the Brooklyn

24

> Bridge, to name a few.
>
> The visible and open use of video cameras at these events serves to deter and detect terrorist activity just as it does at airports, in subways, and at other target locations here and throughout the world. The use of photographic equipment at public events serves a vital law enforcement purpose in our efforts to prevent acts of terror in this city.

*Id.* ¶¶ 13, 14. Colgan reasons that "terrorists place a high value on the guaranteed success of an attack which in large part depends on the level of security at the desired target," and "[t]he open and advertised use of video surveillance is an important counter-terrorism tool precisely because it raises the level of security," the presence of video cameras acting as "an obvious deterrent to any terrorist who does not want to be identified and detected." *Id.* ¶¶ 8, 9. Colgan finds support for this reasoning in recent incidents:

> The effectiveness of video surveillance in raising the security level has been demonstrated by the discontinuance of IRA attacks in the London subway system after surveillance cameras were installed. Its usefulness in detecting terrorists has also been demonstrated in the identification of the perpetrators in the 9-11 attack on the World Trade Center and the 2005 London subway bombings.

*Id.* ¶ 10.

In his declaration, Mr. Doepfner identifies himself as the NYPD Legal Bureau attorney who "was responsible for drafting Interim Order 47." Doepfner Decl. ¶ 2. After the Court approved the Modified Handschu Guidelines, Doepfner's office set about "drafting a new Department procedure to address generally the use of photographic and video equipment by members of the Department." *Id.* ¶ 4. Doepfner excluded from the new procedure "[c]ertain types of video and photographic activities . . . such as ongoing criminal or internal investigations, standard evidence collection, or arrest processing procedures, as well as closed circuit television or similar surveillance camera

systems for which there are separate procedures." *Id*.  The new procedure Doepfner's office drafted "was intended to address all other uses of such equipment, including videotaping at demonstrations and other large public gatherings or events." *Id*.  Order 47 sets forth the procedure Doepfner drafted and Police Commissioner Kelly approved.  *Id*.

Doepfner says that in drafting Order 47, he "was mindful of the practices developed under the guidelines contained in the Consent Decree (the "Old Guidelines") with respect to the use of photographic equipment and the importance of providing for supervision of the use of such equipment at the operations level."  Doepfner Decl. ¶ 5.  Given that history,  Doepfner states, Order 47 "continues the practices of (i) requiring a permissible operational purpose for the videotaping and photography of public events, including demonstrations, and (ii) requiring the application of the Handschu Guidelines (which as modified require Intelligence Division supervision) where that purpose is to investigate political activity."  *Id*.

Doepfner then turns his attention to the Note which *Handschu VI* directed the parties to discuss.  Since, in Doepfner's view, "the Modified Guidelines significantly changed the rules for investigating political activity which had been in place for over twenty years," he

> considered it important to make it clear that although photographic equipment could be used for a variety of legitimate law enforcement purposes, it was still prohibited *for the purpose of* investigating political activity without the express written approval of the Deputy Commissioner for Intelligence.  Thus, the Note that appears on page 2 of Interim Order 47 was included for the express purpose of reminding members of the Department of the continued restrictions on the investigation of political activity contained in the Modified Guidelines. . . .
>
> The Note did not intend to require every officer using photographic equipment at a demonstration or other public event to have the permission of the Deputy Commissioner of Intelligence to do so.

> Rather, when the *purpose* for using the equipment *is to investigate the political activity* itself, the Note reinforced that the investigation had to be initiated and/or supervised by the Intelligence Division pursuant to the Modified Guidelines.

Doepfner Decl. ¶¶ 6, 7 (emphases in original). "This interpretation of what constitutes the investigation of political activity," Doepfner concludes, "is consistent with a common sense approach to the practical law enforcement problems that arise in the context of large public events, political or otherwise." Doepfner supports that assertion by referring to Chief Colgan's declaration, which in Doepfner's paraphrase "points out, when an event, be it a demonstration, or the holding of a holiday such as Independence Day or New Year's Eve, concentrates a large number of people at a central location, it creates an attractive target for terrorists. Obviously the NYPD must police such events to insure the public safety." Doepfner Decl. ¶ 8.

The opening paragraphs of the declaration of Deputy Commissioner for Intelligence Cohen are consistent with these views. Cohen does not refer to the Note in Order 47 by name, but when it comes to the actual operation and effect of the Note, Cohen says this:

> To date, I have not received any requests from any NYPD commands to use photographic equipment for the purpose of monitoring political activity at demonstrations or other public events. In the event I were to receive such a request from an NYPD command other than the Intelligence Division I would treat it as a request to initiate an investigation under Section V of the Guidelines and would require the same procedures be followed in respect to that request as would be followed in respect to any other investigation of political activity, including that the request be submitted to me for final approval and that the investigation, if approved, be conducted under the supervision of the Intelligence Division.

