UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
BARBARA HANDSCHU, RALPH DIGIA,
ALEX McKEIVER, SHABA OM, CURTIS :
M. POWELL, ABBIE HOFFMAN, MARK
A. SEGAL, MICHAEL ZUMOFF,            :
KENNETH THOMAS, ROBERT RUSCH,                71 Civ. 2203 (CSH)
ANETTE T. RUBENSTEIN, MICHEY       :
SHERIDAN, JOE SUCHER, STEVEN                 MEMORANDUM OPINION
FISCHLER, HOWARD BLATT and          :                AND ORDER
ELLIE BENZONE, on behalf of themselves
and all others similarly situated,             :

                              Plaintiffs,      :
          -against-

SPECIAL SERVICES DIVISION, a/k/a      :
BUREAU OF SPECIAL SERVICES,
WILLIAM H.T. SMITH, ARTHUR          :
GRUBERT, MICHAEL WILLIS,
WILLIAM KNAPP, PATRICK              :
MURPHY, POLICE DEPARTMENT
OF THE CITY OF NEW YORK,            :
JOHN V. LINDSAY and various unknown
employees of the Police Department acting  :
as under-cover operators and informers,

                              Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

HAIGHT, Senior United States District Judge:

         In an opinion and  accompanying order dated February 15, 2007 and reported at 475 F. Supp.

2d 331 (S.D.N.Y. 2007) ("*Handschu VII*" or "the 2/07 Order"), familiarity with which is assumed,

the Court granted the motion of counsel for the plaintiff class ("Class Counsel") to enjoin the

implementation of Interim Order 47 ("Order 47") issued by Commissioner Raymond Kelly of the

New York Police Department ("NYPD") to regulate the NYPD's photographing and videotaping

of public demonstrations and participants in them.

The NYPD, represented by the Corporation Counsel of the City of New York ("Corporation Counsel"), now moves under Rules 59 and 60(b)(1), Fed. R. Civ. P., and Local Civil Rule 6.3 for an order "vacating, amending, altering, and/or reconsidering" the 2/07 Order and "relieving defendants" from an earlier order of this Court issued on August 6, 2003 (the "8/03 Order"). The NYPD also asks the Court to approve a Proposed Interim Order 47 (the "Proposed Order") to replace Order 47.

For the reasons that follow, the NYPD's motion is granted in part and denied in part. The 2/07 Order will be vacated and directions given to counsel for further submissions.

## I. BACKGROUND

### A.   Procedural History

I assume familiarity with all prior decisions in this action and set forth here only a summary of the events and rulings most pertinent to the NYPD's present motion.

The recent motions concerning Order 47 implicate a consent decree entered by this Court in an action filed in 1971 in which plaintiff citizens of New York City complained that those in charge of the NYPD were conducting surveillance and intelligence-gathering activities that violated their rights under the United States Constitution. *See Handschu v. Special Servs. Div.*, 349 F. Supp. 766 (S.D.N.Y. 1972) (*"Handschu I"*) (Weinfeld, J.) (denying defendants' motion to dismiss the complaint). A plaintiff class was certified. In 1985 the parties entered into a consent decree that established guidelines governing police conduct during investigations of political activity. *See Handschu v. Special Servs. Div.*, 605 F. Supp. 1384 (S.D.N.Y. 1985) ("*Handschu II*"), *aff'd* 787 F.2d 828 (2d Cir. 1986). I will refer to those guidelines, appended to the opinion in *Handschu II*,

as "Original Handschu" or "the Guidelines."

Original Handschu set up a three-person "Handschu Authority," comprised of the Deputy Commissioner for Legal Matters of the NYPD, the First Deputy Commissioner of the NYPD, and a civilian member appointed by the mayor upon consultation with the Police Commissioner. *See Handschu II*, 605 F. Supp. at 1420. Original Handschu's General Statement of Policy provided, "Activities of the Public Security Section (hereafter PSS) of the Intelligence Division will conform to constitutionally guaranteed rights and privileges. Information shall be collected, retained and disseminated by the PSS only in accordance with the provisions set forth herein." *Id.* The Guidelines provided that the NYPD "shall not engage in any investigation of political activity except through the PSS of the Intelligence Division or its successor and such investigations shall be conducted as set forth in these guidelines." *Id.* (Section IV(A)). The Guidelines defined "political activity" as "[t]he exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions" and "investigation" as "a police activity undertaken to obtain information or evidence." *Id.* (Section II).

Original Handschu set forth protocols to be followed corresponding to different levels of investigation: in certain circumstances an "Investigation Statement" specifying the factual predicate for the inquiry had to be filed; in others, additional approval had to be sought from the Authority. *See id.* at 1421 (Section IV(B)-(C)). For any level of investigation (apart from an "Event Planning Inquiry" that involved collecting logistical and other basic information about a planned public event), the police could not take action under the Guidelines unless they had received "specific information" that criminal activity was taking place or was about to take place. *See id.* (Section IV(C)). Section V provided, "At any time, a person or a member of a group or organization having

3

reason to believe that such person, group or organization has been named in PSS files as the result of an investigation in connection with or related to his, her or its political activities, may request in writing which sufficiently identifies the requesting party that the Authority make an inquiry of the PSS." *Id.* at 1422 (Section V).  Upon receipt of such a request, the Authority was then required to make an inquiry into the matter and to determine whether the Guidelines had been violated.  If the Authority determined that the NYPD investigation had not been conducted in compliance with the Guidelines, it was to submit a report to the Police Commissioner, who was then to take appropriate disciplinary measures.  *Id.* at 1423 (Section V).

In 1989 Class Counsel moved to hold the NYPD in contempt of the consent decree.  They claimed that a number of police activities, including the monitoring of a radio station and the subsequent  preparation and retention of summaries of its programs, had violated the Guidelines. I declined to hold the NYPD in contempt but did conclude that some of its activities had been improper.  I also clarified the scope and meaning of the Guidelines.  *See Handschu v. Special Servs. Div.*, 737 F. Supp. 1289 (S.D.N.Y. 1989) (*"Handschu III"*).

After the events of 9/11, the NYPD moved to modify the consent decree and Original Handschu.  The NYPD claimed that in order to combat the threat of terrorism in a changed world, it needed greater flexibility in intelligence gathering and dissemination than Original Handschu allowed.  In an opinion and order dated February 11, 2003, I granted the NYPD's motion and modified the consent decree and its accompanying Guidelines.   *See Handschu v. Special Servs. Div.*, 273 F. Supp. 2d 327 (S.D.N.Y. 2003) ("*Handschu IV*" or "the 2/03 Order").

The modified Guidelines eliminated the procedures set forth in Section IV concerning the NYPD's conduct of investigations.  All that remained of Original Handschu were the definitions of

4

"political activity," "investigation," and "Authority"; the continued existence of the Authority; and the first sentence of the General Statement of Policy stating that activities of the NYPD would conform to constitutionally guaranteed rights and privileges. The mandate of the Authority to review complaints by persons or groups was reduced to those situations in which the person or group had reason to believe that a police investigation had violated "constitutionally guaranteed rights and privileges." *See Handschu IV*, 273 F. Supp. 2d at 350 (Section V). In making its inquiry under the new regime, the Authority was only empowered to examine whether the investigation by the police "was conducted in conformity with the Constitution." *Id.* The text of the modified Guidelines made clear, then, that only violations of the United States Constitution were now subject to review by the Authority.

During the modification process, a question arose as to whether eliminating much of Original Handschu and tying any violation of what remained to the constitutional standard transgressed the Supreme Court's decision in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367 (1992). *Rufo* held that even if circumstances warranted modification of a consent decree, such modification should not "strive to rewrite [it] so that it conforms to the constitutional floor." 502 U.S. at 391. I addressed this concern in *Handschu IV* and concluded that while "the modification elevator may have descended close to the constitutional floor," *Handschu IV*, 273 F. Supp. 2d at 344, such a result did not descend all the way down for two reasons. The first was preservation of Section V, the section that charged the Authority with investigating complaints by individuals or groups. Of this section, I said:

> One can readily discern in Section V of Modified Handschu significant
> enhancements of the remedies secured to the public by the Constitution and the civil
> rights laws and the deterrent effect of those laws on unlawful police conduct. First,
> Section V gives the John Does of the City a very considerable leg up in pressing

their claims.  If the Authority reports to John Doe that no constitutional violation occurred, he may be disappointed, but his right to file a § 1983 action is undiminished.  Second, NYPD commanders will surely be aware that investigations for which they are responsible may have the unwanted effect of having the Handschu Authority come to call.

*Id.* at 346.

