**WYLIE M. STECKLOW**  WWW.LAWYERSFORTHERESTOFUS.COM
**STECKLOW & THOMPSON**  217 CENTRE ST. FL. 6
NEW YORK, NY 10013
T(212) 566-8000
F(212) 202-4952
WYLIE@SCTLAW.COM

April 15, 2016

The Honorable Judge Charles S. Haight, Jr.
Senior United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, N.Y. 10007

> Re: Comments on the Proposed <u>Handschu</u> Settlement
> 71CV2203(CSH)

Dear Honorable Judge:

At the invitation of the *Handschu* class counsel, I have received and reviewed the proposed settlement agreement in *Handschu v. Special Services Division*, 71CV2203(CSH), and the related case of *Raza v. City of New York*, 13CV3448 (PKC)(JO). I very much appreciated the opportunity to assist in providing notice to other *Handschu* class members and to assist in the submission of their comments. Additionally, what follows are my personal comments concerning the proposed settlement. As an individual that has been working at protest here in NYC and around the country over the past twenty years, I cannot emphasize enough the importance of this case, and this Honorable Court, in sheparding and overseeing these efforts all these years, in the name of providing protections from unlawful police activity to activists in New York City. The work of the *Handschu* counsel over the past forty years has been monumental, and each of the participants should be thanked for their diligence and zealous representation of all those that participate in activities protected by the First Amendment in New York City.

Unfortunately, I cannot support the new *Handschu* guidelines as proposed. They fall far short of the needed protection while giving far too much trust to an NYPD that has proven decade after decade to have little to no respect, understanding or training for the intersection of First Amendment activities and constitutionally-proper policing in the streets and sidewalks of New York City. The NYPD continues to deny, but is often caught,

tracking, monitoring, reporting on, spying on, intimidating and chilling individuals and groups participating in activities protected by the First Amendment. The proposed guidelines do not provide the necessary protection to ensure that the unlawful activities of the NYPD will end.

I am a partner in a small, boutique civil rights law firm based in downtown New York City.  In 2008, I was one of the lead attorneys for the National Action Network in protests that occurred around New York City due to the acquittals of the NYPD officers that shot and killed Sean Bell which resulted in the arrest and prosecution of two-hundred and sixteen civilians.   In 2011, my law firm was retained by the Occupy Wall Street General Assembly and I assisted in facilitating the pro bono representation of over two-hundred individuals arrested in protest activities related to Occupy Wall Street. In 2014, I became the Civil Rights Law Committee Chairperson for the Federal Bar Association, Southern District of New York Chapter.  In 2015, I became the national Chair-Elect of the Federal Bar Association's Civil Rights Law Section.  My practice is focused on false arrests of activists and individuals in minority communities in and around New York City.  Pursuant to various litigations, attorneys in my office, and I, have deposed officers of the NYPD of all ranks from Police Officer to Chief of Department. I submit these comments in my personal capacity, as an attorney with a significant background in how the NYPD polices activities protected by the First Amendment.

Initially, I note that many individuals (including some that have submitted comments via email - See Docket # 443) have expressed a desire to be present at the fairness hearing and/or provide comments.  However, many of these individuals did not feel that they had sufficient time to submit comments.  Moreover, the fairness hearing is scheduled on the same day as the New York presidential primary, creating a conflict for individuals engaged in the activist and political process.  Do they work on a get out the vote or poll monitoring or some other electoral day activity in support of their chosen candidate or party, or do they spend the time seeking to be heard at the *Handschu* fairness hearing ?  I now understand that the court has entered an order (Docket # 444) adding a potential second day of testimony (April 20, 2016) and extending the date for comments to be submitted for thirty days.  I would ask the Court to consider adding one further additional day of testimony in Mid-May, to coincide with the expiration of the thirty day extension on comment submission.

