DAVID A. THOMPSON
STECKLOW & THOMPSON

217 CENTRE STREET, 6TH FLOOR
NEW YORK, NEW YORK 10013
TEL:     (212) 566-8000
FAX:     (212) 202-4952
DAVE@SCTLAW.NYC

April 19, 2015

The Honorable Judge Charles S. Haight, Jr.
Senior United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, N.Y. 10007

      Re:    Comments on the Proposed Handschu Settlement
               *Handschu, et al. v. Special Services Division, et al.*, 71-cv-2203 CSH-SCS

Dear Honorable Judge Haight:

    I write as a member of the *Handschu* class.[1]  I write for the purpose of participating in the comments concerning proposed modifications of the Handschu Guidelines.  I affirm the truth of factual statements herein under penalty of perjury.  My qualifications as a class member are as follows.  I have been a resident of New York since shortly after this litigation was filed.  In 2004, I was co-chair of a grassroots political action group called Marriage Equality New York, and was one of the principal organizers of a march of approximately 3,000 people in New York City in support of same-sex marriage rights.  I organized or participated in numerous other events on behalf of that organization.  In addition, I recently gave a politically-themed short speech at a New York City mosque which was holding an event about Islamophobia.  To the extent that the current proposal concerns an actual or conceptual 'subclass' of individuals potentially subject to investigation because of their attendance at, or association with, a mosque, I may be a member of that 'subclass' as well.

    In addition, as an attorney a large percentage of my practice consists of representing New York City protestors in Section 1983 claims against the police.  All of these clients would be members of the *Handschu* class.  While I do not submit this letter on behalf of any particular such client, I believe the positions stated herein are broadly representative of the positions my protestor clients would wish me to present on their behalf.

    This litigation has been ongoing longer than I have been alive; it has been pending for approximately one-fifth of our history as a Republic.  I must therefore first note that one cannot express any valid opinion concerning this case that does not acknowledge the hard work and

---

[1] Defined as persons residing or physically present in New York who "engage in or have engaged in lawful political, religious [etc.] .. activities and who … have been, are now or hereafter may be subjected to or threatened by infiltration, physical and verbal coercion, photographic, electronic and physical surveillance, provocation of violence, recruitment to act as police informers and dossier collection and dissemination" by the NYPD.  *See Handschu v. Special Services Div.*, 605 F. Supp. 1384, 1388 (S.D.N.Y. 1985).

thought expended by class counsel and the Court these many years.  All concerned have my sincere thanks as a member of the class, and my tribute as a member of the legal profession.

I.      **The Request for Comment Has Not Been Clearly Presented to the Public**

Before commenting on the proposed amendments, I must first express my concern that the issues concerning which comment is being solicited are not sufficiently clear.  The docket in this case (i.e., in *Handschu, et al v. Special Serv. Div., et al*, 71-cv-02203-CSH-SCS) does not contain a copy of the proposed modification of the *Handschu* Guidelines.  While the docket contains items relating to the public notice concerning the modification, the notice itself is also absent from the docket.  (I assume that such materials would be found, if anywhere, in or after docket number 429).  There is a "Proposed Modification to the Handschu Guidelines" to be found on the docket of another case, *Raza v. The City of New York,* 13-cv-03448-PKC-JO (E.D.N.Y.), annexed to a proposed stipulation of settlement which references this case and states, *inter alia*: "The Parties further agree that the consent decree in *Handschu* shall be revised to reflect the edits in the Proposed Modified Handschu Guidelines set forth in Exhibit A."  (*See Raza*, 13-cv-03448, Docket No. 121-1, -2).  Exhibit A, in turn, contains a document which I take to be the proposed modifications that are at issue now.

Finding the proposed modifications does not completely dispel the mystery, however.  As just explained, the *Raza* proposed modifications are presented as proposed modifications to the "consent decree," but appear in fact to be modifications to the Patrol Guide Guidelines which were first made effective in their present form as an attachment to this Court's August 6, 2003 Second Revised Order and Judgment (288 F. Supp. 2d 411, 2003 U.S. Dist. LEXIS 24915).

