# DAVID A. THOMPSON
# STECKLOW & THOMPSON

217 CENTRE STREET, 6TH FLOOR
NEW YORK, NEW YORK 10013
TEL:    (212) 566-8000
FAX:    (212) 202-4952
DAVE@SCTLAW.NYC

May 27, 2016

The Honorable Judge Charles S. Haight, Jr.
Senior United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, N.Y. 10007

      Re:    Comments on the Proposed Handschu Settlement

Dear Honorable Judge Haight:

      I write as a member of the *Handschu* class. The *Handschu* consent decree as presently formulated is premised on the idea that there is no way to express a distinction between terrorism, on the one hand, and political or religious expression, on the other. Therefore, this Court has approved, and appears ready to re-approve, a consent decree that relieves the police from any duty to make such a distinction.

      There can be no argument that a police department which is incapable of distinguishing between terrorists and protestors, or between prayer and conspiracy, is fundamentally incompetent. If such a police force is entrusted with the task of preventing terrorist attacks, it will fail at that task. It is not a question of **if** such a failure will occur, but **when**. A police force that cannot tell the difference between Al Qaeda and Occupy Wall Street will spend its time infiltrating sit-ins when it should be infiltrating sleeper cells. It will blindly and randomly assign officers to surveil and snoop, because it is blind to the differences in goals, tactics and actions that distinguish terrorists (who blow up buildings) from protestors (who picket in front of them). Such a police force is incapable of accurately assessing risk, and is doomed to fail at preventing risk from materializing.

      Nor can there be any argument that a police force which is capable of distinguishing between terrorists and protestors – but which chooses not to – is

1

fundamentally corrupt. We give the police incredible power, including the power to kill, for a purpose: to protect the innocent in society from the guilty. A police force which uses its power against the innocent and guilty alike, without distinction, commits an absolute violation of that trust. It is certainly a violation of every officer's oath to uphold the Constitution. It is a violation tinged with fraud, and that fraud is itself tinged with real or threatened violence. Needless to say, a police force that willfully refuses to distinguish between terror and protest, or terror and worship, will fail at the task of protecting society from terrorism, for the simple reason that it is has substituted a self-serving agenda of power-augmentation for the legitimate goals assigned to it by society.

Do not think that this is mere rhetoric. In this country, we have seen the evils of domestic political surveillance before.

An example from the previous era of rampant political surveillance is the FBI's surveillance of Martin Luther King. Starting in 1963, the FBI placed Martin Luther King under constant surveillance. An FBI memo of the time described King as an "unprincipled opportunistic individual" whose work was leading towards a "Negro-labor coalition which the communists hope to be able to manipulate as a potent political action weapon."[1] Internally, the FBI's stated goal in collecting information on King was "neutralizing King as an effective Negro leader."[2]

In 1964, the FBI sent an anonymous letter to King, purportedly from a disgruntled "Negro," calling Dr. King a "complete fraud," and demanding that he kill himself within 34 days: "There is but one way out for you. You better take it before your filthy, abnormal fraudulent self is bared to the nation."[3]

Until the time of King's death, J. Edgar Hoover's FBI continued to monitor King for the purpose of discrediting or neutralizing him. In August 1967, the FBI created a "covert intelligence project" ("COINTELPRO") targeting "Black Nationalist–Hate

---

[1] Memorandum of F.J. Baumgardner, December 19, 1963: "Subject: Communist Party USA, Negro Question, Communist Influence in Racial Matters."
[2] Memorandum of W.C. Sullivan, December 24, 1963: "Subject: Communist Party USA, Negro Question, Communist Influence in Racial Matters."
[3] Christensen, Jen, "The FBI's secret memos show an agency obsessed with "neutraliz(ing)" MLK," CNN.com November 14, 2014, available at, http://www.cnn.com/2014/11/14/us/fbi-and-mlk/; 1964 Draft Letter (anonymous) from FBI files.

2

Groups," which in the mind of the FBI included Dr. King and other civil rights leaders. King was targeted because the FBI believed that he could become a "messiah" who could unify black nationalists "should he abandon his supposed 'obedience' to 'white liberal doctrines' (nonviolence) and embrace black nationalism."[4]

The FBI did not succeed in "neutralizing" King, at least not directly. However, it cannot be said that there was no harm caused by the FBI's categorization of Dr. King as a threat. The US Select Committee on Assassinations of the U.S. House of Representatives found that "It is highly probable that James Earl Ray stalked Dr. King for a period immediately preceding the assassination."[5] If the FBI had not been focused on bringing about the disgrace and possible suicide of Martin Luther King, it might have prevented his assassination at the hands of the domestic terrorist who was, like the FBI itself, "stalking" Dr. King.

Let this be a lesson: A law enforcement agency which cannot or will not distinguish between crime and protest will fail at its basic law enforcement mission, while creating a danger to society every bit as grave as that presented by crime and terrorism.