Cohen Decl. ¶ 5. Cohen concludes:

> In summary, the Intelligence Division is only involved in the decision to use photographic equipment when the purpose of its use is the

> investigation of political activity. Decisions about whether to use
> photographic equipment at demonstrations for other law enforcement
> purposes, such as to record disorder should it occur, or to monitor
> police performance activity, are made by the relevant and responsible
> commands.

*Id*. ¶ 6.

The NYPD promulgated Order 47 on September 10, 2004. Cohen's declaration is dated July 25, 2006. His declaration shows that during that period, no NYPD command requested the approval by Cohen for video recording or photography contemplated by the Note. The parties have submitted subsequent supplemental briefs. The declarations have not been supplemented. Therefore I assume that up to the present time Cohen has not received any such request.

### c. *Affidavits Submitted by Class Counsel*

In addressing the questions the Court posed in *Handchu VI*, class counsel submitted three affidavits. They were sworn to by Lindsey Davis, a member of the staff of the Coalition for the Homeless, a nonprofit organization which advocates for the homeless population of New York City; Antonia Cedrone, a psychologist in private practice who serves as a volunteer legal observer at marches and rallies in the City; and Gideon Oliver, an attorney who has observed Critical Mass bicycle rides in Manhattan.

Davis says that on Sunday, December 4, 2005, he attended a march organized by the Coalition for the Homeless on the sidewalk in front of the townhouse home of New York City Mayor Michael Bloomberg on the north side of 79th Street between Madison and Fifth Avenues in Manhattan. The purpose of the march was to urge the Mayor to work to put an end to "Albany's three-decade control over New York City's rent laws." Davis Aff. ¶ 3. "The march had been negotiated with the New York City Police Department, and it took place with police permission."

*Id*. ¶ 4.  Davis continues:

> The march consisted of approximately 50 people who held signs and
> chanted on the sidewalk in a moving picket line.  Although the march
> was at all times lawful and peaceful, I observed that throughout the
> march, New York City Police officers stood in the street, directly
> next to the sidewalk where the march was taking place, and
> videotaped the people participating in the march.  The officers moved
> up and down the line and frequently held the camera just a few feet
> from the marchers, aiming the camera at participants' faces and the
> messages on the signs they carried.

> This videotaping took place throughout the approximately hour long
> period the march lasted.  To my knowledge, there was no illegal
> activity taking place at the march, and to my knowledge there were
> no people arrested at the march.

Davis Aff. ¶¶ 5, 6.

   Cedrone says in her affidavit:

> On March 19, 2005 I was serving as a volunteer Legal Observer on
> a march from Marcus Garvey Park in Harlem to Central Park.  I
> understand the march was sponsored by an organization called the
> International Action Center.

> Along the line of march on a city street, I observed officers from the
> New York City Police Department's TARU unit videotaping rally
> participants.  The officers were photographing the participants at
> various points along the march from Harlem to Central Park.  The
> marchers were lawfully and peacefully walking, and no arrest or
> police enforcement activities were in progress at the time of this
> videotaping.  I clearly remember the officers photographing the
> marchers, because I took a still photograph of the officers
> videotaping in my direction.  I have reviewed that photograph in
> connection with preparing this affidavit.

Cedrone Aff. ¶¶ 2, 3.

   Oliver's declaration focuses upon an activity called "Critical Mass bicycle rides,"

in which bicyclists in a number of cities, including New York, ride *en masse* to promote their rights

29

and those of pedestrians to use the streets, and to call attention to the air and noise pollution cars

create in city traffic.  The rides take place on the last Friday of a month.  For Critical Mass rides in

Manhattan, bicyclists, well-wishers, and members of the press have gathered in Union Square Park

at about 7:00 p.m.  "The bicyclists in the front of the ride typically determine where the ride is going.

There is no pre-determined route and no formal leadership."  Oliver Aff. ¶ 5.  These rides have taken

place "[f]or more than a decade prior to August of 2004."  *Id.*

Participants in Critical Mass bike rides and the NYPD have come into frequent and

confrontational contact with each other over the years, resulting in civil and criminal litigation in

this Court and state courts.[7]  Mr. Oliver represented Critical Mass bicycle riders in a number of the