I also noted that the NYPD had committed to adopting into its Patrol Guide a version of guidelines concerning investigations of political activity that had been developed by the FBI after 9/11.  In my estimation, this commitment was "a relevant consideration in the 'constitutional floor' analysis required by *Rufo*."  *Id.*  In other words, the NYPD's undertaking to adopt and adhere to the FBI guidelines was a factor in the Court's constitutional floor analysis.  Indeed, I *conditioned* modification of the decree on the promulgation of these rules.[1]  *See Handschu IV*, 273 F. Supp. 2d at 349 ("If the NYPD complies with these conditions [including the promulgation of NYPD guidelines containing the substance of the FBI Guidelines], the Court will enter an Order modifying the decree.").[2]  When the NYPD complied with the Court's order directing them to promulgate the rules, and adopted as guidelines a document entitled "Guidelines for Investigations Involving Political Activity"  into its Patrol Guide, I approved modification of the consent decree in an order entered in April 2003.  Although Class Counsel asked me to do so, I did not at that time incorporate these "NYPD Guidelines" into the Court's Order and Judgment.

---

[1] I said in *Handschu IV* that "I do not think the Modified Handschu's constitutional policy statement, standing alone, preserves [the Guidelines] from a disfavored descent to the constitutional floor," 273 F. Supp. 2d at 345, but found sufficient saving factors in the particulars discussed in the text.

[2] The 2/03 Order also stated that the modified consent decree would require that the NYPD Guidelines "remain in the NYPD patrol guide unless otherwise directed by the Court."  *Id.*

This was the law of the case only for a short period of time. Upon learning of certain activities of the NYPD in conjunction with arrests at political protests, Class Counsel made a Rule 59(e) motion to alter or amend the Court's order approving modification. On August 6, 2003, I granted Class Counsel's motion. *See Handschu v. Special Servs. Div.*, 288 F. Supp. 2d 411 (S.D.N.Y. 2003) ("*Handschu V*"). I held that "the plaintiff class is entitled to a strengthening of the Judgment because the two-level display of operational ignorance on the part of the NYPD's highest officials with respect to an investigatory technique resonant with constitutional overtones, as revealed by this record, requires that enhancement." *Id.* at 418. I determined that a revision of the Order and Judgment would give plaintiff class "increased protection warranted by recent events without unfairly burdening the NYPD." *Id.* To provide this additional strengthening, I stated in the decretal portion of the Order:

> [I]n order to clarify and enhance the standing and authority of counsel for the plaintiff class to contend, if so advised, that violations of the said Guidelines have deprived a member or members of the plaintiff class of rights or freedoms guaranteed to them by the Constitution, the said Guidelines are, to that extent and for that purpose, incorporated by reference into and made a part of this Second Revised Order and Judgment.

*Id.* at 420.

The 8/03 Order was not the result of a modification motion, but rather a Rule 59 motion, *see id.* at 419 n.12. I did not perform another *Rufo* analysis or alter that analysis underlying the 2/03 modification. The 8/03 Order amended the 2/03 modification in order to incorporate the NYPD Guidelines into the decree, as described. The resulting combination of the text appended to the 2/03 Order and the text of the NYPD Guidelines (which appears as an appendix to the 8/03 Order) became the final version of the modified Guidelines, which I will refer to as "Modified Handschu."

At this point the modification process was complete. Modified Handschu is the version of

the decree under which the parties have coexisted since August 2003.  Nonetheless, it appears that uncertainty remained as to the consequences of my incorporation of the NYPD Guidelines into the Order and Judgment of the Court.  When Class Counsel appeared before the Court with their motion to enjoin Interim Order 47, they possessed one view of those consequences; it turned out that Corporation Counsel possessed quite another.  In *Handschu VII*, the 2/07 opinion and order, I granted Class Counsel's motion. For the reasons there stated, I held that Modified Handschu empowered the plaintiff class to seek relief – including contempt – for violations of the NYPD Guidelines and that Interim Order 47 violated the NYPD Guidelines.  It is this 2/07 Order that the NYPD's present motion requires me to revisit.

**B.    The NYPD's New Affidavits**

In support of its present motion, the NYPD submitted new affidavits whose provenance and content it is necessary to consider at some length.

In *Handschu VII*, I quoted three affidavits submitted by Class Counsel in response to questions the Court posed to both parties in an earlier memorandum opinion, 2006 WL 1716919 (S.D.N.Y. June 21, 2006) ("*Handschu VI*").  *See Handschu VII*, 475 F. Supp. 2d at 344-49.  One affidavit described police videotaping of participants in a march organized by the Coalition for the Homeless in front of Mayor Bloomberg's Manhattan townhouse home.  A participant's affidavit described the march, undertaken with police permission, as consisting "of approximately 50 people who held signs and chanted on the sidewalk in a moving picket line," with "no illegal activity taking place at the march" and no arrests made.  *Id*. at 347.  Another affidavit described police videotaping of participants in a march from Marcus Garvey Park in Harlem to Central Park.  A participant's affidavit described the marchers as "lawfully and peacefully walking," with no arrests made.

8

Class Counsel filed these affidavits on August 16, 2006.  The Court decided *Handschu VII*

on February 15, 2007.  During that interval, Corporation Counsel did not submit any affidavits

giving a different version of the events described.  In those circumstances, I regarded the affidavits

submitted by Class Counsel as accurate accounts of what transpired and gave them some prominence

in my opinion.  However, in support of the NYPD's present motion under Rule 59, Corporation

Counsel submit affidavits of attorneys in the NYPD Legal Department who observed these two

marches and give quite different accounts of what occurred.

As for the Coalition for the Homeless demonstration in front of the Mayor's house, the

affidavit of Mary C. Kilker transforms the participants from a group of citizens walking peacefully

and in good order on the sidewalk into an unruly and disobedient crowd, illegally blocking

pedestrian and vehicular traffic, and even forcing a mother and her child in a baby carriage off the

sidewalk and into the street.  Kilker says in her affidavit at ¶¶ 4-6:

> In advance of the event, the organizers reached an agreement with the NYPD with
> respect to marching on the south sidewalk on 79th Street, between Fifth and Madison
> Avenues (the "Sidewalk").  The Sidewalk is narrow, approximately seven and one
> half feet wide.  The agreement permitted demonstrators to walk two abreast on the
> Sidewalk and back again, provided there was sufficient space on the Sidewalk to
> simultaneously accommodate other pedestrians.  If not, a single file march would be
> permitted.  The demonstrators agreed to walk to Madison Avenue, turn around and
> walk back to Fifth Avenue.  Upon their return to Fifth Avenue the group was to
> demonstrate on the west side of Fifth Avenue at 79th Street, on either the north or
> south side of the transverse.  A second demonstration area was set up on the north
> sidewalk of 79th Street in front of 980 Fifth Avenue for a representative group of
> twenty five.
>   Despite this agreement, I observed the demonstrators marching slowly down the
> Sidewalk – taking up the entire Sidewalk – to the exclusion of all others.  As a result,
> several individuals, including a mother with a baby carriage and a small child were
> forced off the Sidewalk and into the street.  At this point the organizers of the event
> were warned that they were blocking pedestrian traffic, and they needed to proceed
> in single file.  When the demonstrators failed to comply with this directive and were
> clearly in violation of New York State Penal Law section 240.20 subdivision (5), the
> Technical Assistance Response Unit (TARU) was instructed to begin videotaping.

At this point members of the police department discussed making arrests.  While the demonstrators were in violation of the Penal Law and subject to arrest, the decision was made not to take enforcement action at that time.

   I have reviewed TARU's videotapes of the event from that date.  The tapes record pedestrians being into the street, large groups of demonstrators congregating on the corner of 79th Street and Madison Avenue completely blocking the crosswalk and demonstrators standing in the street beyond the parking lane thereby interfering with vehicular traffic.

The Marcus Garvey Park march, sponsored by an organization called the Troops Out Now

Coalition, was observed by a member of the NYPD Legal Department named Anne Eleanor Stone.

Stone says in her affidavit at ¶¶ 4-5:

   The event began with a rally in Marcus Garvey Park, followed by a march past a U.S. Army recruiting station on 125th Street and continued down to Central Park.  A rally was held in Central Park, after which a march proceeded to the Mayor's Residence where a final rally was held.  The entire event lasted approximately eight hours, with over four thousand participants.

   I reviewed the only two videotapes filmed by the Technical Assistance Response Unit (TARU) for this event.  The combined duration of the tapes is less than 20 minutes.  Included in the tapes are segments showing the crowd as they exited Marcus Garvey Park, an arrest which took place in front of the recruitment station, a group of demonstrators on bicycles riding in violation of New York City Traffic regulations, several thousand demonstrators marching towards Central Park, a contentious interaction between demonstrators and police, several thousand demonstrators marching out of Central Park, and a group of more than two demonstrators congregating together wearing masks in Central Park near 79th Street in violation of New York State Penal Law § 240.35(4).