Among the concerns I have with the wording of the agreement include:

(i) the authorization for the NYPD to use investigative techniques that are inappropriate for use against First Amendment groups. These include techniques such as police infiltrators, commonly called undercovers, and the use of stingrays by the NYPD (devices designed to steal cell phone messaging and phone calls without warning to anyone on the call);

(ii) the overuse of the term *unlawful activity* as a trigger for when the NYPD may open an investigation into First Amendment groups;

(iii) the lack of a clear level of proof for when the NYPD may open an investigation into a First Amendment group;

(iv) the 11 -1 (NYPD v. civilian advocate) membership of the *Handschu Committee* and the five year lifespan of the civilian representative; and

(v) failure of the NYPD to accept responsibility for its violations of the rights of members of the Muslim community in New York.

While I recognize that some of the concerns expressed herein may include items that were part of the prior *Handschu* guidelines, since those guidelines were created in 1985 and suspended in 2003 without comment or participation of the class, I respectfully submit that in 2016 comments that exceed the current modifications should be considered.

**(i)    IMPROPER INVESTIGATIVE TECHNIQUES**

In the Fall of 2011, Occupy Wall Street ("OWS") began in downtown New York City, and spread to over one hundred cities across the world in a matter of weeks. Previously, in response to the perceived failings that led to 9/11, the Department of Homeland Security ("DHS") set up multiple cross-jurisdictional offices (fusion centers) across the United States where law enforcement from federal, state, and local agencies could share information. During the early days of OWS, DHS received inquiries from many of these fusion centers seeking guidance concerning the type and manner of policing that was constitutionally permissible at various Occupy Wall Street encampments. Within the DHS, two offices were tasked with the responsibility of ensuring that DHS programs did not violate civil rights or privacy of individuals: The Civil Rights Civil Liberties Office ("CRCL")[1] and The Privacy Office (PRIV")[2]. Before announcing the official DHS position

---

[1] "Safeguarding civil rights and civil liberties is critical to DHS' work to protect the nation from the many threats we face. The Office for Civil Rights and Civil Liberties (CRCL) supports the Department's mission to secure the nation while preserving individual liberty, fairness, and equality

3

concerning the policing of OWS, both PRIV and CRCL were required to approve the standard for DHS.   The result was:

> PRIV and CRCL supports the position that the Occupy Wall Street-type protesters mostly are engaged in constitutionally protected activity. We maintain our longstanding position that DHS should not report on activities when the basis for reporting is political speech. We would also be loath to pass DHS requests for more information on the protests along to the appropriate fusion centers without strong guidance that the vast majority of activities occurring as part of these protests is protected. To do otherwise might give the appearance that DHS is attempting to circumvent existing restrictions, policies, and laws. To a large degree, these protests are no different from any other protests/events from civil liberties, civil rights and privacy perspectives. The issue is not the assembly of the groups nor the message of the participants, it is only (as far as DHS is concerned) illegal or suspicious behavior related to a DHS mission that occurs during the protests. A possible exception would be reports on the environment created at the protests sites that would endanger public health and safety, where the health and safety concern relates to a DHS mission.
>
> So there are certainly some circumstances that may allow limited reporting on behavior that is coincident and collocated with Occupy Wall Street-like protests. Persons demonstrating illegal or suspicious behavior and attempting to use the protests to obscure their activity could be reported, as long as there is no attempt to link the suspicious/illegal behavior to first amendment protected activity. Indeed, the normal CRCL and PRIV guidance used for HIRs and intelligence products would apply, as it is only the behavior which is being addressed.

This position was cleared by CRCL and PRIV and repeatedly set out in official DHS communications, that were publicly disclosed via FOIA requests by Truthout.org[3] and Partnership for Civil Justice[4].

---

under the law." https://www.dhs.gov/office-civil-rights-and-civil-liberties (last visited April 19, 2016)

[2] "The Department of Homeland Security Privacy Office is the first statutorily-required privacy office in any federal agency, responsible for evaluating Department programs, systems, and initiatives for potential privacy impacts, and providing mitigation strategies to reduce the privacy impact." https://www.dhs.gov/privacy-office (last visited April 19, 2016)

[3] Leopold, Jason, *DHS Turns Over Occupy Wall Street Documents to Truthout, 3/20/2012,* http://www.truth-out.org/news/item/8012-dhs-turns-over-occupy-wall-street-documents-to-truthout (last visited April 19, 2016)

[4] Partnership for Civil Justice Fund, *Documents Reveal Secret Nationwide Occupy Monitoring, 12/21/2012,* http://www.justiceonline.org/fbi_files_ows (last visited April 19, 2016)