The history, as I understand it, is as follows.  The *Handschu* consent decree consisted of the March 7, 1985 Stipulation of Settlement and Order which contained: a) recitals, b) certain terms of agreement, and c) the "Handschu Guidelines," all of which are contained in Exhibit A to this Court's March 7, 1985 Order.[2]  *See Handschu v. Special Services Div.*, 605 F. Supp. 1384, 1417-1424 (S.D.N.Y. 1985).  On February 11, 2003, this Court (without notice and comment by the class) entered a conditional order granting modifications to the Handschu Guidelines and some other terms of the consent decree.  *See Handschu v. Special Servs. Div.*, 273 F. Supp. 2d 327, 349 (S.D.N.Y. 2003).  The modifications were set forth in Appendix A to that decision.  One condition was that the NYPD propose a "text to be included in the patrol guide" reflecting a commitment by the NYPD to substantially conform to practices in use by the FBI.  *See id*.  This Court's Aug. 6, 2003 Second Revised Order found that the NYPD had complied with the condition by proposing an acceptable addition to the Patrol Guide.  *See Handschu v. Special Servs. Div.*, 288 F. Supp. 2d 411, 420, 2003 U.S. Dist. LEXIS 24915, *2 (S.D.N.Y. 2003).  The Court's Aug. 6, 2003 Second Revised Order accordingly modified the "Handschu Guidelines"[3] so as to "conform to the text appearing in Appendix A of the Court's Memorandum and Order of February 11, 2003."  In effect, this made the previously conditional order no longer conditional.  Attached to the Aug. 6, 2003 Second Revised Order was a NYPD FINEST message announcing "Guidelines for Investigations Involving Political Activity," the modification to the Patrol Guide mandated by the Court's Feb. 11, 2003 Order.  As the Court had previously explained in its Feb.

---

[2]      As this Court later explained, these "Handschu Guidelines" were "an integral part of the consent decree previously entered in this case" on March 7, 1985, but were not synonymous with the consent decree.  *See Handschu v. Special Servs. Div.*, 288 F. Supp. 2d 411, 420, 2003 U.S. Dist. LEXIS 24915, *2 (S.D.N.Y. 2003).

[3]

11, 2003 Order, these Patrol Guide sections were not at the same level as the consent decree and its Handschu Guidelines. The Court expressly declined to "entertain detailed objections or suggestions as to what the patrol guide should or should not say", because "the patrol guide is an internal NYPD document," as distinct from the consent decree and its Handschu Guidelines. *Handschu v. Special Servs. Div.*, 273 F. Supp. 2d 327, 349 (S.D.N.Y. 2003).

The Court should ensure that the relationship between the consent decree, the Handschu Guidelines, and the Patrol Guide is clarified for the plaintiff class generally, and commenters in particular. Although I am a reasonably well-trained lawyer, I cannot say with confidence whether the proposed modification is a proposed Patrol Guide section ("an internal NYPD document"), or whether it replaces both the Patrol Guide section and the February 11, 2003 Handschu Guidelines, or whether it is meant to have some other effect.

Similarly, it is not clear whether the terms of the proposed settlement in the *Raza* litigation are intended to become binding on the Handschu class. The *Raza* settlement includes terms which would affect the Handschu class if binding upon them. For example, it includes the statement: "The sole authority to allege that the NYPD has violated the Proposed Modified Handschu Guidelines … remains with Handschu Counsel, and nothing in this Stipulation shall be construed to mean otherwise." (13-cv-03448-PKC-JO Document 121-1, ¶ 11). This statement is facially inconsistent with the Court's prior ruling that "the only sensible and practical manner in which to provide for future enforcement of the Court's decree, should that prove necessary, is to permit any class member feeling aggrieved to retain counsel of his, her or its choosing to prosecute the claim*." Handschu v. Special Services Div.*, 605 F. Supp. 1384, 1416 (S.D.N.Y. 1985). The Court's holding that other counsel should be permitted to represent Handschu plaintiffs was based in part on the Court's observation that class counsel are not immortal, a factual finding that – although lamentable – cannot be assailed. ("Thout know'st 'tis common, all that lives must die, passing through nature into eternity.").