But is it really the case that the NYPD is a law enforcement agency that cannot or will not distinguish between terrorists and protestors? The terms of the consent decree indicate that it is. The NYPD sought, and was granted, relief from any duty to make such a distinction. But far more significantly, the NYPD has organized its enforcement divisions around this very principle. The NYPD has combined its anti-terrorism unit and the unit that polices protests into a single "strike force" called the Strategic Response Group. According to Commissioner Bratton, the Strategic Response Group will be dedicated to "disorder control and counterterrorism protection capabilities."[6] CBS News

---

[4] *See* FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES, UNITED STATES SENATE : TOGETHER WITH ADDITIONAL, SUPPLEMENTAL, AND SEPARATE VIEWS, BOOK III, 94th Cong. 2d Sess. Report No.94-755, pp. 16-21, available at https://archive.org/details/finalreportofsel03unit.
[5] REPORT OF THE SELECT COMMITTEE ON ASSASSINATIONS OF THE U.S. HOUSE OF REPRESENTATIVES, Washington, DC: United States Government Printing Office, 1979, available at: http://www.archives.gov/research/jfk/select-committee-report/part-2a.html.
[6] "Commissioner Bratton Unveils Plans For New High-Tech Anti-Terror Police Unit," CBS Local, January 29, 2016, available at: http://newyork.cbslocal.com/2015/01/29/bratton-unveils-plans-for-new-anti-terror-police-unit/.

3

reported: "The unit of 350 cops will be specially trained in high-tech weaponry to deal with protests, 'lone wolf' attacks and evolving threats posed by terrorists."[7] Protestors and terrorists will stare down the barrel of the same gun.

Even so, the Court may imagine that the NYPD of 2016 is more benign than the FBI of the 1960's. At least one member of today's FBI would beg to differ. Commenting on NYPD activity surveilling the Muslim community, in November 2011 a Senior FBI agent (name unknown) wrote of the NYPD's surveillance of the Muslim community, as he observed it from the New York fusion center:

> [Officers from NYPD Intelligence Division] are also listening to [NYPD Deputy Commissioner for Intelligence] Cohen who, near as anybody can tell, never had to make a criminal case or testify in court. I keep telling you, you and I are going to laugh and raise a beer one day, when everything intel has been involved in during the last 10 years comes out – it always eventually comes out. They are going to make Hoover, COINTEL, Red Squads, etc. look like rank amatures [sic] compared to some of the damn right felonious activity, and violations of US citizen's rights they have been engaged in.[8]

And, according to Pulitzer Prize winning reporting by the Associated Press, the abuses described by this FBI agent led to **no** leads and **no** terrorism cases.[9] Once again: a police force that cannot distinguish between worship and terror will fail at its most basic mission.

How dangerous is an NYPD out of control? The NYPD claims to have the ability to "shoot down planes" if it deems it necessary.[10] It has purchased "sound cannons" that could permanently deafen an entire crowd of protestors. It has purchased Stingray equipment that allows it to tap cell phones without any oversight. It is deploying "high-tech weaponry" against protestors.

Would the NYPD engage in widespread activity that violated the law and the public trust? Sadly, there is plenty of evidence that it would, and that it does.

---

[7] *Id.*

[8] Kundnani, Arun, THE MUSLIMS ARE COMING!: ISLAMOPHOBIA, EXTREMISM, AND THE DOMESTIC WAR ON TERROR, Verso, London, 2014.

[9] Goldman, Adam and Apuzzo, Matt, "NYPD: Muslim spying led to no leads, terror cases," Associated Press, Aug. 21, 2012, available http://www.ap.org/Content/AP-In-The-News/2012/NYPD-Muslim-spying-led-to-no-leads-terror-cases

[10] Goldman, Russel, "NYPD Can Shoot Down Planes, But With What Weapon?" ABC NEWS, Sept. 26, 2011, available at: http://abcnews.go.com/Blotter/nypd-shoot-planes-weapon/story?id=14608555

4

From 1983 through 2010, the NYPD "continuously enforced three unconstitutional loitering statutes for decades following judicial invalidation of those laws and despite numerous court orders to the contrary." *Casale v. Kelly*, 710 F. Supp. 2d 347, 350 (S.D.N.Y. 2010). This unlawful enforcement resulted in tens of thousands of arrests. Only the threat of sanctions finally terminated the illegal practice.