---

[7] *See, e.g.*, *Bray v. City of New York*, 346 F. Supp. 2d 480 (S.D.N.Y. 2004) (Pauley, J.)
(preliminarily enjoining City and the NYPD from seizing bicycles used by participants in an
October 2004 Critical Mass bike ride unless those participants are provided with notice of the
reasons for the seizure or are charged with a crime or violation of law, and denying City's cross-
motion for a preliminary injunction to enjoin Critical Mass bike rides absent a parade permit);
*Bray v. City of New York*, 356 F. Supp. 2d 277, 287 (S.D.N.Y. 2004) (Pauley, J.) (declining to
exercise supplemental jurisdiction over City's counterclaim seeking to enjoin Critical Mass bike
ride participants from gathering in Union Square Park without a Parks Department permit and
engaging in a bicycle precession without an NYPD parade permit) ("[C]omity dictates that this
Court avoid entanglements in the enforcement of local laws involving novel questions."); *People
v. Bezjak*, 11 Misc.3d 424 (Crim. Ct. N.Y. Cty. 2006) (after bench trial, dismissing count in
information charging eight Critical Mass bike ride participants with parading without a permit
because the City's parade permit scheme was facially unconstitutional; dismissing count charging
participants with failing to comply with a lawful order to disperse for lack of legal sufficiency;
and convicting participants on count charging disorderly conduct by obstructing vehicular and
pedestrian traffic); *Kelly v. Times' Up, Inc.*, 11 Misc.3d 1052(A) (Sup. Ct. N.Y. Cty. 2006)
(denying motion of City and the NYPD and Parks Department commissioners for a preliminary
injunction with respect to the pre-ride gatherings for the Critical Mass rides, advertising of the
rides, or the rides themselves); *People v. Barrett*, 13 Misc.3d 929, 948 (Crim. Ct. N.Y. Cty 2006)
(on pre-trial motions, dismissing on statutory and constitutional grounds counts against Critical
Mass bike riders for parading without a permit;  dismissing on the pleadings counts charging
disorderly conduct against three of four defendants; but denying motion to dismiss by the fourth
because "her alleged conduct of running a red light with a large group of cyclists could cause
serious disorder and, contrary to the statements in defendant's motion, certainly provided an
appropriate basis for the officer to arrest her").

cited cases.  He was contacted by Franklin Siegel, Esq., one of the counsel for the plaintiff class in

the instant case, and asked to give a declaration in support of the present motion.  Siegel advised

Oliver that the actions of NYPD officers in "videotaping and/or photographing people who had been

riding bicycles when stopping them to arrest them or issue a summons" was not the subject of the

present motion, Oliver Decl. ¶ 8, and Oliver's declaration does not describe such conduct.  Instead,

Oliver describes NYPD videotaping and photographing he observed which involved "the NYPD

taking footage of individuals lawfully engaging in political activity in city parks or streets either

standing around talking or riding bicycles."  *Id.*

Specifically, Oliver  says that "[i]n connection with my representation of people arrested by

the NYPD for their alleged participation in Critical Mass rides," he has reviewed footage produced

to him in discovery and taken by TARU officers between October 2004 and May 2005, much of

which "shows people lawfully gathering in Union Square Park or people lawfully riding their

bicycles."  Oliver Decl. ¶ 20.  In addition, on a number of days during the same period Oliver

> personally observed people I understand to be NYPD officers,
> footage from whom I have since received as discovery materials from
> the Office of the District Attorney of New York County, videotaping
> class members gathered prior to Critical Mass bicycle rides in Union
> Square Park from approximately 6:00 p.m. or earlier and
> approximately 9:00 p.m. or later.
>
> At the time this videotaping took place, class members were
> generally standing or sitting and talking with each other in a
> completely lawful manner.  Class members were not blocking
> pedestrians or engaging in anything which could be characterized as
> anything other than casual park use.
>
> On at least January 28, April 29, and May 27, 2005, I personally
> observed NYPD officers videotaping class members riding their
> bicycles on the public roadways in full compliance with all
> applicable laws and regulations.  I identified the individuals in

question as NYPD officers by viewing videotape provide to me by
the Office of the District Attorney of New York County.

*Id*. ¶¶ 20, 21, 22.[8]

> ### 5.   Does Order 47 and/or NYPD's Videotaping and Photographing Activity as Revealed by this Evidence Violate the Modified Handschu Guidelines?

In addressing these core questions, I note at the outset that the NYPD does not seek to justify any of its videotaping or photographing activity on the basis of a written approval given by the Deputy Commissioner, Intelligence, as contemplated by the Note to Order 47. The reason is simple. Since Order 47's promulgation in September 2004, no Borough or Bureau Commander has ever asked the Deputy Commissioner of Intelligence for permission to use video recording or photography "for the purpose of investigating political activity," as that phrase is used in the Note. Accordingly the NYPD's contentions on this aspect of the case must be that (1) the videotaping and photographing revealed by the present record are sanctioned by Order 47 *without reference to the Deputy Commissioner of Intelligence*; and (2) in sanctioning such conduct, Order 47 does not violate the Modified Handschu Guidelines.[9]

While Mr. Doepfner, the draftsman of Order 47, declared his purpose to be the formulation of "a new Department procedure to address generally the use of photographic and video equipment by members of the Department," there was no need to do so with respect to the use of that

---

[8]  Oliver's declaration does not say so explicitly, but I understand his references to "class members" to mean Handschu class members.