The descriptions of events given by these two NYPD attorneys are materially at odds with

those given in the participants' affidavits submitted by Class Counsel in August 2006.  Why

Corporation Counsel waited until after the Court filed the 2/07 Opinion and Order before disputing

the Class's factual accounts "passeth all understanding."[3]   Surely the reason proffered by

Corporation Counsel is difficult to understand: they say that the defendants "did not make

---

[3]  Phil. 4:7.

submissions with respect to these events because plaintiffs' motion was a facial challenge to Interim Order 47," and "[h]ad defendants believed the Court's determination would be influenced by the accounts of class members," they "would have made a submission for the record."  Def.'s Mem., dated March 5, 2007, at 17 n.12.  While Class Counsel's initial motion could be read as limited to a facial attack upon the validity of Order 47, the Court's questions to the parties promulgated in *Handschu VI* clearly indicated a shift in the focus of the inquiry toward the manner in which the Order was implemented and applied.  Class Counsel, understanding that shift, submitted the event participants' affidavits.

Presumably Corporation Counsel promptly asked the NYPD about the accuracy of those accounts and were promptly given the Legal Department attorneys' conflicting narratives.  At that point Corporation Counsel had three options: ask the Court to disregard Class Counsel's affidavits because they were irrelevant to a facial challenge; ask leave to submit the NYPD version of the events; or do nothing, on the assumption that the Court would pay no attention to the participants' affidavits and decide Class Counsel's motion in the NYPD's favor.  Corporation Counsel's choice of the third option was imprudent, to put it charitably.  Nonetheless, it is appropriate on this motion for reconsideration of and relief from the 2/07 Order that I take into account the NYPD's affidavits, however belated they may be.  Given these conflicting accounts, the descriptions of these events in the Court's 02/07 Order cannot be regarded as findings of fact by the Court in areas where the facts are disputed.

## C.    The NYPD's Contentions

On this motion NYPD contends principally that the 2/07 Order misinterpreted or impermissibly modified the consent decree as it has been interpreted in prior orders of this Court.

The NYPD makes three arguments:

(1) Because the 8/03 Order only makes the NYPD subject to contempt for violations of the NYPD Guidelines that rise to a constitutional level, the 2/07 Order misinterpreted or impermissibly modified the 8/03 Order when it concluded that the NYPD could be subject to contempt for non-constitutional violations of the NYPD Guidelines.

(2) Because the NYPD Guidelines are for internal Department guidance only, sole power to ensure compliance with them is vested in the Police Commissioner. In the case of non-constitutional violations, class counsel are powerless to complain, and the Court powerless to provide a remedy. Since no constitutional violation has been shown in the instant case, it follows that this Court was without authority to enjoin Order 47 in its 2/07 Order, even if Order 47 conflicted with the obligations undertaken by the Department in the NYPD Guidelines.

(3) Even assuming that the Court had the authority to determine whether Order 47 conflicted with the NYPD Guidelines, the Court's interpretation of the NYPD Guidelines in its 2/07 Order conflicted with a prior determination of the scope of the Guidelines, and in doing so impermissibly expanded their scope.

For the reasons that follow, I agree with the first and the third of the NYPD's contentions. The 2/07 Order must perforce be vacated. I disagree with the NYPD's second contention.

## II.  DISCUSSION

### A.    Standards of Review

On this motion the NYPD's prayer for relief from the 2/07 Order invokes Rules 59(a) and

60(b)(1) of the Federal Rules of Civil Procedure and Local Civil Rule 6.3 of this Court.

Rule 59(a) provides for a new trial "in an action tried without a jury, for any of the reasons for which new trials have heretofore been granted in suits in equity in the courts of the United States," and that in such cases the court "may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." Rule 59(c) allows a motion for new trial to be based on affidavits.

Rule 60(b) allows a court to relieve a party from a "final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect . . . ."

Local Civil Rule 6.3, governing "motions for reconsideration or reargument," provides that the moving party must serve a memorandum "setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked."

Granting or denying relief under these rules is vested in the sound discretion of the trial court.

**B.      Constitutional Violation as a Prerequisite to Holding the NYPD in Contempt of the Consent Decree and the Guidelines**

The first question presented is whether, under Modified Handschu, the NYPD's conduct must violate the constitutional rights of class members in order to justify a court order holding the NYPD in contempt for engaging in it. Upon careful reconsideration, I answer that question in the affirmative.

In my 2/07 Order, I discerned ambiguity in my 8/03 Order and stated that the NYPD Guidelines had been incorporated for all purposes into the decree. *See Handschu VII*, 475 F. Supp. 2d at 342-43. However, the 8/03 Order itself referred to the Constitution in three places: First, I

stated that "as with the present order and judgment,[4] no liability on the part of the NYPD under a further revised Order and Judgment and Guidelines will attach unless a constitutional violation does occur; the effect of the revision is to make a violation of the Constitution a contempt of the Court's Order as well." *Handschu V*, 288 F. Supp. 2d at 419.  Second, I stated, in responding to the objection that Class Counsel might come to court for every violation of the NYPD Guidelines, "Moreover, the Statement of Policy with which the Modified Guidelines begin . . . makes it clear that any failure of the NYPD to comply with the Guidelines must rise to a constitutional level in order to sustain a motion by Class Counsel to hold the NYPD in contempt." *Id.*  Third, as previously quoted, the Second Revised Order and Judgment itself states that "in order to clarify and enhance the standing and authority of counsel for the plaintiff class to contend, if so advised, that violations of the said Guidelines have deprived a member or members of the plaintiff class of rights or freedoms guaranteed to them by the Constitution, the said Guidelines are, to that extent and for that purpose, incorporated by reference into and made a part of this Second Revised Order and Judgment." *Id.* at 420.  In three places, therefore, I stated that a violation of the NYPD Guidelines must rise to a constitutional level to be actionable under the decree.[5]

This result – incorporating the NYPD Guidelines but stating that any individual violation must rise to a constitutional level for the remedy of contempt to issue – was not sought by either party.  Class Counsel had sought an incorporation of the NYPD Guidelines that would make them enforceable in their own right, independent of the Constitution.  As Mr. Eisenstein said at oral argument on Class Counsel's motion in 2003, the NYPD Guidelines should be "incorporated in the

---

[4] That is a reference the 2/03 Order, *Handschu IV*.

[5] "What I tell you three times is true."  Lewis Carroll, *The Hunting of the Snark*.

14

consent decree as the old rules were so that . . . violations of those rules carry with them potentially, if not cured, the contempt power of this Court." Tr. of  Oral Arg. on May 28, 2003, at 11.[6] Corporation Counsel, on the other hand, had desired the NYPD Guidelines to remain entirely internal; they expressed concern that plaintiffs would "be running into court for every little transgression." *See Handschu V*, 288 F. Supp. 2d at 419 (quoting Tr. of Oral Arg. on May 28, 2003, at 64).[7]   The 8/03 Order constituted a compromise between the parties' expressed desires.[8] However, I agreed then with Corporation Counsel, and on reconsideration still agree, that it would be unduly burdensome for this Court to police every  alleged violation of the NYPD Guidelines, no matter how slight.

In connection with their position on the incorporation of the NYPD Guidelines, Class Counsel have advanced an argument based upon the "constitutional floor" analysis in *Rufo*.  They characterize the modification process as an ongoing one, contending at oral argument on the present

---

[6] I put this question to Professor Chevigny at oral argument: "So you have those two sources of governmental obligation, the constitution and the procedural guidelines generated by this litigation.  And it is at least conceptually possible that the police could be held in contempt for violating the guidelines, even though the conduct which made them contemnors in that context did not rise to the level of violating the constitution.  Is that the conceptual notion you're giving me?"  Professor Chevigny replied, "Yes.  As a last resort, yes.  That was true under the previous regime of those guidelines and it is a part – it is part of the thrust of this motion that it should continue to be the case." Tr. of Oral Arg. on May 28, 2003, at 47-48.

[7] At oral argument, Ms. Donoghue stated, "I think the guidelines, if they were to be incorporated in the consent decree, would have to be a different type of guidelines, frankly.  Those guidelines were designed to function as operational guidance, not just rules that are not to be violated. There is a combination of both in those guidelines. And I think they are very wordy because they are an attempt to help officers figure out – to figure out particular situations that are presented to them.  I think to have those kind of guidelines, if they are going to be a part of a court order, would not be that workable, frankly."  Tr. of Oral Arg. on May 28, 2003, at 39.

[8] "The prayers of both could not be answered; that of neither has been answered fully." Abraham Lincoln, Second Inaugural Address (March 4, 1865).

motion:

> It is not that when you issued your ruling in February of 2003 . . . that was the end of your power and your responsibility in relation to this situation.  You had a continuing duty, which you have exercised, to make sure that the modification does not descend to the constitutional floor. . . .
>
> What has been happening since that time, since you made your rulings in early 2003, is not an agreement, it's not a bargain, it's a series of decisions by the Court exercising its powers in equity. . . .   The Court has modified the modification requested by the NYPD in obedience to the Rufo commandment that the modification of a consent decree not land us in the constitutional basement.