4

The *Handschu* guidelines should utilize, at a minimum, this very same standard and provide the same, not less, protection than what DHS believes is required. Unfortunately, during the life of OWS in NYC, the NYPD did not respect these limitations. In fact, one Senior FBI Official, in an email communication with a former Senior FBI Official explained that (i) it was the NYPD Intelligence Division that refused to work within the parameters agreed upon by the other members of the fusion centers, including the other NYPD members of the fusion center, and (ii) the violations of individuals' rights that was perpetrated by the NYPD Intelligence Division would "make Hoover, COINTEL, Red Squads, etc look like rank amateurs compared to some of the damn right felonious activity, and violations of U.S. citizen's rights they have been engaged in."   (See Exhibit 1)

   a.  **INFILTRATORS**

Admittedly, courts have upheld some preliminary government investigations when they further proper law enforcement objectives, even when the activity affects First Amendment freedoms, *Fifth Avenue Peace Parade Committee v. Gray*, 480 F.2d 326 (2d Cir. 1973), cert. denied, 415 U.S. 948 (1974). However, courts do not (and should not) approve long-term infiltration into First Amendment groups without specific criminal activity afoot. Courts recognize that "governmental surveillance and infiltration cannot in any context be taken lightly. The dangers inherent in undercover investigation are even more pronounced when the investigative activity threatens to dampen the exercise of First Amendment rights." *Socialist Party v. Attorney* General, 419 U.S. 1314, 1318 (1974).

Absent judicial oversight of infiltration activities, the NYPD will continue their practice, as set by the NYPD Intelligence Division, to place long-term undercovers inside First Amendment groups for extended periods of time without cause. In October 2011, Detective Wojciech Braszczok infiltrated Occupy Wall Street and stayed inside the organization even after the occupation of Zuccoti Park had ended (11/15/11), continued after the 6 month anniversary (3/11/12), continued after the one year anniversary (9/17/12), continued even after those involved with OWS had pivoted when Hurricane Sandy hit New York (11/2012) when Occupy Sandy became a first responder to many residents of New York City devastated by this weather, and even after the two-year

5

anniversary (9/17/13). In fact, the New York Times reported this undercover continued to show up at Occupy events and keep contact with the Occupy activists in 2013.[5]

Det. Braszczok was not the only infiltrator placed by NYPD at OWS. He was simply the one that was publicly outed in 2013 by the NYPD, after he was arrested for his criminal conduct in escalating a traffic disagreement while undercover with a motorcycle gang.

In the *Raza* litigation, there was identification of an infiltrator from the NYPD that befriended female students at Brooklyn College from 2011 through 2013. "Three Brooklyn College graduates who had been close to the undercover officer told Gothamist of the intimate ties she developed with Muslim students, her presence during some of the most private moments of their lives, and the fear they endured when they learned her true identity."[6] It is this type of infiltration and relationship building without specific criminal activity afoot in groups and individuals involved in First Amendment activity that will continue under, and be condoned by, the current *Handschu* guidelines. In 2008, the Associated Press released documents from an investigation into the NYPD's continued spying on First Amendment groups. Along with a redacted Intelligence Division Deputy Commisionser's Briefing dated April 25, 2008, the AP identified multiple groups spied on by the NYPD that involved no criminal activity, from Sean Bell protesters to individuals involved in the People's Summit in New Orleans in April 2008, to college student members at College of the City of New York Muslim Student Organization (who had an infiltrator join them on a white water rafting trip). (See Exhibit 2).

Contrast these long-term infiltrations with one revealed by the New York City Law Department revealed in a FRCP 56.1 filing in *Carpenter v. City of New York*, 11CV8414(DLC) (Docket 36, paragraph 12-13). In that court filing, the New York City Law Department

---

[5] Dwyer, Jim, *Undercover Police, Just About Everywhere,* The New York Times, 10/10/2013, available at: http://www.nytimes.com/2013/10/11/nyregion/undercover-just-about-everywhere.html (last visited April 19, 2016)

[6] Stahl, Aviva, *NYPD Undercover 'Converted' to Islam to Spy On Brooklyn College Students, Gothamist* 10/29/2015, http://gothamist.com/2015/10/29/nypd_undercover_brooklyn.php (last visited April 19, 2016)

6

admitted that two undercovers were dispatched to infiltrate an OWS action that was to take place inside a Citibank in the West Village in October 2011. This type of short-term infiltration identified a specific, and articulable suspicion of criminal activity. It is this type of infiltration that the courts have approved in First Amendment settings.