Relatedly, it is not clear to me whether any of the living class representatives still act in that capacity, and thus, whether any non-attorney is representing the class, and whether there is anyone exercising the client's prerogative to approve or disapprove settlements. I do not say that there necessarily must be formal class representation at all times. The Court's 1985 ruling implies, but does not expressly state, that in the "generations yet unborn" who will be bound by this decree, individuals may emerge from the class as needed to seek its enforcement an modification. *Handschu v. Special Services Div*., 605 F. Supp. 1384, 1416 (S.D.N.Y. 1985). That may well be the correct position to take, but class members should at least be aware – especially at moments like this one when a modification is in the offing – whether the class has non-lawyer representatives, who they are, and what position (if any) such persons have taken on the issues at hand. In the present context, if there are no longer any active class representatives, class members ought to know that this comment process is the sole manner in which the class is participating in the modification process. Such knowledge could materially affect the scope and nature of class members' comments.

To summarize, the class cannot comment effectively unless it knows what it is commenting on. Respectfully, the Court should not issue an order until this has been remedied.

II.     **The Handschu Authority Is the Sole Benefit Still Provided By The Decree**

When the Court approved the 2003 modifications to the Handschu decree, without public comment, the Court undertook to assure itself that the modified Handschu consent decree did not sink to the "constitutional floor," which means that the Court sought assurance that the revised

Handschu regime offered the plaintiff class something extra above mere observance of the Constitution.  The Court held, and it was apparently undisputed, that if the proposed revision to the Handschu consent decree did not offer something extra, it could not be approved.  *See Handschu v. Special Servs. Div.*, 273 F. Supp. 2d 327, 342 (S.D.N.Y. 2003) (citing *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 391 (1992)).

The Court admitted that "the NYPD's motion seeks to modify [pre-2003 Handschu] by eliminating all restrictions and limitations on police investigative activity other than the constitutional policy statement." *Id.* at 345.  The Court noted that the Constitution would limit NYPD activity regardless of that policy statement: it would do so even if the modified Handschu "contained an express provision purporting to repeal the Constitution." *Id.*  The Court concluded: "I do not think the Modified Handschu's constitutional policy statement, standing alone, preserves them from a disfavored decent to the constitutional floor.: *Id.*  (Indeed, a bare commitment to obey the Constitution is 'the constitutional floor' by definition).

The Court found one single benefit to the modified Handschu regime that raised it above the constitutional floor, thus allowing it to be approved.  This was the continued existence of the "Handschu Authority." *Id.* at 345.  The Court noted that in addition to existing, upon complaint by a citizen, the Handschu Authority was obliged to "make inquiry of the appropriate investigative officer of the NYPD, … to determine whether the investigation was or was not 'conducted in accordance with the Constitution,' and notify the requesting party of its conclusion." *Id.*  Nothing in the amended Handschu regime compelled the Handschu Authority to provide anything more than a bare yes or no in answer to a citizen's request.  Nothing compelled the Handschu Authority to do anything more than ask the appropriate officer if a violation occurred.[4]  The Handschu Authority would do absolutely nothing other than make such inquiries.