For decades, police engaged in a practice of falsely arresting civilians (generally minority) for misdemeanor marijuana possession when they were guilty only of non-criminal possession. As the Court may know, possession of small amounts of marijuana is not a criminal offense. Rather, it is a non-criminal violation. If the same quantity of marijuana is held in "plain view," however, possession becomes criminal (a misdemeanor). Beginning in the mid-1990's police conducting *Terry* stops began routinely instructing civilians whom they stopped to take any marijuana in their possession out of their pockets. If the person did so, however, they were frequently arrested on the misdemeanor charge for having marijuana in "plain view."[11] It should go without saying that conduct performed at the order of a police officer cannot be the basis for criminal liability. However, the arresting officers routinely committed perjury in the misdemeanor criminal complaints associated with these arrests, omitting the critical fact that conduct the person was arrested for was the result of following police orders. This racially-skewed practice led to tens of thousands of arrests over a decade. Individual officers were motivated to make these arrests because the non-violent offenders presented low risk, and the arrests generated overtime pay and "productivity" numbers. Without admitting that the practice existed, in 2011 Commissioner Kelly finally ordered his officers to stop it.[12]

For more than a decade, the NYPD engaged a program of employing *Terry* stops on a massive scale in what has become known as "stop-and-frisk." In 2011, at its peak, the NYPD performed 685,724 such stops (mostly of minorities). Police allegations that each stop was supported by reasonable suspicion were belied by the fact that the tactic

---

[11] Levine, Harry G., and Deborah Peterson Small, "Marijuana Arrest Crusade: Racial Bias and Police Policy in New York City 1997-2007," American Civil Liberties Union (2008).
[12] Chang, Ailsa, "Police Commissioner Calls on NYPD to Stop Improper Marijuana Arrests," WNYC Radio, Sept. 23, 2011, available at: http://www.wnyc.org/story/160516-police-commissioner-calls-nypd-stop-improper-marijuana-arrests/.

actually uncovered crime at a minimal rate.[13] The Floyd litigation examined a sample of stops, considered evidence of police practices, and expert analysis of stop statistics, to find a pattern of unlawful stops. The fact-finding noted that the police "increasingly developed 'scripts' for checking off stop factors" (i.e., the information provided by police on mandatory reporting forms was not truthful), but even relying on such information, and acknowledging that unjustified stops were drastically undercounted as a result, the court found a pattern of unlawful stops, and that "NYPD implements its policies regarding stop and frisk in a manner that intentionally discriminates based on race." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 663 (S.D.N.Y. 2013). Outside the courtroom, the NYPD insisted that it could not keep us safe unless it were permitted to continue routinely violating the Constitution on a massive scale. If true, this would be a sign of incompetence. However, when the new administration ended the practice, crime rates remained stable. The NYPD's warning was not true.

If we knew more about NYPD practices, we would be likely to identify further widespread abuses. Courts, however, routinely allow flimsy claims of privilege to go unchallenged. Much remains secret. This Court should not believe that by preserving the veil of secrecy around the NYPD's practices, it contributes to our security.

Secrecy does not promote security, it undermines it. The 9/11 Commission stated in the executive summary to its final report: "Secrecy stifles oversight, accountability, and information sharing."[14] Secrecy – in particular "overclassification" of information – was one of the causes of the intelligence failures that allowed 9/11 to happen. NYPD secrecy increases the risk of another 9/11, and creates other risks by allowing authoritarianism to grow within the organization unchecked.

The Court has indicated that the only portions of the consent decree that are under any review are the proposed modifications from the 2003 version. However, that need not be the case, and should not be the case. Facts have changed – including the Court's

---

[13] Gay, Mara and Mark Morales, 'NYPD Stop-and-Frisk Numbers Questioned Auditor raises doubts on extent of drop in police tactic as audit shows some encounters go unreported," the Wall Street Journal, July 9, 2015, available at: http://www.wsj.com/articles/nypd-stop-and-frisk-numbers-questioned-1436489927.
[14] THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES, EXECUTIVE SUMMARY, p. 24, available at: http://govinfo.library.unt.edu/911/report/911Report_Exec.pdf

knowledge that the NYPD completely ignored its duties under the prior consent decree to maintain a functioning Handschu Authority (which appears never to have met or performed any functions whatsoever). Furthermore, because the consent decree is being re-issued, the Court is under a duty to ensure that it does not re-issue something bearing the imprimatur of this Court which, beneath a plausible-sounding veneer, has little or no substance.

In the Court's order of April 27, 2016, the Court stated: "I cannot accept a delay for instruction and comment that would consume the entire summer and put off this Court's decision until the fall (to be followed, perchance, by another appeal)." I take this to mean that the Court will do no fact-finding to determine why the Handschu Authority, supposedly created by the prior consent decree, never actually met or did anything. This is unfortunate, because it essentially guarantees that the Handschu Committee created by the proposed revised consent decree will also never meet or do anything.

As this Court once remarked, decisions in this case affect a class which includes "generations yet unborn." *Handschu v. Special Services Div.*, 605 F. Supp. 1384, 1415 (S.D.N.Y. 1985). Surely it is not too much to ask that sufficient time be taken to answer the essential question of what happened to the Handschu Authority. Without an answer to that question, the fairness of the modifications from the 2003 consent decree cannot possibly be determined.

Respectfully submitted,

David A. Thompson