[9]  As noted in Part IV.A.2., *supra*, the NYPD contends that only a violation of the Constitution can be said to violate the Guidelines. I rejected that argument for the reasons stated in Part IV.A.3. Constitutional issues are discussed in Part IV.B., *infra*.

equipment in the investigation of political activity.  That subject is already covered by the Modified Handschu Guidelines.  The NYPD does not contend, nor could it validly do so, that Commissioner Kelly had the authority to achieve a unilateral modification of the Guidelines by issuing Order 47.

The Note in Order 47 says that police "may not use video recording or photography for the purpose of investigating political activity, without the express written approval of the Deputy Commissioner, Intelligence."  The Doepfner and Cohen declarations and the language of the Note together indicate that the NYPD believes the Modified Handschu Guidelines *only* apply to investigations conducted when their purpose is to investigate the political activity itself.  *See* Doepfner Decl. ¶ 7 ("[W]hen the purpose for using the equipment is to investigate the political activity itself, the Note reinforced that the investigation had to be initiated and/or supervised by the Intelligence Division pursuant to the Modified Guidelines.").  This is far too narrow a reading of the Guidelines.  Solely politically-based investigations are flatly prohibited by the Guidelines.  Section II says, "It is important that such investigations not be based solely on activities protected by the First Amendment  When, however, statements advocate unlawful activity, or indicate an apparent intent to engage in unlawful conduct . . . an investigation under these guidelines may be warranted. . . ."  In other words, there must *always* be a legitimate law enforcement purpose—having a purpose of investigating political activity exclusively for its own sake is never allowed.  The Note's misreading of the Guidelines may explain why no police commander has asked Deputy Commissioner Cohen for permission to videotape demonstrations.  Those reading the Note may have understood that as long as there was a legitimate law enforcement purpose *in conjunction with* investigation of the political activity, the Guidelines did *not* apply, whereas in fact under the Guidelines, as long as there is a legitimate law enforcement purpose in conjunction with an

investigation which involves political activity, the Guidelines apply.[10]  The presence of a legitimate

law enforcement purpose is thus a necessary condition, not a factor that eliminates the protocol

established by the Guidelines and sanctions unrestrained police action.

The incidents related  in the affidavits submitted by class counsel occurred after Order 47

was distributed to the several NYPD commands.  One may charitably assume that the police

conducted themselves in the manners described because they believed that Order 47 authorized them

to do so.  But the question is not whether Order 47 allowed that conduct.  The question is whether

the Modified Handschu Guidelines prohibited it.

The participants in the Critical Mass bicycle demonstrations described by Oliver do appear

to have been engaging in political activity falling within the Modified Handschu Guidelines protocol

for investigation.  However, it is clear that some Critical Mass bikers thought the best way to get

their message across was to engage in the unlawful and dangerous practices of running red lights

and impeding automobile traffic.   Under the Guidelines, police videotaping of Critical Mass

demonstrations was likely to have been proper *if authorization was sought and given*, because there

appears to have been reason for the police to believe that unlawful activity would occur.  This is a

classic case of application of the Guidelines: political activity on the part of individuals, but

legitimate law enforcement purpose on the part of the police.  It is precisely the sort of situation

where the Guidelines require adherence to certain protocols but ultimately give the NYPD the

flexibility to pursue its law enforcement goals.  Order 47 cannot shortcut the Guidelines' procedures

---

[10] *See also* Section III ("These guidelines apply only to investigations which involve
political activity.  They do not apply to, or limit, other activities of the NYPD in the investigation
or detection of unlawful conduct, the preservation of the peace and public safety or other
legitimate law enforcement activities which do not involve political activity.").

to sanction such videotaping without recourse to the Guidelines.

Police videotaping of the demonstrations by Coalition for the Homeless and the International Action march are even more egregious when analyzed under the Guidelines.  No reasonable person, and surely not this Court, is unaware of the perils the New York public faces and the crucial importance of the NYPD's efforts to detect, prevent, and punish those who would cause others harm.  But I cannot avoid the conclusion that the police conduct aimed at members of the Coalition for the Homeless, recounted in Lindsey Davis's affidavit, violated the Modified Handschu Guidelines.  Here, on an early December Sunday, having previously obtained NYPD permission, are a group of about 50 people carrying signs, chanting, and walking in a picket line before the Mayor's residence on 79th Street, trying to enlist the Mayor's aid in relaxing state government control over city rent laws.  This is a quintessential "political activity" as defined in Section II(A) of the Modified Handschu Guidelines: "The exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions."  And there are police officers, videotaping the marchers, holding their cameras just a few feet from them and aiming them at the marchers' faces and the signs they carried.  This is a quintessential "investigation" as defined in Section II(C) of the Guidelines: "A police activity undertaken to obtain information or evidence."  And those camera-wielding police did not just happen to be in the neighborhood.  Some commanding officer, presumably not the Deputy Commissioner for Intelligence, sent them there with orders to conduct the investigation which Davis's affidavit describes.