Tr. of Oral Arg. on Apr. 26, 2007 ("Oral Arg. Tr."), Statement by Jethro Eisenstein, at 44-45. According to this theory, I have a continuing duty to ensure that the decree does not bottom out on the constitutional floor, even after *Rufo* analysis is performed and the decree modified.

   While the argument has a surface appeal, I am unable to accept it.  A consent decree is a hybrid creature, both a contract between parties and a court order, interpreted as a contract but enforced as an order.  *See Berger v. Heckler*, 771 F.2d 1556, 1567-68 (2d Cir. 1985).  When the decree is modified against the wishes of one party and perhaps to the complete satisfaction of neither, it becomes less a contract between the parties and more an order of a court sitting in equity. Because modification substantially changes the nature of the decree and the obligations it imposes, it is not a process to be undertaken unadvisedly or lightly.  *See United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211, 216 (2d Cir. 2001) ("Modification is a remedy not to be lightly awarded, especially where the design is not to relieve a party of obligations but to impose new responsibilities.") (citation and internal quotation marks omitted).  *Rufo* instructs lower courts in undertaking modification and requires an analysis intended to ensure both that modification is warranted and that the modified decree's meaning is fixed.  A consent decree cannot be subject to

16

continuing revision by the court, which is how Class Counsel envision the process. Under the logical extension of their position, I could decide in their favor now but decide in a year from now that some other requirement was necessary for the constitutional floor to be satisfied. This would place the parties in an untenable state of uncertainty.

Class Counsel's theory of the case is at odds with the nature of the modification process, which is a process with a beginning and an end. As discussed in Part I, *supra*, I performed a *Rufo* analysis in *Handschu IV* and concluded that the constitutional floor requirement was satisfied by the combination of the availability of contempt, the continued existence of the Handschu Authority, and the NYPD's promise to promulgate a version of the FBI Guidelines as an internal document. I did not alter that *Rufo* analysis in my 8/03 Order. If *Rufo* was met when the NYPD Guidelines were *internal*, it is immaterial to *Rufo* analysis whether the 8/03 Order incorporated the NYPD Guidelines for all purposes or only for purposes of constitutional violations, since even the latter of those cannot but be higher than the constitutional floor.

In short, I decided the constitutional floor question in the 2/03 modification Order. The analysis leading to that decision was not affected by the 8/03 amendment of the modification order, and remains in effect today. It necessarily follows that the Court erred in holding in the 2/07 Order that incorporation of each and every NYPD Guideline into the consent decree was essential to keeping the consent decree above the constitutional floor. *See Handschu VII*, 475 F. Supp. 2d at 343.

I now hold that under the present wording of the consent decree and the Guidelines, police conduct must violate a class member's constitutional rights in order to sustain a motion by Class Counsel to hold the NYPD in contempt. It follows that the 2/07 Order must be vacated.

C.     **NYPD Conduct that Violates the NYPD Guidelines but not the Constitution**

        The second question presented is whether, under the consent decree and the Guidelines as

they are presently worded, Class Counsel cannot complain of and the Court cannot consider NYPD

conduct that violates the NYPD Guidelines but not the Constitution.  As Corporation Counsel stated

in their opposing brief to Class Counsel's motion to enjoin implementation of Order 47, "There is

no obligation under either Modified Handschu or the NYPD Guidelines that investigations of

political activity conducted by the NYPD meet any additional requirements other than what is

required by the Constitution."  Def.'s Mem. in Opp'n, dated Jan. 20, 2006, at 4.  Corporation

Counsel contend that in the case of non-constitutional violations, sole and unfettered authority is

vested in the Police Commissioner to monitor and enforce compliance with the NYPD Guidelines.

*See* Def.'s Mem. in Opp'n, dated Jan. 20, 2006, at 4.  Counsel base that contention upon their

characterization of the NYPD Guidelines incorporated in the Patrol Guide as "internal."   In

Corporation Counsel's view, so long as police conduct does not violate a class member's

constitutional rights, the Commissioner may turn a blind eye and a deaf ear to a violation or

disregard of the procedures required by the NYPD Guidelines, whether that violation or disregard

is an isolated incident or an established practice.  The careful reader will understand that I am not

saying Commissioner Kelly has behaved in this fashion or is likely to do so.  But the logical

conclusion of Corporation Counsel's argument poses the question whether the Commissioner could

behave that way if he chose, with Class Counsel and the Court powerless to take any action.  Upon

careful consideration, I answer this question in the negative.

The NYPD Guidelines resulted from a promise made to the Court by the NYPD.[9]  I conditioned my approval of the modification on their enactment.[10]  The NYPD Guidelines were thus enacted in compliance with an order of the Court.  Moreover, their formulation took place in an adversarial context: the NYPD suggested language for the NYPD Guidelines, Class Counsel suggested alternative language in some places, and I served as arbiter of the few remaining disputes.

---

[9] At oral argument on the motion to modify the decree in 2003, I asked Ms. Donoghue about the NYPD's written representation that it would adopt internal guidelines substantially similar to the FBI guidelines:

> THE COURT: I construed that, when I read it, as something rather akin to a promise on the NYPD's part to say to me in effect that if you will modify the Handschu guidelines in the manner we request, then we will promulgate these internal guidelines.  Is it correct of me, do you think, to cast it in terms of something of a promise?
> MS. DONOGHUE:  Yes.
> THE COURT: Something of a contractual undertaking, if you will?
> MS. DONOGHUE: Yes, your Honor.  That is correct.

Tr. of Oral Arg. on Jan. 29, 2003, at 19.  At oral argument on the present motion, I resurrected this idea.  The following is an exchange between me and Ms. Donoghue:

> THE COURT:  We agree that it was a promise, you and I.
> MS. DONOGHUE:  Yes, it was a promise.
> THE COURT:  But surely not an empty promise.
> MS. DONOGHUE:  No, it was not and has not been an empty promise. . . .

Oral Arg. Tr., at 11.

[10] Again at oral argument Ms. Donoghue characterized the process as an exchange of promises:

> THE COURT: Did the commissioner include those guidelines in the patrol guide in order to comply with the order and/or opinion of this court?
> MS. DONOGHUE: Eventually your Honor ordered it.  I think it was a two-step process where an offer was made to incorporate them . . . and the judge then, the judge, yourself, then ruled that the consent decree would be modified providing the commissioner lived up to his promise, so it was kind-of a two-step promise.

Oral Arg. Tr., at 26.  In the language of contracts, on which Corporation Counsel heavily rely, the NYPD promised to enact (and impliedly to follow) the NYPD Guidelines in exchange for the Court's promise to grant modification.  Once there had been the exchange of promises and performance, the NYPD is estopped from repudiating its promise, and is bound (as are all parties to contracts) by an implied covenant of good faith and fair dealing.  Moreover, in this analogy members of the plaintiff class may fairly be regarded as third-party beneficiaries of the NYPD's promise to the Court.

*See Handschu IV*, 273 F. Supp. 2d at 349 ("[T]he Court will not entertain detailed objections or suggestions as to what the patrol guide should or should not say in that regard. The Court's function will be to determine whether the proposed text to be included in the patrol guide adequately reflects the substance of the FBI Guidelines."); *Handschu v. Special Servs. Div.*, 288 F. Supp. 2d 404 (March 12, 2003) (approving final proposed draft of the NYPD Guidelines). Even though I confined my oversight to ensuring that the NYPD Guidelines incorporated the substance of the FBI Guidelines, it is indisputable that the Court was involved in the creation of the NYPD Guidelines. Additionally, when I entered the Order approving modification of the decree, I expressly ordered that the NYPD Guidelines "remain in the NYPD Patrol Guide unless otherwise directed by the Court." *Handschu v. Special Servs. Div.*, 2003 WL 21961367, *1 (S.D.N.Y. Apr. 7, 2003). This component of the Order indicates another dimension of the Court's oversight of the NYPD Guidelines. Finally, as the result of my 8/03 Order, the NYPD Guidelines were themselves expressly incorporated into the decree.

This procedural history makes clear the Court's role in the promulgation of the NYPD Guidelines and their relationship to the decree. Even though at present the remedy of contempt is only available if a Guidelines violation rises to a constitutional level, the Court's inherent power to ensure compliance with its orders provides the source of my authority to enforce the NYPD Guidelines in the event that they are shown to have been repudiated or disregarded. *See Berger*, 771 F.2d at 1568 ("As a general matter, a federal court's interest in orderly expeditious proceedings justifies any reasonable action taken by the court to secure compliance with its orders.") (internal quotation marks and citation omitted). "In enforcing its orders, a district court may take such steps as are appropriate given the resistance of the noncompliant party." *Id.* at 1569.