### b.  USE OF STINGRAYS WITHOUT A WRITTEN POLICY

According to Wikipedia, 'the StingRay is an IMSI-catcher with both passive (digital analyzer) and active (cell site simulator) capabilities. When operating in active mode, **the device mimics a wireless carrier cell tower in order to force all nearby mobile phones and other cellular data devices to connect to it.**"[7] (emphasis added) The devices also can record phone numbers of incoming and outgoing calls, intercept the content of voice and text communications and quite possibly, can turn a cellphone into a bug to intercept conversations not being transmitted over the cellphone, just near the cellphone.[8]  Since 2008, the NYPD has admitted to using stingrays in the City of New York more than one-thousand times. Yet the NYPD also admits it has never had a written policy concerning the lawful use of such devices or perhaps, a training that sets out the requirements needed for use of such an invasive devise to be constitutionally compliant.[9] By allowing the NYPD to use this incredibly privacy invading surveillance equipment at protest activities, the policy makers at the NYPD have indicated their refusal to respect the First Amendment protections that cover these activities and the groups and individuals that participate in them. The *Handschu* guidelines, as currently proposed, will only empower those at the NYPD to continue such impermissible conduct without the proper checks and balances.

---

[7] Wikipedia, *Sting Ray Device*, https://en.wikipedia.org/wiki/Stingray_phone_tracker (last visited April 19, 2016)

[8] Zetter, Kim, *Turns Out Police Stingray Spy Tools Can Indeed Record Calls, Wired 10/28/2015,* http://www.wired.com/2015/10/stingray-government-spy-tools-can-record-calls-new-documents-confirm/ (last visited April 19, 2016)

[9] Goldstein, Joseph, *New York Police Are Using Covert Cellphone Trackers, Civil Liberties Group Say, New York Times,* 2/11/2016, http://www.nytimes.com/2016/02/12/nyregion/new-york-police-dept-cellphone-tracking-stingrays.html (last visited April 19, 2016)

### (ii)    UNLAWFUL ACTIVITY AS JUSTIFICATION
###           FOR INFILTRATION & SURVEILLANCE

The *Handschu* guidelines, like the NYPD and its Intelligence Division, fail to distinguish between terrorist activity and civil disobedience. The lack of understanding of the protections afforded protest activities is lost on the NYPD that from the Commissioner on down.  In fact, the NYPD no longer even believes it needs to hide its' disdain for free speech activities.  The NYPD has literally created a group that is tasked with policing both terrorism and free speech activities as if these were related.  In 2015, the NYPD created the Strategic Response Group to deal with terrorist attacks and protest activities. Within the proposed *Handschu* guidelines, See V(D)(a), there is specific explanation of when a terrorist enterprise investigation may begin.  However, there is no definition of unlawful activity. While individuals who seek to protest may take to the streets and block traffic momentarily, even if this conduct was deemed an act of civil disobedience, it should not authorize the opening of an NYPD police investigation into the activities of First Amendment groups. The preamble to the *Handschu* guidelines sets out that *"the prevention of future attacks requires the development of intelligence and the investigation of potential terrorist activity before an unlawful act occurs."* However, throughout the modified guidelines, the continued use of the term *unlawful activity* appears without the modification related to terrorist activity.  By a strict reading of the guidelines, the possible civil disobedience mostly associated with groups involved in Free Speech activities will authorize the opening of an investigation.  This court should not authorize such a broad based opening of investigations into groups protected by the First Amendment.  I respectfully refer the court to the comments submitted by my law partner David Thompson, for a more thorough explanation of the failures of the NYPD relating to civil disobedience, disorderly conduct and the NYPD's failure to train a constitutionally compliant definition of these terms as they relate to Firs Amendment activities.