Nevertheless, the Court found the existence of the Handschu Authority sufficient to lift the Handschu regime some quantum above the impermissible floor.  The Court explained how a hypothetical John Doe citizen might avail himself of the Handschu Authority's powers:

> By invoking Section V [the section creating the Handschu Authority complaint system], John Doe is assured that a formidable body (two police officers of exalted rank and a civilian member who is a Mayoral appointee) will seek out and question the NYPD commander involved in order to determine the constitutionality of the NYPD's investigation of John Doe and report to John Doe the outcome, all without effort or expense to him. All Section V requires John Doe to do is show the Authority that he has 'reason to believe' the NYPD has violated his constitutional rights: not too high a bar to set.

> One can readily discern in Section V of Modified Handschu significant enhancements of the remedies secured to the public by the Constitution and the civil rights laws and the deterrent effect of those laws on unlawful police conduct. First, Section V gives the John Does of the City a very considerable leg up in pressing their claims. If the Authority reports to John Doe that no constitutional violation occurred, he may be disappointed, but his right to file a § 1983 action is undiminished. Second, NYPD commanders will surely

---

[4] Indeed, activities like obtaining relevant documents and "inquiry into the circumstances" were expressly deferred until after the initial "inquiry" reveals that the Constitution was violated.  *Handschu v. Special Servs. Div.*, 273 F. Supp. 2d 327, 350 (S.D.N.Y. 2003).

be aware that investigations for which they are responsible may have the unwanted effect of having the Handschu Authority come to call.

The Court found no basis other than this Handschu Authority complaint system to approve the modification, except perhaps the Court's finding that the substance of the guidelines might be counted as evidence of the proper constitutional standard in a litigation, and thus were not "entirely meaningless." *Handschu v. Special Servs. Div*., 273 F. Supp. 2d 327, 345, 347 (S.D.N.Y. 2003). The Court was correct to find such a benefit not quite entirely meaningless.

### III.   The Handschu Authority Has Apparently Done Nothing Since 2003

Since the Handschu Authority was the linchpin of the modified Handschu regime, it is of critical importance to understand how that lynchpin has functioned since 2003. There are two observations to be made in this regard.

First, neither the *Raza* docket nor the *Handschu* docket reflect that any Court-directed inquiry has been made into the efficacy of the Handschu Authority. Given that the Handschu Authority is the *raison d'etre* of the modified Handschu regime, neither the class members nor the Court can properly evaluate the proposed modifications to the Handschu Authority (by means of the creation of a Handschu Committee) without such information. The proposed modifications should not be approved until an audit of past activities of the Handschu Authority has been performed and publically shared with the class. John Doe deserves to know what the Authority has been up to.

Second, the little we do know about the Handschu Authority suggests that unfortunately it has done absolutely nothing since 2003. In 2014, the Village Voice spoke to John H. Doyle III, the Handschu Authority's "last civilian representative." Doyle explained that the Handschu Authority essentially ceased to exist after the 2003 modification. The Voice wrote:

> The Handschu Authority ostensibly still exists, but John H. Doyle, the body's last civilian representative, appointed by Rudy Giuliani in the mid 1990s, says it hasn't met in more than a decade. Before the guidelines were modified the Handschu Authority would meet every couple of months. "We heard the police department present a description of their ongoing intelligence activities, and the Handschu commission had to approve them in advance, and then we would get reports on the status," Doyle tells the Voice. "After the new guidelines went into effect there were no meetings."
>
> That means there is no one anywhere outside of the NYPD to question whether there really is enough specific evidence to open an investigation, or to suggest a fruitless hunt should finally be called off. Doyle won't say how often the Handschu Authority rejected the NYPD's surveillance requests before the guidelines were modified, but he does offer, "There were situations where what was proposed was rejected." Today, he says, the authority's only purpose would be to accept a complaint from someone who believes he or she was improperly surveilled — but he has never received one.[5]

I cannot vouch for the accuracy of what is reported, but I can verify that I have never come across evidence of the Handschu Authority's active existence in any protestor-related