One searches the Modified Handschu Guidelines and the Patrol Guidelines which form a part of them in vain for provisions authorizing this sort of police investigation of that sort of political

activity.  On the contrary: by spelling out in detail the police procedures to be followed in investigating political activity, the Guidelines by necessary implication prohibit any investigation that does not comply with them.  This investigation into a political activity should have been "initiated by, and conducted under the supervision of the Intelligence Division," Patrol Guidelines Section IV(1), and should have taken place only if circumstances existed to justify one of the three "levels of investigative activity" delineated in Section V: checking of leads, a preliminary inquiry, or a full investigation.  Moreover, even the lowest level of investigation requires the police to possess information suggesting that unlawful activity may occur.  *See* Section V(A) ("checking of leads" requires information received by the police to be "of such a nature that some follow-up as to the possibility of unlawful activity is warranted").  Here there was no reason to suspect or anticipate that unlawful or terrorist activity might occur, or that pertinent information about or evidence of such activity might be obtained by filming the earnest faces of those concerned citizens and the signs by which they hoped to convey their message to a public official.  Similar concerns arise and similar inferences may be drawn with respect to the March 19, 2005 NYPD videotaping of the International Action March described by Cedrone.

These two demonstrations stand on a different footing from the Critical Mass bicycle rides. Police conduct, on those two occasions at least, would seem to be just as egregious as that conduct described in the affidavits of the war protesters which led this Court to issue its order in *Handschu V*.  There is no discernible justification for the apparent disregard of the Guidelines.

Chief Colgan's declaration does not suffice.  Colgan describes the importance of video surveillance "to protect the city's critical transportation infrastructure, e.g., bridges/tunnels;" voices an intention to "locate cameras at high risk public locations throughout the city to improve security

at those locations;" states that "[l]arge public events such as the New Year's eve celebration and demonstrations present desirable targets because they concentrate a large number of people in a small area, in close proximity to large buildings and/or symbolic targets;" opines that "[t]he visible and open use of video cameras at these events serves to deter and detect terrorist activity just as it does at airports, in subways, and at other target locations here and throughout the world;" and asserts that "[t]he effectiveness of video surveillance in raising the security level has been demonstrated by the discontinuance of IRA attacks in the London subway system after surveillance cameras were installed." All Chief Colgan's assertions may be true, but they are not relevant to the central issue presented by this motion, namely, whether the NYPD's videotaping practices revealed by this record violate the Modified Handschu Guidelines.[11]  Indeed, Colgan's stress upon videotaping large, traditional or well-advertised public gatherings, airports, bridges, tunnels, and subway lines as a terrorism deterrence has the unintended consequence of showing that more modest and unheralded political gatherings, such as the Coalition for the Homeless demonstration, are less likely to attract terrorists bent upon destruction, or to deter terrorism by the open and public display of video recorders and cameras. Moreover, the Modified Handschu Guidelines have no application to First Amendment-neutral video camera surveillance of traffic, human or mechanical, at airports, bridges, tunnels, and subway lines.

Nor does Section VIII(A)(2) of the Patrol Guidelines furnish any support to the NYPD on this motion. The authority therein conferred upon the NYPD "to visit any place and attend any event that is open to the public, on the same terms and conditions of the public generally," cannot be

---

[11]  Class counsel argue in their written submissions that various British and American studies question the efficacy of fixed video cameras in public places in deterring acts of terrorism. This is a quibble, and an irrelevant one at that.

stretched to authorize police officers to videotape everyone at a public gathering just because a visiting little old lady from Dubuque (to borrow from *The New Yorker*)[12] could do so.  There is a quantum difference between a police officer and the little old lady (or other tourist or private citizen) videotaping or photographing a public event.  Section VIII(A)(2) provides in plain language that police officers may attend public places and comport themselves in all ways as do members of the public *only* "[f]or the purpose of detecting  or preventing terrorist activities."  The record does not suggest that such a showing could be made with respect to the videotaped Coalition for the Homeless or International Action Center political activities.