This is true both as a general matter and in the context of consent decrees.  *See E.E.O.C. v. Local 580 & Int'l Assoc. of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 593 (2d Cir. 1991) ("Where equitable remedies which exceed the confines of the consent judgment are reasonably imposed in order to secure compliance of the parties, the court has not overstepped its bounds, and its orders must be obeyed.").  The Second Circuit has noted that a court has "inherent power to enforce consent judgments, beyond the remedial 'contractual' terms agreed upon by the parties."  *E.E.O.C. v. Local 580*, 925 F.2d at 593. This is because "[u]nlike a private agreement, a consent judgment contemplates judicial interests apart from those of the litigants.  Until parties to such an instrument have fulfilled their express obligations, the court has continuing authority and discretion – pursuant to its independent, juridical interests – to ensure compliance."  *Id.*

Not only does the district court have the authority to ensure compliance; it has the duty to do so: "Consent decrees are subject to continuing supervision and enforcement by the court.  A court has an affirmative duty to protect the integrity of its decree.  This duty arises where the performance of one party threatens to frustrate the purpose of the decree."  *Berger*, 771 F.2d at 1568 (internal quotation marks and citation omitted); *see United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir. 1995) ("[A] consent decree is an order of the court and thus, by its very nature, vests the court with equitable discretion to enforce the obligations imposed on the parties.").

*Berger* involved a consent decree regarding the eligibility of certain aliens for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  Plaintiffs had been denied SSI benefits, available to those "permanently residing in the United States under color of law," even when they were not permitted to leave the country due to the processing of deportation papers and

other circumstances.  Paragraph 3 of the consent decree defined the scope of eligibility for SSI benefits and gave greater content to the statutory language of "permanently residing in the United States under color of law."  The consent decree also contained a paragraph requiring the Secretary to "take all steps necessary to ensure that this order is carried out by the employees of the Social Security Administration."  *See id.* at 1560 (discussing ¶ 5 in the decree).  Plaintiffs came to court four years after settlement of the decree seeking contempt on the basis that the Secretary had not taken steps under ¶ 5 of the decree to ensure that the agency's regulations reflected the terms of the decree and, in particular, its definition of "under color of law."  The district court ordered the Secretary to promulgate regulations concerning ¶ 3 in the decree.  In the face of a dispute between the parties about the proper interpretation of ¶ 3, the court also directed the parties to settle an amended final judgment clarifying those who were to be considered permanently residing in the country under color of law.  The district court ultimately adopted language similar to that proposed by the plaintiffs.  *See id.* at 1560-61, 1570.

The Second Circuit in *Berger* reviewed, *inter alia*, the Secretary's challenges to that amendment of the decree and to the court's directive that the Secretary promulgate regulations.  The Second Circuit held that the district court's amendment of the decree was "appropriate in light of its duty to protect the integrity of its judgments."  *Id.* at 1569.  Even though one of the two parties had objected to the amendment, this "basic authority to compel compliance with its orders," *id.* at 1569 n.19, supported the district court's decision.  The Second Circuit also approved the district court's decision requiring the Secretary to promulgate amendments to agency regulations, operations manuals, and guidelines.  *See id.* at 1579 ("Under its powers to take reasonable steps to enforce its orders, the court was entitled to require that the Secretary promulgate regulations so as to come into

compliance with the decree.").  The court of appeals explicitly stated that contempt is not the only remedial power available to a district court, and the standard for contempt need not be met before the court can impose a different remedy: "Ensuring compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt."  *Id.* at 1569.[11]  *See also Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) ("The remedy might be a contempt judgment, but more commonly, and here, it is a supplementary order (preferred as less

---

[11] The equitable power described in *Berger* was not restricted by the Second Circuit in *United States v. Int'l Bhd. of Teamsters*, *Chauffeurs, Warehousemen & Helpers, AFL-CIO et al.*,141 F.3d 405 (2d Cir. 1998), where the Second Circuit reversed a district court's decision requiring a union party to a consent decree to pay for the costs of a rerun election of union officials.  In that case, the district court had relied on its broad equitable powers in ordering the union to pay for the rerun, *see* 989 F. Supp. 468, 476-77 (S.D.N.Y. 1997), even though the consent decree explicitly contained a provision providing the government with the option of supervising elections but requiring it to pay for election expenses if it exercised that option.  *See Int'l Bhd. of Teamsters*,141 F.3d at 407.  The government had elected to supervise the election and thus payment obligations were clearly specified by the decree.

In the case at bar, by contrast, I do not entertain the notion that my equitable powers permit me to override the language of the decree.  But they do empower me to enforce agreements made pursuant to the decree.  A large part of the reason the government had argued in *International Brotherhood of Teamsters* that it should not pay for the rerun costs was that the government had attributed to the union the bad acts necessitating the rerun.  It was unfair, the government argued, to force one party to pay for the other party's misdeeds.  On appeal, writing in dissent, Judge Parker agreed with this position.  He observed that since rules governing elections had been promulgated by the court-appointed election officer and adopted by the district court, violation of these rules by union members was tantamount to a violation of the decree.  *See id.* at 410-12 (Parker, J., dissenting).  In other words, the union by its misdeeds, which the status of the election rules rendered misdeeds under the decree, forfeited its right to have the government pay for the rerun election.  The majority did not address Judge's Parker's point about the status of the election rules adopted by the court, merely determining that the clear terms in the decree controlled.  One need not infer from the majority's decision that as a general matter the district court was powerless to enforce the election rules as an order of the court.  I infer merely that the clear language of a decree trumps the combination of a violation of a court order and the court's exercise of equitable discretion.  In the case before this Court, where I am not deciding a motion for contempt, holding that the NYPD Guidelines may be subject to enforcement through injunctive relief poses no conflict with express terms in the decree.

23

condemnatory than a judgment of contempt, less likely therefore to be resisted), designed to make the party whole for his or her loss."). Courts have in other cases approved of enforcement steps taken by district courts that stopped short of contempt. *See, e.g.*, *United Seafood Workers*, 55 F.3d at 69 (district court's order extending administrator's term retroactively was appropriate "on the ground that such an extension was necessary to assist the court in ensuring compliance with the Judgment").

The only exercise of authority that the Second Circuit found inappropriate in *Berger* was the judge's requirement that certain language be included in the regulations to be promulgated by the Secretary. *See Berger*, 771 F.2d at 1580. This was found to be an unnecessary intrusion into the administrative sphere. *Id.*[12] In the case before me, by contrast, the NYPD *itself* suggested adopting a version of the FBI Guidelines.[13] When I conditioned approval of modification on promulgation of the NYPD Guidelines, and later when I incorporated the NYPD Guidelines into the Order and Judgment of this Court for certain purposes, these judicial acts brought the NYPD Guidelines within the ambit of the Court's equitable power. If the NYPD should break its promise to the Court, I am not required to sit idly by with my hands tied. *See Thompson v. United States Dep't of Hous. &*

---

[12] In *E.E.O.C. v. Local 40*, 76 F.3d 76 (2d Cir. 1996), the Second Circuit also found that a district court had overstepped its bounds when it sought to enforce certain commitments under a consent decree that had expired by its own terms twelve years earlier. There, even though a union had taken on certain "permanent" responsibilities under the decree, the Second Circuit found it inappropriate of the district court to enforce those responsibilities upon termination of the decree. *Id.* at 81. In the case at bar, by contrast, no one disputes that the consent decree is alive and in full force. Thus I am not prohibited from enforcing the responsibilities taken on by the NYPD in connection with the decree.

[13] As noted in text *supra*, my oversight of the formulation of the NYPD Guidelines was confined to reviewing whether the language proposed did in fact embody the substance of the FBI Guidelines, which was what the NYPD had promised to do.

*Urban Dev.*, 404 F.3d 821 (2d Cir. 2005) ("Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender.") (internal quotation marks and citation omitted). A single alleged violation of the NYPD Guidelines by a police officer would not warrant the exercise of my remedial powers; the NYPD itself must be found to have broken its promise by adopting a policy that conflicts with or operates in derogation of the NYPD Guidelines.[14]

When Class Counsel came to Court complaining of Interim Order 47, the nature of their complaint was that the NYPD had adopted a policy that conflicted with the Guidelines. They noted in their initial briefing on Interim Order 47 that they were not seeking to hold defendants in contempt, but rather "to enforce commitments that were made under the consent decree." Pl.'s Reply Mem., Mot. to Enjoin Interim Order 47, dated Feb. 24, 2006, at 11. The Court is obliged to oversee those commitments since the alleged conflict concerns a police policy, and therefore the Court is obliged to determine whether Order 47 evinces a disregard of the NYPD Guidelines. Before I do so, however, the proper scope of the NYPD Guidelines must be clarified.

**D.    The Scope of the NYPD Guidelines**

The third question presented is the scope of the NYPD Guidelines. It is necessary to revisit that question, so that the NYPD may fully understand its continuing obligations and responsibilities, and Class Counsel may fully understand the circumstances that might enable them to invoke the Court's equitable powers discussed in Part II.C., *supra*, of this opinion.