### (iii)    THE STANDARD FOR OPENING AN INVESTIGATION

While the standard for opening a terrorism enterprise investigation is specifically spelled out in the guidelines, the standards for opening  the first two levels of investigation identified as the (i) checking of leads or a (ii) preliminary inquiry, are not defined.  The *Handschu* guidelines allow the NYPD to infiltrate First Amendment groups during both a level 1 checking of leads (*Handshu modification (*V)(A)), and a level 2 preliminary investigation

8

(*Handshu modification (*V)(B)), but do not require proof of any criminal activity afoot, and no probable or arguable probable cause is needed.  In fact, if a "reasonable indication," a lower standard than probable cause, is present, the NYPD can bypass the first two levels of investigation and go directly to a full investigation.  While these various low levels of proof may be acceptable when investigating criminal or terrorist enterprises, the *Handschu* guidelines are intended to govern when the NYPD investigates groups involved in activities protected by the First Amendment.  Such low thresholds of proof to begin investigating groups engaged in Free Speech activities should not be authorized by this court.

### (iv)   HANDSCHU COMMITTEE

The current make up of the proposed Handschu Committee would be up to eleven (11) high ranking members of the NYPD (and its Intelligence Division) and a single civilian member.  The guidelines anticipate two distinct types of violations: (a) a singular violation and (b) systematic violations.

(a) If the civilian representative identifies a singular violation of these guidelines, they are not authorized to inform the court.  They are obligated to initially file an objection in the minutes of the *Handschu* committee meeting and subsequently notify the NYPD Police Commissioner.  The NYPD Police Commissioner is tasked with opening an investigation, but the scope and timing of this investigation are undefined.  Seemingly, during this process, the objected-to police investigation will continue without interruption, and unless this singular investigation becomes part of a pattern or system of improper investigations, it will continue unabated until the NYPD unilaterally chooses otherwise.

(ii) If the civilian representative believes a violation to be a systematic and repeated violation, the civilian "shall" prepare a report for the judge assigned to the Handshu case.  While the use of the word 'shall' implies that a report must be made to the judge, this civilian representative has unlimited discretion to determine whether or not the violation is of a kind that triggers this obligation. However, the civilian representative cannot simply provide a copy of the report to the  court, but must first give the report to the NYPD Police Commissioner and Deputy Commissioner of Intelligence seven (7) days prior to confidentially providing a copy of this report to the federal judge assigned to the *Handschu* case.

9

Absent any express limitation in the guidelines, the police may open unlawful investigations on Free Speech groups without any recourse short of further litigation that actually ends the objectionable activity. Conceivably, numerous violations that arise under somewhat different circumstances could be treated individually, without notification of the Court. Moreover, with an 11 to 1 ratio of high-ranking NYPD officials to a civilian whistleblower, this position will be an extremely difficult one to be effective. A more even 1:1 ratio would be appropriate, but perhaps not possible. Therefore, the Court should consider whether two or three civilian members should be placed on the Handschu Committee, and whether the votes of two or three members of the *Handschu* committee should be sufficient to temporarily stop an objected-to investigation pending the police commissioner investigation or action taken by the Judge assigned to overview these objections.

### (v)   NO ADMISSION OF LIABILITY

Despite being caught in the act of unlawful spying on groups and individuals engaged in activities protected by the First Amendment, the NYPD settle these lawsuits with almost two million dollars of taxpayer dollars but under the agreed-upon settlement, "deny any and all liability and deny that they had or have a policy, or engaged in or currently engage in a pattern or practice of conduct that deprives any persons, including the Plaintiff Class and the plaintiffs in Raza, of rights protected by the Constitution and Laws of the United States." Obviously, when matters settle, they often include non-admission language. But this is not a run of the mill commercial litigation. This is an extremely disturbing pattern and practice of tracking, monitoring and surveilling the Muslim community in violation of a long-standing set of guidelines set in *Handschu*. The City of New York and the NYPD should not be able to buy their way out of this liability with no admission of wrongdoing. It is obviously and patently wrong, and this Court should not accept the settlement without an acceptance of responsibility by the City of New York of wrongdoing by the NYPD.

Respectfully submitted,

Wylie M. Stecklow, Esq.

10