---

[5]   See Stuart, Tessa, "Spy vs. Guy: What It's Like to Be the Target of NYPD Surveillance," THE VILLAGE VOICE, Tuesday, November 25, 2014 http://www.villagevoice.com/news/spy-vs-guy-what-its-like-to-be-the-target-of-nypd-surveillance-6692249

litigation of which I have knowledge (direct or otherwise).  After an extensive web search I have been unable to find any evidence of activity by the Handschu Authority after 2003.  Nor have I been able to find any indication of where or how John Doe might make a complaint to the Authority to set that "formidable body" in motion on his behalf.  The few facts we have concerning the Handschu Authority give troubling cause for further investigation to learn whether it ever fulfilled its proposed and critical function.  It is difficult to imagine how the Court or the Handschu class could evaluate the viability of plans for the Handschu Committee without such information.

In 2003, the Court did not have the benefit of hindsight to know that the Handschu Authority, for which it had such evident hopes, would in fact (apparently) fail so grievously to live up to them.  "The best-laid schemes o' mice an' men gang aft agley."  However, the scheme having gone agley, the Court should undertake a robust investigation to determine what happened.  At a minimum, there should be testimony from former members of the post-2003 Authority and from whomever it was that made the decision to disband it (if indeed it ever was formally disbanded).  The Court and the class might also benefit from testimony by members of the pre-2003 Authority, for the purpose of understanding why and how that body apparently worked more effectively.

### IV.    The Court Should Entertain Discussion of the Language of the Patrol Guide Policy

In 2003, the Court expressly declined to "entertain detailed objections or suggestions as to what the patrol guide should or should not say", because "the patrol guide is an internal NYPD document," as distinct from the consent decree and its Handschu Guidelines.  *Handschu v. Special Servs. Div.*, 273 F. Supp. 2d 327, 349 (S.D.N.Y. 2003).  At that time, the Court did not hear comment from the plaintiff class concerning any part of the modified Handschu regime.  I believe that comment on the entire substance of Handschu as it is currently written and as it is proposed to be changed should be heard.  I offer some such comment herein.

My concern with the Handschu guidelines as they presently exist and as they are proposed to be modified springs first and foremost from the fact that they condone long-term intrusive investigation of any and all "unlawful" activity.  Unlawful activity includes not merely criminal activity but any activity that violates the law.  *See United States v. Johnson*, 968 F.2d 208, 212 (2d Cir. N.Y. 1992) ("While it may not be 'seriously' unlawful in some broader moral sense, conduct which constitutes a 'violation' under New York law is not 'lawful conduct.'").  As such, the term "unlawful activity" includes noncriminal violations such as disorderly conduct, noise violations, jaywalking, etc.  Taken as a whole, the guidelines presently authorize intrusive investigative activity into political conduct and organizations if the police anticipate that "unlawful activity," such as one or more instances of disorderly conduct or jaywalking, may occur.

 I can state from personal knowledge that police officers are presently trained to regard occurring or imminent acts of disorderly conduct in violation of Penal Law 240.20, as sufficient pretext to film protesters under the current guidelines.  (I base this statement on testimony by videographers of the NYPD Technical Assistance Response Unit which films outdoor protests, in depositions I have taken within the last two years).  I'm not aware of anything in the guidelines which would compel a different interpretation of the term "unlawful activity" in the context of undercover infiltration of a political group than that which I know the police currently use in the context of videotaping protest activity.

	As mentioned previously, prior to becoming an attorney who litigates on behalf of protesters, I was an activist and I've personally organized pickets, protests, and marches, including one march that involved approximately 3000 participants.  I can say from experience that it is impossible to organize any march involving a significant number of people at which at least one person does not commit jaywalking, disorderly conduct by blocking pedestrian traffic, or some other minor offense.  If the prospect of "unlawful' activity at a march justifies an investigative technique, and disorderly conduct is an unlawful activity, then every march may be subject to that investigative technique under the guidelines.   The sole limitation will be the discretion of the police.