There is one remaining possible explanation for the police videotaping of these political activities: the police commander involved may have interpreted language in Order 47 as authorizing his action.  Specifically, the "Scope" section of the Order, after stating that "permissible operational objectives" justify "the use of video and photography by members of the service to accurately record police operations and other public activity," lists as non-exhaustive examples of permissible operational activities "preparing training and monitoring and/or assessing: emergency incidents, traffic control, crowd control (parades, demonstrations, etc.), counter-terrorism, public safety, crime, or disorder conditions, deployment of police resources, etc.," as well as "accurately documenting events, actions, conditions or statements made during special events, disorder events, arrests, public assemblages or any other critical incident in which such accurate documentation is deemed potentially beneficial or useful."  So open-ended, vaguely stated, and permissive descriptions of "permissible operational objectives," together with the Note, may have induced police commanders

---

[12]  "The 'Old Lady' term was created by Harold Ross, founder of *The New Yorker* magazine, who said in his 1925 prospectus for the publication that it would not be directed to 'the little old lady in Dubuque.'"  *Des Moines Register* - "Famous Iowans."

to believe that they were authorized to videotape or photograph individuals engaged in nothing more than constitutionally protected political activity, with no reason for the police to suspect or anticipate unlawful or terrorist activity. The events disclosed by this record strongly suggests that this has happened (and may be continuing to happen).

But Order 47 may not validly be read to authorize such investigative conduct. Order 47 may validly confer authority and establish procedures for police videotaping and photography for purposes other than the investigation of political activity. However, with respect to the investigation of political activity, Order 47 may not trump the Modified Handschu Guidelines. Police investigation of political activity must conform to those Guidelines, and commanders cannot avoid that obligation by affixing a different label to their "operational objective" in order to make that objective appear "permissible." The evidence on this motion indicates that police officers engaged in videotaping and photography which violated the Modified Handschu Guidelines.

**B.      The Alternative Claim of the Plaintiff Class that the Procedures Established by Order 47 and the Police Activities Revealed by the Evidence Give Rise to a Viable Constitutional Claim on Behalf of Class Members**

If, contrary to the conclusion I have reached in Part IV.A., the Order 47 procedures for videotaping and photography and the police videotaping practices revealed by the evidence do not violate the Modified Handschu Guidelines governing NYPD investigations of political activity, I must consider the alternative claim of the plaintiff class – that the Order and the conduct constitute violations of the United States Constitution justifying equitable relief.

This alternative claim fails because, as the NYPD and Corporation Counsel contend, neither Order 47 on its face nor as it is apparently applied by police officers to the demonstrators described

on this record give rise to a viable constitutional claim.  This aspect of the case is governed by the

Supreme Court's decision in *Laird v. Tatum*, 408 U.S. 1 (1972), an unbroken line of Second Circuit

cases following and applying *Laird*, and the first reported opinion in the case at bar, authored by

Judge Weinfeld, my predecessor and the first *Handschu* judge.

The gravamen of the plaintiff class's present complaint is that being videotaped by police

officers during the peaceful and lawful exercise by class members of their First Amendment rights

is unpleasant, unsettling, and inhibits their constitutionally protected activities.  Thus Gideon

Oliver's declaration asserts:

> The NYPD has recently given notice of its intention to amend its
> administrative regulations regarding parades, processions, and races,
> in order to expand the definition thereof to include some 'groups' as
> small as two people.  Many of my former clients have told me of
> their interest in attending the public hearing regarding the proposed
> rule change the NYPD is holding on August 23, 2006, but that they
> are hesitant to testify at the hearing in light of the likelihood that they
> will have to provide their signatures, and more photographs or video
> images, to the NYPD.

Oliver Decl. ¶ 23.  Lindsey Davis, the Coalition for the Homeless staffer, says in his affidavit:

> I and other march organizers were dismayed to see the Police
> photographing and videotaping us and the other march participants.
> We at the Coalition work with a vulnerable constituency.  I and
> others I spoke with found it intimidating to have police taking our
> pictures while we lawfully petitioned New York City's Mayor.

Davis Aff. ¶7.

These sentiments, while understandable in human terms, fall well short of articulating a

justiciable constitutional claim.  In *Laird* the plaintiffs, four individuals and nine unincorporated

associations, sued on their own behalf and on behalf of all other individuals and organizations who

wished to exercise their First Amendment rights "without fear of harassment, intimidation and injury

resulting from investigation, surveillance and record keeping by military authority."  Complaint ¶

5 (quoted in *Fifth Ave. Peace Parade Comm. v. Gray*, 480 F. 2d 326, 330-31 (2d Cir. 1973)).  The

complaint in *Laird v. Tatum* further alleged that the intelligence agencies of the United States Armed

Forces were continually engaged in the surveillance of lawful and peaceful civilian activity, that the

information collected concerning the plaintiffs served no legitimate purpose, was widely and

indiscriminately disseminated, and stored in computerized data banks.  It further alleged that a

blacklist of potential troublemakers had been compiled.  The plaintiffs further claimed that the

defendants' activities inhibited and curtailed their free exercise of First Amendment Rights and

deprived them of their constitutionally guaranteed right of privacy.