---

[14] I note that this analysis is not an interpretation of my 8/03 Order but rather an analysis of my equitable powers to ensure compliance with court orders. Consequently, my explanation of my responsibilities here does not implicate Corporation Counsel's motion based on Rule 60(b)(1). I consider defendants' application under Rule 60(b)(1) to be rendered moot by my disposition here; but to the extent that it is not, I deny the motion.

The title of the NYPD Guidelines is "Guidelines for Investigations *Involving* Political Activity" (emphasis added).  Section III of the NYPD Guidelines, entitled "Applicability," states, "These Guidelines only apply to investigations *which involve* political activity."  *Handschu V*, 288 F. Supp. 2d at 421 (Section III) (emphasis added).  Section IV begins, *"Investigation* of political activity shall be initiated by, and conducted under the supervision of, the Intelligence Division." *Id.* at 422 (Section IV) (emphasis added).  The scope of the NYPD Guidelines therefore turns on the meaning of these three phrases: "investigations involving political activity," "investigations which involve political activity," and "investigation of political activity."[15]   In the present motion, Corporation Counsel argue that my 2/07 Order interpreted the NYPD Guidelines too broadly.  *See* Def.'s Mem., dated March 5, 2007, at 13-14.  In that Order I said that "as long as there is a legitimate law enforcement purpose in conjunction with an investigation which involves political activity, the Guidelines apply."  *Handschu VII*, at 475 F. Supp. 2d at 350.  Applying that standard, I determined that the videotaping of the Coalition for the Homeless was a situation in which the NYPD Guidelines applied because it was "quintessential political activity" and a "quintessential investigation" of it.  *Id.* at 351 (internal quotation marks omitted).  My application of the NYPD Guidelines to the situation described in the affidavits submitted by Class Counsel did suggest that the NYPD Guidelines extend to any situation where the collection of information or evidence coincides with political activity.  On reconsideration, I agree with Corporation Counsel that this was too broad an interpretation of the scope of the NYPD Guidelines.  It is one supported by their text

---

[15] As I noted in my 2/07 Order, the meaning of "investigation" and "political activity" that are contained in both the text of Modified Handschu and the NYPD Guidelines have remained unchanged since Original Handschu.  *See Handschu VII*, 475 F. Supp. 2d at 336.  Thus the scope of the NYPD Guidelines is the same as the scope of Original Handschu.

but not by the history of the case.

Given the definitions of "political activity" and "investigation" that are present in the text of Modified Handschu and in the NYPD Guidelines, the bare text of the decree supports two interpretations of the scope of the NYPD Guidelines: (1) they apply in all instances where police are collecting information or evidence about political activity, whatever the police purpose in doing so; and (2) they apply in instances where police are collecting information or evidence about political activity *in order to* investigate the activity. The difference between these two interpretations is that in the second, the NYPD Guidelines do not apply unless the police are acting with a purpose of investigating the political activity.

Class Counsel have argued that police purpose is irrelevant to the application of the NYPD Guidelines. They stated in a brief in 2006:

> The Guidelines do not say anything about "purpose to investigate political activity.". . . An objective meaning for "investigation of political activity" is the only workable interpretation; the subjective interpretation invites the result that we see in this instance, namely, that the defendants will try to define their "purpose" so as to avoid the approvals required under the Guidelines.

Pl.'s Mem. Regarding the Court's Questions, dated Aug. 16, 2006, at 8. In other words, Class Counsel argue that police intent cannot be determinative of whether the NYPD Guidelines apply, because the police can always hide their true intent. However, Class Counsel's argument fails, because I have previously decided this question about the relevance of police purpose to application of the Guidelines.

In 1989, presented with the argument that the scope of Original Handschu was unclear because the term "investigation of political activity" did not contain one clear meaning, I said:

> The Guidelines regulate "activity" which police "undertake . . . to obtain information or evidence about the exercise" of constitutionally protected rights

27

> or expressions or association.  The Guidelines address police *purposes and method*.  Only activity undertaken *for the purpose of* learning about citizens' exercise of rights falls within the Guidelines.

*Handschu III*, 737 F. Supp. at 1301 (emphases added).  In that opinion I agreed with the Handschu Authority's assessment that the "true evil" addressed by the Guidelines is the "surreptitious collection of information for the *purpose* of monitoring, investigating or indexing an individual or group's constitutionally protected views."  *Id.* at 1301 (internal citations omitted) (emphasis in original).  The consent decree arose out of particular concerns and set up a regime to address those concerns.  In 1989 I clarified this regime when I determined that application of the Guidelines requires a purpose to investigate.  My decision concerning the scope of the Guidelines in 1989 is, as Corporation Counsel put it, "no less valid today" because the definition of an investigation has never changed.  *See* Def.'s Mem., dated March 5, 2007, at 14.

The difficulty of Class Counsel's position on the scope of the NYPD Guidelines became clear at oral argument on the present motion.  Mr. Eisenstein stated, "Our position is that any videotaping of a political demonstration is *per se* an investigation of political activity and, therefore, is subject to the Guidelines which then require that the police department act in certain ways with respect to them."  Oral Arg. Tr. at 78.  But shortly thereafter, when presented with a hypothetical, he continued, "[I]f you are asking me how I would view a TARU officer at the top of the Empire State building videotaping a demonstration from 86 floors up, I would say, Judge . . . I think that particular one is not one that is either – it's neither here nor there because I don't think anybody would ever do that.  If there is fixed locations of cameras, we don't have a problem with that."  Oral Arg. Tr. at 79.  According to Mr. Eisenstein's understanding of the scope of the NYPD Guidelines, however, the situation of fixed cameras must be "*per se* an investigation of political activity"

28

because it is "videotaping of a political demonstration." A *per se* rule is a *per se* rule. Application of the NYPD Guidelines in that fixed-camera scenario would of course make little sense, because the scenario does not appear to fit into any of the three categories of investigation outlined in the NYPD Guidelines – checking of leads, preliminary inquiries, and full investigations. And yet, under Mr. Eisenstein's definition, even if he might not "have a problem" with that manner of videotaping, the NYPD Guidelines would apply. Class Counsel's position illustrates what is problematic about a broad definition of "investigation" that does not take purpose into account.

Although my opinion in *Handschu III* made clear that purpose plays a role in the definition of investigation of political activity, I also at that time rejected an interpretation of the Guidelines that would cleave solely to purposes lines. The Authority had proposed that whenever the NYPD possesses an "investigational purpose," the Guidelines apply, but whenever the NYPD possesses an "operational purpose," the Guidelines do not apply. *Handschu III*, 737 F. Supp. at 1301-02. On that point I said:

> I decline to endorse the Authority's purportedly curative "construction," suggesting that "investigational" activity should "generally" be proscribed and "operational" activity should "generally" be permitted. That purpose-oriented analysis is not, of course, entirely inappropriate, given what I have just said; but a broad division of the "generally" proscribed and permitted, according to whether the conduct is characterized as "investigational" or "operational," raises the risk that a distinction in principle will swallow up the Guidelines in practice.

*Id.* In other words, *Handschu III* held that while an investigative purpose is required in order for the Guidelines to apply, the presence of a non-investigative purpose does not preclude application of the Guidelines.[16] Possession of dual or multiple purposes could arise in instances where the

---

[16] When Thomas P. Doepfner, an attorney and Assistant Deputy Commissioner in charge of the NYPD's legal department at the time of Class Counsel's motion concerning Order 47 stated, "The presence of a legitimate law enforcement *purpose*, other than the investigation of political

police have completely separate purposes, such as crowd control and investigating political activity; it also could arise in situations where pursuit of one purpose is bound up with pursuit of another, as in a situation where the police are investigating political activity because they are concerned about the possible outbreak of violence.  In both types of situations, the NYPD Guidelines apply.  In the context of videotaping, it is not difficult to imagine police officers videotaping persons at a demonstration for the operational purpose of crowd control but also to collect information on what groups were present so that they could determine where else those groups might appear and how big a presence could be expected from them in the future, etc.  The second purpose has the potential to shade into a purpose of investigating political activity.  Once it does, the NYPD Guidelines apply.

The only workable way to respect the purpose requirement of the NYPD Guidelines but also to accept the reality that purposes do not always come in neatly tied packages is to recognize that while an investigative purpose is necessary for application of the NYPD Guidelines, the NYPD's proffered purpose is not necessarily determinative; an inference of an investigative purpose can arise in some situations due to the *manner* of investigation.  If this notion were not built into the requirement of an investigative purpose, the Department could escape application of the NYPD Guidelines, despite employing intrusive techniques, simply by offering up its legitimate law enforcement purpose.  I am not suggesting that the police seek to evade the NYPD Guidelines.  But even though Class Counsel are wrong that purpose is not relevant to application of the NYPD

---

activity, for making videotapes is a factor that distinguishes investigations to which the Modified Guidelines apply from those to which they do not," Decl. dated July 13, 2006 (emphasis in original), I take him to recognize that the NYPD Guidelines might still apply in the presence of a legitimate law enforcement purpose, so long as there was *also* a purpose to investigate political activity at play. If that was not Mr. Doepfner's understanding, this opinion will enlighten him.