	Furthermore, paragraph one of the general principles makes clear that pure speech which advocates the commission of disorderly conduct, such as civil disobedience by sitting on a street or sidewalk blocking traffic, could be subject to a Handschu-compliant investigation unless it was apparent that there was "no prospect of harm."  Given that the term "harm" is also undefined by the guidelines, one must assume that police seeking to initiate investigations will give this word the broadest conceivable meaning. One must assume that the term harm will be read to encompass inconvenience to pedestrians and other trivialities.   Thus, there is unlikely ever to be an instance of unlawful conduct which the police do not regard as presenting some prospect of harm.

	 The guidelines say: "full investigation may be initiated when facts or circumstances reasonably indicate that an unlawful act has been is being or will be committed." (Proposed Guidelines, III.C).  And, "the standard of reasonable indication is substantially lower than probable cause." (Proposed Guidelines, III.C.i).  With this in mind, I understand the guidelines as currently written to authorize a Full Investigation of any proposed protest or march, and of any individuals or groups who propose to participate in a march.

	For these guidelines, it can be truly said (as the Court noted) that the 2003 modification "eliminate[ed] all restrictions and limitations on police investigative activity other than the constitutional policy statement." *Handschu v. Special Servs. Div.*, 273 F. Supp. 2d 327, 345 (S.D.N.Y. 2003).

	Thus, there is only one check upon police use of minor "unlawful activity" as a pretext for conducting a Full Investigation, and potentially employing "any lawful investigative technique" while doing so.  That is existence of the Handschu Committee, successor to the late lamented Handschu Authority. (Proposed Guidelines, VI.1).  However, based on the apparently immediate demise of the Handschu Authority after the NYPD obtained the modifications it requested in 2003, the Handschu Committee must be presumed ineffective unless the settlement structure compels it to be otherwise.  The proposal for the Handschu Committee falls far short.  Like the Handschu Authority, the Handschu Committee will accomplish nothing.

	Whereas the both the original Handschu Authority had three members, one of whom was a civilian, the Handschu Committee is proposed to have 11 police members and one civilian. (Proposed Guidelines, VI.2, 3).  Thus, all but one of the Committee's members will be drawn from the same entity that the Committee purportedly supervises, and the one civilian will be thoroughly outnumbered. (Proposed Guidelines, VI.2, 3).   This civilian, furthermore, will be appointed by the successor of one of the defendants.  The presence of the civilian on the Committee cannot be presumed to continue after five years, when the guidelines permit that position to be abolished. (Proposed Guidelines, VI.3).  Thus, the Handschu Committee is structured to lack an effective civilian voice.  In 1985, this Court declined to presume that the civilian member of the Authority would "play a supine role" "until the contrary is demonstrated."

*Handschu v. Special Services Div.*, 605 F. Supp. 1384, 1410 (S.D.N.Y. 1985). The contrary has now been demonstrated, at least on *prima facie* basis, and unless a factual inquiry shows cause to believe that the result post-2016 will be different than it was post-2003, the Court must be cynical about how this proposed Committee will function.

According to the proposal, the Handschu Committee "may" meet monthly, but it may never meet at all without violating the proposed language of the guidelines. (Proposed Guidelines, VI.1). The Handschu Committee will be presented with "investigative statements," which are not expressly required to contain any particular information. (Proposed Guidelines, VI.1). There is no requirement, furthermore, that the investigative statement call attention to the intent to use intrusive techniques such as undercover infiltration in a particular investigation. (Proposed Guidelines, VI.1). There will be no incentive to include information which might give rise to questions or negative opinions by the Committee, due to the lack of content requirements, and the lack of any penalty for failure to properly inform the Committee. (Proposed Guidelines, VI.1).

The Handschu Committee cannot approve or disapprove any activity. (Although several members of the Committee could, if motivated to, use the chain of command independently of the Committee to initiate, modify, or terminate investigations or the use of particular investigative techniques). The sole activity of the Committee will be to "ask questions and offer opinions" about investigative statements. (Proposed Guidelines, VI.1). The obligation to investigate on behalf of John Doe has been removed.