> The Supreme Court, reversing the Court of Appeals, held:

> > Allegations of a subjective "chill" are not an adequate substitute for
> > a claim of specific present objective harm or a threat of specific
> > future harm; the federal courts established pursuant to Article III of
> > the Constitution do not render advisory opinions.

408 U.S. at 13-14 (citation and internal quotation marks omitted).

> In *Gray*, the first Second Circuit case decided after *Laird v. Tatum*, the Court of Appeals

reached the same conclusion with respect to the complaint of organizers of an anti-Vietnam war

demonstration, who alleged that an FBI investigation, conducted immediately prior to the

demonstration and pursuant to which a special bank account was examined by an agent, the number

of busses reserved by an organization ascertained, and bus departures observed, "has and will restrict

and inhibit the Individual plaintiffs and the members of the Class from the lawful exercise of

[constitutional] rights, has and will place them in fear of repression and retaliatory acts by agencies

of the United States Government, and has and will intimidate, harass and have a chilling effect upon

the individual plaintiffs and the members of the Class in the lawful exercise of such rights."  480

F.2d at 330.  Affirming the district court's dismissal of the complaint after bench trial, the Second

Circuit said:

> We believe that this case is governed by *Laird v. Tatum*, 408 U.S. 1
> (1972), and accordingly we affirm the judgment below on the ground
> that plaintiffs failed to present a justiciable controversy. . . . In *Tatum*
> as we have indicated, the Court found mere speculative apprehension
> of future misuse of information and hence no objective harm and no
> justiciable issue.  This case is no different.  There is no showing of
> any misuse of information and the plaintiff's allegations on
> information and belief with respect to photographs, check duplication
> and list compilation were not established and in fact disproved.

As Judge Mulligan added in his characteristically striking way: "The shivering here was self-

induced."  480 F.2d at 330-31.

More recent Second Circuit cases adhere to the Supreme Court's ruling in *Laird v. Tatum.

See*, *e.g., Hankard v. Town of Avon*, 126 F. 3d 418, 423 (2d Cir. 1997) (quoting *Laird*'s reference

to "to the established principle that to entitle a private individual to invoke the judicial power to

determine the validity of executive or legislative action he must show that he has sustained, or is

immediately in danger of sustaining, a direct injury as a result of that action," 408 U.S. at 13 and

holding that "plaintiffs must make specific allegations that indicate a deprivation of constitutional

rights; general, indirect and conclusory allegations are not sufficient"); *Gill v. Pidlypchak*, 389 F.3d

379, 382 n.4 (2d Cir. 2004) (collecting cases deriving from *Laird v. Tatum*, "a case in which, once

again, the only harm alleged was the chilling of plaintiffs' speech").

Finally, in this Court's first *Handschu* opinion, Judge Weinfeld noted that "[t]he use of

informers and infiltrators by itself does not give rise to any claim of violation of constitutional

rights."  349 F. Supp. at 769. The Handschu plaintiffs' complaint survived a motion to dismiss

because it went on to allege that "the informers and infiltrators provoked, solicited and induced members of lawful of political and social groups to engage in unlawful activities," and "provided funds and equipment to further that purpose." *Id.* at 770. The present motion is not supported by comparable specific assertions.

In sum, there is no discernible way to distinguish the apprehensions and feelings of intimidation expressed by the plaintiffs in *Laird v. Tatum* and its progeny from the sentiments expressed by Handschu class members on the present motion. Class counsel's briefs argue that there are factual differences between the governmental conduct in *Laird* and in the case at bar, but to the extent such differences exist, they do not affect or allow the plaintiff class to avoid *Laird*'s core holding about justiciability. Accordingly, this Court is bound by *Laird v. Tatum* and subsequent Second Circuit case law, and concludes that if the validity of Order 47 and the NYPD practices of videotaping and photographing demonstrators depended solely upon the demonstrators' First Amendment rights, no constitutional claim is presented, and hence cannot be the basis for injunctive relief.

## C.   Retention of Videotapes and Photographs

As noted in Part II.C., the Order 47 procedures require the NYPD to maintain all photographs and video recordings prepared in connection with the Order's procedures for a "minimum" of one year from the date the images were recorded. The responsible NYPD officers are directed to prepare and maintain a written summary describing the event and activities in each recording, to assist in indexing and retrieval. Materials will be retained if they "contain evidence of criminal activity" and consequently are considered evidence, or if they are deemed valuable for other purposes such as litigation, training, and after-action reports. If the materials do not meet

43

those criteria, they "may" be destroyed after one year.

While class counsel disapprove of these provisions, I think that they are reasonable – to the extent that the videotaping itself is conducted in accordance with the Modified Handschu Guidelines. Doepfner, the member of the NYPD legal staff, says that the "NYPD does not create data bases or dossiers of any kind from videotapes and has never done so. Indeed, virtually the only time these tapes have ever been duplicated or requested has been in the context of civil or criminal litigation or the investigation of complaints against officers by the Civilian Complaint Review Board." Doepfner Decl. ¶ 9. Mr. Doepfner is an officer of the Court and I accept his representations.