Guidelines, they are correct that the determination of purpose must have an objective component.

Corporation Counsel acknowledged as much at oral argument on this motion:

> But in a particular case, whether an investigation has as its purpose to snoop on citizens' First Amendment rights or to control possible disorder are two different things. And we don't think it is subjective. We think there are objective elements that come to bear that one can evaluate when a decision is made as to whether or not this is the investigation of political activity.

Oral Arg. Tr. at 75. Ms. Donoghue did not specify what these "objective elements" might be. But it is not difficult to imagine circumstances that would create such an inference – such as training video cameras on individuals engaged in a peaceful and entirely lawful demonstration in a systematic and close-up manner, so that it reasonably appears that information about the particular persons or group to which they belong is being collected, and then using those videos within the Department in a manner that further suggests an investigative purpose. If tapes were made ostensibly for crowd control purposes but then retained and made available for intelligence purposes, that would also implicate the NYPD Guidelines because the subsequent use of the tapes would support an inference that they were made for an investigative purpose.

In sum, a police purpose to investigate is required for application of the NYPD Guidelines, but such purpose could be inferred from objective indicia present in a particular situation.

E.    **Interim Order 47**

Interim Order 47 is captioned: "REVISION TO PATROL GUIDE 212-71, 'GUIDELINES FOR THE USE OF PHOTOGRAPHIC/VIDEO EQUIPMENT BY OPERATIONAL PERSONNEL AT DEMONSTRATIONS.'" The Order is a five-page single-spaced document organized under three main headings: "Purpose," "Scope," and "Procedure." The "Scope" section states:

31

The use of photographic or video equipment by operational personnel to accurately record police operations and other public activity is appropriate if a permissible operational objective exists. Permissible operational objectives include accurately documenting events, actions, conditions or statements made:

a. during special events, disorder events, arrests, public assemblages or any other critical incident in which such accurate documentation is deemed potentially beneficial or useful; . . .

c. when a reasonable belief exists that unlawful activity, terrorist activity or arrest activity will occur. . . .

Ex. 1 ("Order"), Pl.'s Notice of Mot. to Enjoin Order 47, dated Nov. 28, 2005, at 2.  The procedures outlined by the Order require a ranking member of the Department who is contemplating the use of photographic or visual recording equipment to submit a report to his or her Patrol Borough/ Bureau Commander requesting the deployment of equipment and properly trained personnel.  Order, at 2-3. He or she must include in the request the date, time, and location of the incident or event to be recorded; the identity of the individuals or groups involved; and the "specific permissible operational objective(s) to be achieved."  *Id.*  Upon completion of the photographing/videotaping, the recordings are to be maintained "for a minimum of one (1) year from the date the images were recorded," and a "written summary describing the event and activities preserved in each recording, to assist in indexing and retrieval" must be prepared.  Order, at 4.  After one year, materials that do not contain evidence of criminal activity or are not "deemed valuable for other purposes, for example, litigation, training, after action reports, etc." and consequently are not preserved for that reason "may be destroyed."  *Id.*

The Order also contains an italicized "Note" stating, "Pursuant to Modified Handschu Guidelines, the investigation of political activity may only be initiated by and conducted under the supervision of the Intelligence Division," and providing that "members of the service not assigned

32

to the Intelligence Division may not use video recording or photography for the purpose of investigating political activity, without the express written approval of the Deputy Commissioner, Intelligence."  Order, at 2.

Order 47, promulgated on September 10, 2004, represents a departure from previous police orders concerning videotaping of political demonstrations; these had contained largely the same content since February 8, 1991, when an "Order 6" was promulgated by the NYPD.  *See* Decl. of Franklin Siegel, in Supp. of Pl.'s Mot. to Enjoin Order 47, dated Nov. 16, 2005 ("Siegel Decl."), ¶¶ 7-10; Ex. 8 to Pl.'s Notice of Mot., dated Nov. 28, 2005, at 1.  Like Interim Order 47, these earlier orders required officers to submit written requests for permission to use photography or video equipment that stated their operational purpose for using it.  The orders also contained a provision requiring that all photographing and videotaping be done in a manner consistent with the particular operational objective given.  However, there are significant differences between these earlier orders and Interim Order 47.  First, the prior orders highlighted the relationship of the videotaping rules to the constraints of the Handschu Guidelines, whereas in Interim Order 47, mention of Handschu is only in a Note.  Second, the prior orders contained a specific and exclusive list of objectives which "constitute" permissible operational objectives,[17] whereas Interim Order 47's list of objectives is non-exhaustive, stating that permissible operational objectives "include" documenting a range of

---

[17] The "Scope" section of Order 6, for instance, indicated that "the use of photographic or video equipment by operational personnel at political demonstrations is appropriate *only* if a permissible operational objective exists" and then gave as permissible operational objectives the preparation of training materials on crowd control techniques and "a reasonable belief . . . that criminal and/or arrest activity will occur."  *See* Ex. 8 to Pl.'s Notice of Mot., dated Nov. 28, 2005, at 1 (emphasis in original).  In the version of the police order that took effect January 1, 2000, which otherwise resembled Order 6 closely, permissible operational objectives were expanded to include a live video transmission to assess crowd conditions, of which no recording was to be made.  *See* Siegel Decl. ¶ 10; Ex. 9 to Pl.'s Notice of Mot., dated Nov. 28, 2005 (Procedure no. 212-71, setting forth guidelines for videotaping effective 1/1/00).

incidents described, such as whenever the documentation would be "deemed beneficial or useful" to the NYPD.  Third, in the prior orders, tapes were held for a minimum of 60 days, whereas in Interim Order 47, the retention time of the photographs and/or videotapes is extended to a minimum of one year, and a written summary of the media is to be made.  Order, at 4.

In their motion to enjoin Interim Order 47, Class Counsel claimed that it violated the NYPD Guidelines on its face.  They were particularly concerned that the Order permitted photography and videotaping in any situation in which the NYPD considered this to be "beneficial or useful," and that the retention time for videotapes had been extended.  *See* Decl. Jethro M. Eisenstein, in Supp. Mot. to Enjoin Interim Order 47, dated Nov. 16, 2005, at 7-8.  The presence of these provisions alone, however, do not make the Order violative of the NYPD Guidelines.  The Order refers both to situations where the Guidelines apply and to situations where they do not.  If the police have no purpose of investigating political activity, the Guidelines are not triggered.  The Note channels those situations where that purpose is present to the Intelligence Division, and in doing so, it saves the Order from a facial attack.

Order 47 also contains a provision recognizing that the manner in which photographing or videotaping is done is relevant: "Photographs/video taken for training purposes should be consistent with the permissible operational objective.  For example, photographs/video taken for training purposes should generally not contain close-ups of members of the public, but should focus on police tactics and behavior." Order, at 4.  While this provision does not go so far as to acknowledge that videotaping in a manner that does not correspond to the stated operational purpose could create an inference of investigative purpose, it is not inconsistent with that view because it recognizes the

34

importance of police "method" in addition to purpose.  *See Handschu III*, 737 F. Supp. at 1301 ("The Guidelines address police purpose and method.").

While the Court is not bound by the assessments of the Handschu Authority, the Authority's interpretation of how the photographing and videotaping of demonstrations falls within the Guidelines is instructive.  In 1988 and 1991, the Authority, exercising the broader powers it held under the Original Handschu Guidelines, prepared reports analyzing how photographing and videotaping of political demonstrations should be conducted in accordance with the Guidelines.  The Authority's report issued on February 4, 1991 responded to an inquiry by Class Counsel and the NYCLU as to whether  videotaping and photographing at a march and rally on "Cuba Day" in 1990 violated the Guidelines.  *See* Pl.'s Notice of Mot., dated Nov. 28, 2005, Ex. 7.  In preparation of its report, the Authority had reviewed the paper trail required by the police department under then-existing internal memoranda, interviewed ranking officers in command at the demonstration and those officers who conducted the photographing and videotaping, and reviewed the actual footage.

Some discrepancies were noted between the operational purpose cited in requests for equipment and the apparent purpose for videotaping as evidenced by the footage reviewed.  *See id.* at 3.  The Authority observed that of the 136 requests filed since the inception of the departmental process on photographing and videotaping, "all of them were for the purpose of photographing 'criminal activity.'"  *Id.* at 6.  The Authority concluded, "It is inappropriate to use [photographing criminal activity] as a catch-all phrase warranting blanket approval for all photographing activity. We believe that the authorized objective must be specifically stated, and the post-event review . . . should determine whether the content of the photographs and videotapes is consistent with the stated objective."  *Id.*  Nevertheless, the Authority concluded that the Guidelines had not been

violated because "[w]ith some minor exceptions, the photographs and videotapes are consistent with the prior Handschu Authority recommendations allowing photographing and videotaping for legitimate operational needs." *Id.* The Authority found that the vast majority of photographs were of police formations and barricades "with no closeups or readily discernible faces of demonstrators," and only three of the 189 photographs were of specific individuals. *See id.* at 2. And of the three videotapes made, these "primarily contain footage of uniformed officers, motorcycle police and barriers," and in the one segment depicting demonstrators walking through an intersection, the detective who filmed the tape stated that he had been filming a particular police tactic and had used "wide angle" to avoid taking closeups of demonstrators. *Id.* at 2-3. The Authority concluded, "Overall, it appears that the primary purpose was to depict officers, barriers, and departmental vehicles and how they were used to police the demonstration." *Id.* at 3.

The Authority based those conclusions upon a review of how departmental procedures had been applied by the Department. Analyzing as a general matter how photographing and videotaping of demonstrations fall within the Guidelines, the Authority observed that photographing and videotaping are permitted when either "it is pursuant to an authorized investigation under (IV)(C)" or "it is not otherwise proscribed by the Guidelines, as, for example, if it is being used for training purposes or other non-prohibited use, such as filming a crime in progress or arrest activity." *Id.* at 6.[18] Another way of stating this is that where the Guidelines do not apply, videotaping is permitted; and where the Guidelines apply, videotaping must be conducted in accordance with the Guidelines,

---

[18] Counsel for plaintiff class themselves cite this passage in their papers. *See* Siegel Decl. ¶ 6.. However they do not seem to recognize that the Authority's analysis means that not all videotaping of demonstrations implicates the Guidelines. *See id.* ¶ 5 ("[V]ideotaping a demonstration is unquestionably an investigation of political activity."). Videotaping is only considered an "investigation" within the meaning of the Guidelines if a police purpose to investigate the political activity is present. *See* Part II.D., *supra*.

which under Original Handschu meant complying with Section IV(C). That the Authority was basing its analysis on Original Handschu is immaterial, as the analysis chiefly concerns the *scope* of the Guidelines, which has not changed.

The Handschu Authority's report undoubtedly influenced the NYPD in fashioning its procedures, as it promulgated Order 6 four days after the Authority's report on the Cuba Day march. *See* Siegel Decl. ¶ 10. It is important to point out, however, that the Authority's role was to provide recommendations for how the NYPD's procedures on photography and videotaping should be constructed so as to be consonant with Original Handschu; it was not making a determination as to the *minimum* standards that would satisfy the Guidelines. Making a policy recommendation and passing on the validity of a particular police order under the Guidelines are quite distinct tasks. Nevertheless, the Handschu Authority's analysis is instructive, because it reflects the Authority's view of how videotaping and photographing fits within the Guidelines. Under its reasoning, a police photographing/videotaping order with a non-exhaustive list of permissible operational objectives and greater retention time of videotapes would pass muster, so long as the order makes clear that *when* the police are videotaping with the purpose of investigating political activity, the Guidelines apply. Now that we are living under Modified Handschu, this means that when the Guidelines apply, the NYPD must follow the NYPD Guidelines in its Patrol Guide, which require authorization to be sought and proper documentation to be made.

Thus the mere fact that Order 47 is more permissive in the types of situations that warrant photographing and videotaping, and requires retention of tapes for a longer period of time than previous orders, does not mean that the requirements of the consent decree and the Modified Handschu Guidelines have been violated. I conclude that the Note to Interim Order 47 is facially

consistent with the Guidelines because it indicates that in those situations where the Guidelines apply, the Intelligence Division must be involved.[19]  Whether the procedures under the NYPD Guidelines have been actually followed in such a situation is a different question.

The NYPD Guidelines are therefore not violated by Order 47 on its face.  But in light of the foregoing analysis, there remains the possibility that they could be violated by Order 47 as applied.

When making the determination of whether police videotaping practices at the Cuba Day march had violated the Guidelines, the then-existing Handschu Authority reviewed the paper trail created by the then-existing police procedures concerning videotaping; interviewed police officers with relevant knowledge of the videotaping conducted on the day; and reviewed the actual videotapes and compared them to the stated operational objectives in the equipment requests.  *See* Ex. 7, Pl.'s Notice of Mot., dated Nov. 28, 2005, at 2-5.  The Handschu Authority, in other words, looked at the entire picture to determine whether in a given case the videotaping conduct had violated the Guidelines.  It is that entire picture that would need to be examined in order to discern

---

[19] However, it must also be observed that the Note is potentially problematic, if interpreted as only referring to the Intelligence Division situations involving the *sole* purpose of investigating political activity, *see* Order at 2 ("[M]embers of the service not assigned to the Intelligence Division may not use video recording or photography for *the* purpose of investigating political activity, without the express written approval of the Deputy Commissioner, Intelligence.") (emphasis added), because under the Guidelines, situations where there is even a *partial* purpose of investigating political activity must be referred to the Intelligence Division.  As discussed *supra*, even if the purpose of investigating political activity operates in conjunction with a permissible operational objective listed in the Order, the NYPD Guidelines are triggered and their procedures must be followed.  If, for instance, an officer wished to videotape a demonstration for the purpose of deterring terrorism, he would still need to follow the procedures of the NYPD Guidelines if he also possessed the purpose of collecting information or evidence about political activity as a means of achieving his counter-terrorism goal.  Merely having a counter-terrorism purpose does not get him out from under the yoke of the Guidelines where they apply.  To the extent that the Note to Order 47 has not been interpreted in this fashion, but rather to suggest that the presence of a non-investigative purpose excuses the officer from application to the Intelligence Division, it would be misinforming officers about their obligations.

whether a purpose to investigate political activity was present, and if so, whether the photographing or videotaping of a demonstration violated the NYPD Guidelines.

It is for Class Counsel to say whether Class Counsel believe they presently have sufficient evidence to make such a case, particularly in light of the NYPD's recently submitted affidavits after months of imprudent delay. Should Class Counsel believe that Order 47 has been applied in a manner that violates the NYPD Guidelines and should they consider an evidentiary hearing necessary to resolve the as-applied question, they may make that application to the Court. Similarly, they may reapply for discovery of the documentation required by Order 47 in order to assess the Order's implementation by the NYPD.

It is useful to emphasize that while for the reasons stated in Part II.C., *supra*, this Court has equitable powers to enforce the promise the NYPD gave and memorialized in the NYPD Guidelines in order to obtain the Court's modification of the consent decree, a finding that the NYPD broke that promise could not be premised upon isolated and aberrant photographing or videotaping in manners that did not comply with the NYPD Guidelines. To trigger the Court's equitable powers, Class Counsel would have to demonstrate that the NYPD, in the course of photographing or videotaping public gatherings and their participants, systematically and repeatedly disregarded the NYPD Guidelines, to a degree sufficient to show a NYPD policy to act in such a fashion.[20]

---

[20] A policy may be an official policy or may be demonstrated by a departmental custom or practice. *See Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [28 U.S.C.] § 1983."). In this regard, Deputy Commissioner Cohen's acknowledgment that he has "not received any requests from any NYPD commands to use photographic equipment for the purpose of monitoring political activity at demonstrations or other public events" since Order 47 was promulgated in 2004, *Handschu VII*, 475 F. Supp. 2d at 346, would be probative of a policy to disregard the Guidelines only if there is evidence that indeed the NYPD acted with the purpose to investigate political activity at

At oral argument on April 26, 2007, I asked Class Counsel whether they still desired discovery, which they had previously requested, and they replied that they did not.  If that answer was influenced by the analysis in my 2/07 Order that I hereby reconsider and vacate, they may if so advised reapply.


### III.   CONCLUSION


For the foregoing reasons, violations of Modified Handschu and the NYPD Guidelines must rise to a constitutional level for contempt of this Court to issue.  In general injunctive relief is also available only if there is a constitutional violation; however, if it were shown that the NYPD had adopted a policy that disregards the NYPD Guidelines, the Court may exercise its continuing equitable powers in granting appropriate injunctive relief.  The NYPD Guidelines only apply where the police have the purpose of investigating political activity.

The Court holds as follows:

1.  The NYPD's motion for reconsideration and related relief is granted.  The Court's 2/07 Order enjoining implementation of Interim Order 47 is vacated.

2.  The NYPD's motion for relief from this Court's 8/03 Order is denied.

3.  Decision on the NYPD's motion for an order approving the Proposed Order that would replace Order 47 is reserved in order to give Class Counsel sufficient time to respond.  Class Counsel are directed to file and serve papers addressing this issue on or before June 25, 2007.

---

demonstrations.

Counsel may file and serve reply papers on or before July 9, 2007.  If the Court desires oral argument, counsel will be advised.

It is SO ORDERED.

Dated: New York, N.Y.
       June 13, 2007

                                    CHARLES S. HAIGHT, JR.
                            SENIOR UNITED STATES DISTRICT JUDGE