The Handschu Committee is not authorized to publish reports. Only the civilian representative, whose position may be abolished after five years, is authorized to make any report at all. (Proposed Guidelines, VI.3.f-g). The civilian representative clearly represents the defendants, not the class. The representative is appointed by the defendant City of New York. Information possessed by the civilian representative can be shared with representatives of the defendants, but can only be shared with Class Counsel upon defendants' consent or an order of the Court. The civilian representative will only make a report if the civilian representative identifies a pattern of violations, and the report can only be made to the assigned judge. (Proposed Guidelines, VI.3.f-g). The civilian representative's discretion in determining what constitutes a violation or pattern of violations is unreviewable. There is no mechanism for any of this information to become public. Given that the civilian representative is required to report to the rest of the Committee and then wait seven days before making any report to the judge, the likelihood exists that any civilian representative who determines to make a report will be subject to pressure, in the interim, to desist from doing so.

What little we know of the activities of undercover officers in Occupy Wall Street shows that at least one undercover spent more than a year participating in OWS events, including getting arrested with two other OWS protestors in the course of a protest action that involved releasing a small number of balloons in Grand Central Station.[6] Balloon-releasing is not a known Al Qaeda tactic, and there is no conceivable legitimate justification for police undercover involvement in such protest activities. Justification for undercover investigation of Occupy Wall Street ("OWS") was lacking in general. With one or two minor incidents as exceptions, OWS events were uniformly non-violent. OWS had a far better record for non-violence than other civic gatherings like Yankee games or the Saint Patrick's Day Parade. Unlawful activity at OWS events consisted almost exclusively of violations like disorderly conduct, and yet OWS was infiltrated and

---

[6] See "Occupy's Undercover Cop: 'Shady,' Ubiquitous, & Willing To Get Arrested," GOTHAMIST, Oct. 10, 2013, http://gothamist.com/2013/10/10/occupys_undercover_shady_ubiquitous.php.

surveilled. (With more time, other commenters and I could present more detailed evidence of the instances of such surveillance/infiltration which have come to light). Thus, Detective Wojciech Braszczok's long-term undercover presence in OWS is evidence that the police do, in fact, regard non-violent, non-criminal offenses as sufficient justification to institute a multi-year undercover investigation of a political organization. The Court should obtain more information about these police activities before approving any Handschu modifications.

If the police were to institute an 18 month undercover investigation of a political group because of the prospect of the future commission of the offense of disorderly conduct, this would be an absurd degradation of the guidelines and the betrayal of their basic purpose. Yet, there is nothing in the guidelines that expressly prevents this absurd result from occurring. Experience shows the police have no qualms about such abuse of these techniques. The NYPD has no qualms about resort to tortuous interpretation of law and language to reach their desired result. The Court should not approve any Handschu guidelines until proper steps have been taken to ensure that the resulting guidelines will address the problems this lawsuit was originally filed to remedy.

V.      **Conclusion**

For the reasons articulated above, the proposed amendment should not be approved until, at a minimum, the class has been properly informed of what changes to the Handschu regime are proposed, and has been provided the necessary factual and procedural information to evaluate it properly. Such information includes information, which must be gathered, concerning the apparent failure of the post-2003 Handschu Authority. For the reasons stated above, the proposed Handschu Committee appears likely to fail for similar reasons to the flaws that killed the 2003 Authority. Because it has never previously done so, and the language of the decree is once again at issue, the Court should expressly invite and entertain comment concerning the words used in the Patrol Guide section which embodies the Handschu Guidelines. For the reasons stated above, the language in the Patrol Guide section should be disapproved, because it seemingly condones a "Full Investigation" including infiltration and surveillance of any and all individuals that propose to take part in protest of any kind.

Respectfully submitted,

DAVID A. THOMPSON