Furthermore, he and Corporation Counsel are correct in asserting that there is a need to preserve tapes for criminal proceedings and civil litigation, a circumstance which prevents a cutoff date by which such material *must* (as opposed to *may*) be destroyed. That practical reality is evidenced by Mr. Oliver's declaration, as an attorney who has represented participants in the Critical Mass bicycle demonstrations in litigating claims against the NYPD and the City arising out of police arrests of bikers and seizure of their bicycles. It appears from Oliver's declaration that he has been assisted in that litigation by videotaped footage he obtained from the district attorney in pretrial discovery. Had such footage been destroyed by the NYPD, with knowledge of pending or threatened litigation, one would expect Mr. Oliver to charge the NYPD with spoliation of evidence. It is not fair to put the NYPD in a "damned if you do, damned if you don't" dilemma. The written records which Order 47 requires be maintained in connection with such materials appear adequate to allow interested parties, including present class counsel, to pursue the matter further, in aid of a contention that the Modified Handschu Guidelines may have been violated. Further requirements

for logging requests for the use of video and photographic equipment are contained in ¶¶ 2-5 of the Procedure section of Order 47.  In consequence, there is no compelling showing that the Court should strike down Order 47's procedures for the retention of material.

### D.    <u>The Appropriate Remedy</u>

Class counsel pray for an order "enjoining enforcement of New York Police Department Interim Order 47."  Mot. at 2.  That requested remedy paints with too broad a brush.  Order 47 provides the procedures for *all* videotaping and photographing activity by officers of the NYPD for *any* purpose.  The Order is necessarily applied in countless situations where political activity is nowhere to be seen.  As noted *supra*, the Modified Handschu Guidelines relate solely to political activity, as defined in the Guidelines.  Consequently, the Court has no basis for enjoining police use of such equipment for investigations which bear no discernible relationship to political activity.

The need for a remedy arises if, and to the extent that, members of the NYPD are relying upon Order 47 to use video and photographic equipment to further investigations involving political activity.  Such investigations are governed by the Modified Handschu Guidelines.  To the extent that the NYPD and Corporation Counsel did not previously understand that a violation of the Guidelines (as opposed to a violation of the Constitution) would be sufficient to entitle the plaintiff class to relief, they will understand it now.  Certainly, any future use by the NYPD of video and photographic equipment during the course of an investigation involving political activity without compliance with the Guidelines' protocol could form the basis for a contempt proceeding.

In order that the Court's resolution of these issues may be promptly disseminated to all NYPD commands, the Order accompanying this Opinion will direct the Commissioner to forward to all Patrol Borough/ Bureau Commanders and other NYPD Unit Commanders copies of this

Opinion and Order, with the instruction that those officers study them carefully.

After counsel for both sides have considered this Opinion and Order, they may if so advised file and serve additional submissions with respect to the form that the remedy should take. Such submissions must be served and filed not later than March 16, 2007. Responsive papers must be served and filed not later than March 30, 2007.

**E.    Release of the Submissions on this Motion to the Public**

While by prior Order the Court directed that the submissions on this motion be sealed, class counsel take the position that these submissions should now be docketed and filed as public documents.

There is a presumption that judicial documents and other documents generated by litigation should be available to the public. The burden is upon a party seeking to place or keep such documents under seal to demonstrate why that should be done. In this case, Corporation Counsel are directed to advise the Court and class counsel forthwith if the NYPD interposes no objection to making the file public at this time. If Corporation Counsel take a contrary view, they must file and serve papers in support of that submission on or before March 16, 2007. Class counsel may have until March 30, 2007 to respond.

**V.  CONCLUSION**

For the foregoing reasons, it is Ordered as follows:

1. The videotaping or photographing by the NYPD of any individual or individuals engaging in political activity must be conducted in accordance with the Modified Handschu Guidelines, and

46

in a manner consistent with this Opinion.

2.   To the extent that Interim Order 47 is inconsistent with the Modified Handschu Guidelines in areas where the Guidelines apply, the implementation of Interim Order 47 is enjoined.

3.   The Commissioner of the NYPD or his designated representative is directed to disseminate to all NYPD Borough, Bureau, and Unit commanding officers copies of this Opinion and Order, with an instruction to study them carefully and comply with the Opinion and Order. An affidavit by an officer with knowledge of the facts attesting that this dissemination has been accomplished must be filed and served not later than March 2, 2007.

4.   Further submissions by the parties may be filed and served in accordance with the directions contained in the Opinion.

It is SO ORDERED.

Dated: New York, N.Y.
February 15, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE