USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC # _____
DATE FILED :10/28/2016

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------X

BARBARA HANDSCHU, *et al.*,

                 Plaintiffs,                          No. 71 Civ. 2203 (CSH)

        -against-

POLICE DEPARTMENT OF THE CITY OF          **OCTOBER 28, 2016**
NEW YORK, *et al.*,

                 Defendants.

-------------------------------------------------------------------------X

## RULING ON PROPOSED SETTLEMENT AGREEMENT

**HAIGHT, Senior District Judge:**

     In this long-standing civil rights class action, the Court is called upon to approve or disapprove a proposed settlement agreement between the plaintiff Class and the City of New York regarding important issues affecting the City's Muslim community. Following a fairness hearing, the Court resolves that question in this decision.

### I

     This action began in 1971. A group of individual plaintiffs filed a complaint against the New York City Police Department ("NYPD") and other City officials, claiming that NYPD officers conducted surveillance and other activities in manners that violated plaintiffs' rights under the United States Constitution.

     The Court denied the defendants' motion to dismiss the complaint. *Handschu v. Special*

1

*Servs. Div.*, 349 F. Supp. 766, 771 (S.D.N.Y. 1972) (Weinfeld, *J.*).   After discovery and related litigation, the Court certified a class of plaintiffs in 1979. Counsel for the plaintiff Class ("Class Counsel") and the Office of the Corporation Counsel for the City of New York ("Corporation Counsel") negotiated and jointly proposed to the Court a settlement of the underlying issues.   The Court conducted a fairness hearing into that settlement, overruled a number of objections, and approved the settlement. 605 F. Supp. 1384 (S.D.N.Y. 1985).   The objectors appealed.   The Second Circuit affirmed the approval of the settlement.   787 F.2d 828 (2d Cir. 1986).

A core provision in the 1985 settlement was the creation of what has come to be called "the Handschu Guidelines." The Guidelines took their name from Barbara Handschu, an attorney, social activist, and first-named plaintiff in the initial complaint filed in 1971.[1] "The Guidelines deal with future collection, retention and dissemination of information by the PSS." 605 F. Supp. at 1389. "PSS" is a reference to the then-existing Public Security Section of the NYPD.

As described *infra*, the Guidelines have been changed during the course of the case.   I will refer to the Guidelines approved in the 1985 settlement as "the Original Handschu Guidelines" or "Original Guidelines."   They are reproduced in full in 605 F. Supp. at 1420-25.   The Original Handschu Guidelines focus upon and regulate any NYPD "investigation of political activity." Original Guidelines, Part IV. "Political activity" is defined as "[t]he exercise of a right of expression or association for the purpose of maintaining or changing governmental policies   or social conditions." *Id.*, Part II.A. The Original Guidelines begin with the "General Statement of Policy"

---

[1] Ms. Handschu appeared at and participated in the fairness hearings held by the Court in April and June of 2016 into the present proposed settlement.   Her insights and advocate's skills are undiminished.   One is moved to consider, but then reject with regret, the possibility that something about this case confers a sort of immortality upon its participants.

that activities of the PSS of the NYPD "will conform to constitutionally guaranteed rights and privileges." *Id.*, Part I.  The Original Guidelines establish "an Authority to oversee the activities of the PSS of the Intelligence Division" consisting of three members: two high-ranking NYPD officers and a third "civilian member appointed by the Mayor." *Id.*, Part III.

## II

After 1986, when the Second Circuit affirmed the approval of the 1985 settlement, life continued under the Original Handschu Guidelines, which did not enjoy universal approbation but did not provoke further litigation.  That changed with the dreadful events of September 11, 2001.  In 2003, the City made a motion to modify the Original Guidelines.  That gave rise to an opinion reported at 273 F. Supp. 2d 327 (S.D.N.Y. 2003), which recites at 337: "the NYPD perceives in the events of 9/11 and subsequent revelations about international terrorism a significant change in facts mandating modification of the Guidelines because in their present form 'they limit the effective investigation of terrorism and prevent cooperation with federal and state law enforcement agencies in the development of intelligence.'" (quoting affidavit of NYPD Deputy Commissioner Cohen).

While Class Counsel opposed any changes to the Original Guidelines, the Court allowed certain modifications, for the reasons stated in the cited opinion.  The principal modification was to replace the detailed  instructions in the Original Guidelines with the FBI Guidelines for investigations issued post-9/11 by Attorney General Ashcroft in May 2002, "whose substance [NYPD] Deputy Commissioner Cohen says will be included in the NYPD patrol guide if the Court approves Modified Handschu." 273 F. Supp. 2d at 346.  In addition, while the Handschu Authority continued to exist, it no longer has detailed oversight responsibilities for investigations; the

Authority's sole function is to review records the NYPD is directed to generate and retain.

The Court granted the modifications requested by the City, on condition that "[n]o later than February 21, 2003, the NYPD must file with the Court and serve upon class counsel the text to be included in the patrol guide which sets forth the substance of the FBI Guidelines." *Id.* at 349. I will refer to the Guidelines approved by the Court in 2003 as "the Modified Handschu Guidelines."

The Court had to revisit the question shortly thereafter, when senior NYPD supervising officers seemingly disregarded the Guidelines in their "debriefing" of arrested and detained participants in anti-war demonstrations on Manhattan streets during February and March, 2003. Class Counsel protested and made an application for further relief, which the Court granted on August 6, 2003. 288 F. Supp. 2d 411 (S.D.N.Y. 2003). I concluded, on the basis of affidavits and other written submissions, that "[t]hese recent events reveal an NYPD in some need of discipline," and the circumstances surrounding the debriefing procedure "entitle the plaintiff class, operating through Class Counsel, to an enhanced level of judicial review." *Id.* at 417, 419. That relief was accomplished by amending the Court's Order and Judgment on the modification issue to provide that "in order to clarify and enhance the standing and authority of counsel for the plaintiff class to contend, if so advised, that violations of the said Guidelines have deprived a member or members of the plaintiff class of rights or freedoms guaranteed to them by the Constitution, the said Guidelines are, to that extent and for that purpose, incorporated by reference into and made a part of this Second Revised Order and Judgment," which superseded and replaced the first Revised Order and Judgment (where the Guidelines were not incorporated). *Id.* at 420

In consequence of this litigation, the full text of the Modified Handschu Guidelines consists of the appendices to the opinions reported at 273 F. Supp. 2d 327 and 288 F. Supp. 2d 411, read

together.  Those Modified Guidelines came into effect in August 2003, and operated without further

litigation or publicly visible strife until the events recounted in Part IV, *infra*.

### III

While the wording of the class certification in this case appears in prior opinions, it is useful

to repeat it here, in order to furnish a complete context for the issues presently before the Court.

The Court has certified a class which includes:

> All individuals resident in the City of New York, and all other
> persons who are physically present in the City of New York, and all
> organizations located or operating in the City of New York, who
> engage in or have engaged in lawful political, religious, educational
> or social activities and who, as a result of these activities, have been,
> are now or hereafter may be subjected to or threatened by infiltration,
> physical and verbal coercion, photographic, electronic and physical
> surveillance, provocation of violence, recruitment to act as police
> informants and dossier collection and dissemination by defendants
> and their agents.

605 F. Supp. at 1388.

That certification was made in an opinion and order issued on May 24, 1979.  The class thus

certified has been in existence since that date.  The temporal boundaries of the class embrace the

past, present and future.  Class members are those who "engage in or have engaged in" specified

lawful activity in the City, and as a result of those activities "have been, are now or hereafter may

be" subjected to specified kinds of police investigation and surveillance.  Unless and until that class

is terminated by the Court for good cause shown, it will continue for the foreseeable future, or at

least for as long as the City of New York stands, people reside in or visit the City, organizations

operate within the City, and the City maintains a police force to protect the public and assist in

enforcement of the rule of law.

5

It asks too much of human nature to expect such a world to be entirely free of strife. The history of this case is that periods of calm – class members and the NYPD existing together in seeming harmony – are interspersed with outbreaks of disputes and active litigation in court as the result of particular circumstances or issues. The present application to the Court, involving the City's Muslim community, is an example.

I turn to the particular circumstances which brought about this revival of activity in the case.

## IV

On October 3, 2011, Jethro M. Eisenstein, Esq., one of the plaintiffs' Class Counsel since the inception of the case, swore to and submitted to the Court a declaration which stated in an introductory paragraph that

> class counsel have reason to believe that the NYPD, in its investigation of the Muslim communities that form a part of the plaintiff class, as a matter of policy retains information about class members' political activity that does not relate to potential unlawful or terrorist activity. Such a policy violates §VIII(A)(2) of the Modified Handschu Guidelines.

Eisenstein Declaration ("E. Decl.") ¶ 2. The source of counsel's belief was a series of news articles published in August and September, 2011, based on a journalist's "interviews with 40 present and former members of the New York City Police Department," which described "an NYPD policy of using undercover officers and confidential informants to gather information about political activity in circumstances where there is no indication of criminal activity." E. Decl. ¶ 3.

The NYPD's purpose, Mr. Eisenstein deduced in his declaration, was described by NYPD Assistant Commissioner Lawrence Sanchez, in testimony he gave to the United States Senate Homeland Security Committee in October 2007. "The key to it," Assistant Commissioner Sanchez

said to the Senators, was "to start appreciating what most people would say would be non-criminal[,] would be innocuous looking behaviors that could easily be argued in a [w]estern [d]emocracy, especially in the United States[,] to be protected by First and Fourth Amendment rights[,] but not to look at them in the vacuum but to look across to them as potential precursors to terrorism." *Id.* ¶ 4 n.5.

Class Counsel acknowledged that such NYPD activity might not violate the Modified Handschu Guidelines, since they provided in Part VIII(A)(2) that "[f]or the purpose of detecting or preventing terrorist activities, NYPD is authorized to visit any place and attend any event that is open to the public, on the same terms and conditions as members of the public generally." But counsel expressed concern that the published articles and NYPD documents "strongly suggest that the NYPD retains such records as a matter of policy," which could violate the cited Guideline, which also provided that "[n]o information obtained from such visits shall be retained unless it relates to potential unlawful or terrorist activity." *Id.* ¶¶ 5-6.

Class Counsel's October 3, 2011 submissions included a proposed order to show cause which, if signed by the Court, would have granted the plaintiff class leave to conduct discovery to determine whether the NYPD and City, "as a matter of policy, retain information about political activity on the part of members of the Muslim communities in New York that has been obtained from visits to public places and events, when such information does not relate to potential unlawful or terrorist activity." That order to show cause was not presented to the Court for execution. Instead, Class Counsel and Corporation Counsel launched into discussions and negotiations about the concerns that had arisen concerning the Muslim community. Those discussions extended over a period of time, during the course of which the Court granted a number of extensions of time for

briefing the issues.

During the pendency of the October 3, 2011 motion for a show cause order, Class Counsel and Corporation Counsel engaged in informal discovery (always highly professional, if not completely amicable), during the course of which Class Counsel concluded that the protection of class members required injunctive relief of a broader and more intrusive nature. In consequence, on February 4, 2013, Class Counsel filed a motion for injunctive relief against the NYPD and the appointment of a monitor to supervise the activities of the NYPD Intelligence Bureau ("the February 2013 motion"). Specifically, the February 2013 motion sought an injunction against (1) "the policy and practice of retaining records concerning visits to public places" made by NYPD units "where no information has been obtained that relates to potential unlawful or terrorist activity," in violation of the Modified Handschu Guidelines; and (2) "the policy and practice of surreptitiously joining, visiting and infiltrating organizations or institutions including organizations associated with Islam, and keeping records of such investigative activities, in the absence of 'reasonable indications' or 'indication' of terrorist or unlawful activity," in violation of certain Modified Handschu Guidelines (identified by internal quotation marks). In addition, the February 2013 motion sought a Court order "appointing an auditor or monitor to supervise compliance by the NYPD, its employees and agents with the injunctive orders made herein mandating obedience to the Modified Handschu Guidelines in investigations of political activity by members of the plaintiff class." Doc. 408 ("Motion for Injunctive Relief and for Appointment of An Auditor or Monitor"), at 2-3 (¶¶ a-c).

Corporation Counsel, appearing on behalf of the NYPD as it has throughout the case, opposed the Class's February 2013 motion. The NYPD denied that it had in any way violated the Modified Handschu Guidelines. Corporation Counsel acknowledged the existence and effect of the

Guidelines, and did not dispute that investigative units of the NYPD had engaged and were engaging in the sort of activities described in general terms by the Class's February 2013 motion.  However, those activities, Corporation Counsel contended, were in full compliance with, and consequently permitted by, the Modified Handschu Guidelines.  That being the case, the NYPD concluded, the Court need not and should not issue a further injunction or appoint a monitor.

These opposing contentions having been drawn by the pleadings, Class Counsel and Corporation Counsel renewed the debate on the enlarged areas of permissible discovery, a sensitive subject given the confidential and secretive nature of some of the NYPD activities being challenged. Applications were made to the Court, which gave me the occasion to observe that an internal NYPD document termed an "investigative statement" was "the best evidence, perhaps the only probative evidence, of whether a particular investigation was commenced in compliance with the Handschu Guidelines." 2013 WL 4767815, at *1 (S.D.N.Y. Aug. 29, 2013).  The Court directed counsel to confer in an effort to agree on a method by which discovery into and proof of the investigative statements might be arranged. 2014 WL 407103, at *7 (S.D.N.Y. Jan. 30, 2014).  Class Counsel and Corporation Counsel succeeded in that effort.  Discovery continued with respect to the factual issues presented by the Class's motion for an injunction and appointment of a monitor.

## V

While these proceedings were taking place in this case, significant events occurred across the East River, in the neighboring United States District Court for the Eastern District of New York. On June 28, 2013, three Muslim individuals, two mosques and a non-profit Muslim organization filed an action in that Court against the City of New York and the NYPD.  The case was assigned

to District Judge Chen. Those plaintiffs, represented by attorneys other than counsel involved in this *Handschu* class action, alleged that the City and the NYPD violated several of their federal and state constitutional rights "through unlawful, suspicionless surveillance and investigation conducted by the New York Police Department ('NYPD') pursuant to its purported 'Muslim surveillance program.'" *Raza v. City of New York*, 998 F.Supp.2d 70, 73 (E.D.N.Y. 2013) ("*Raza*" or "the *Raza* case"). The allegations of the *Raza* plaintiffs concerning NYPD surveillance of the Muslim community resemble those of the plaintiff *Handschu* class in the present injunction motion before this Court.

Discovery in the *Handschu* and *Raza* cases continued independently and separately. Both sets of plaintiffs' attorneys focused on the NYPD investigative statements, to which this Court referred in its August 2013 opinion. On February 4, 2014, Class Counsel in *Handschu* and plaintiff's counsel in *Raza* wrote jointly to Zachary Carter, the newly installed Corporation Counsel following Mayor De Blasio's election and the departure of former Mayor Bloomberg and NYPD Commissioner Kelly. Class Counsel and *Raza* counsel suggested to Corporation Counsel Carter that discussions take place with respect to the possibility of a settlement of the pending claims of the *Handschu* class and the *Raza* plaintiffs against the City and the NYPD. It made sense, in counsel's view, to discuss these cases together, since both involved the same or highly similar NYPD actions directed at the Muslim community of the City.

Negotiations ensued. They were lengthy, conducted by a series of meetings and telephone conferences. Eventually agreements were reached in principle, which then in practice had to be stated in the form of further modifications to the Modified Handschu Guidelines. Eventually, an agreement was reached between Class Counsel in the *Handschu* case, plaintiffs' counsel and the

plaintiffs in the *Raza* case, and the Corporation Counsel on behalf of the City and NYPD in both cases.

That settlement agreement takes the form of further modifications to the Modified Handschu Guidelines. Because *Handschu* is a class action, this Court must approve those modifications to make them effective, and was required to hold a fairness hearing before deciding whether or not to do so. That hearing has now been completed. If this Court approves the settlement and the new Guidelines as fair and reasonable, that approval will be implemented in the *Handschu* case by an order the Court will make regarding the Class's motion for an injunction and appointment of a monitor. The plaintiffs in *Raza* would be affected by such an order because, quite apart from the lawsuit they filed as plaintiffs in the *Raza* case, they are also members of the Plaintiff Class. I make this Ruling as the District Judge presiding over the *Handschu* class action. I am told on the record of this case that if this Court (sitting as *Handschu* class action judge) approves the settlement, Judge Chen in the Eastern District (sitting as *Raza* action trial judge) will then be presented with a stipulation dismissing that action.

On January 7, 2016, Class Counsel and Corporation Counsel made a joint motion in this action under Fed. R. Civ. P. 23(e) for an order approving the proposed settlement and attendant revision of the Modified Handschu Guidelines, which I will hereafter call "the Revised Handschu Guidelines."

## VI

The Revised Handschu Guidelines are captioned, like their predecessor: "Guidelines for Investigations Involving Political Activity." They are the same as the Modified Handschu Guidelines,

in that each set of guidelines provides for graduated "levels of investigative activity." Revised Handschu Guidelines, Part V. "Checking of Leads" is "the lowest level of investigative activity" allowed by the Guidelines. *Id.*, Part V.A. The remaining levels are: "Preliminary Inquiries," Part V.B.; " a "Full Investigation," Part V.C.; and a "Terrorism Enterprise Investigation," Part V.D. In 2003 the NYPD adapted the substance of these provisions from guidelines promulgated by the FBI in 2002. The FBI and the NYPD were each reacting to the events of 9/11. As noted *supra*, the Court allowed the Original Handschu Guidelines to be modified in that manner in opinions reported at 273 F. Supp. 2d 327 (S.D.N.Y. 2003) and 288 F. Supp. 2d 411 (S.D.N.Y. 2003). The Modified Handschu Guidelines have governed the NYPD's relevant conduct since 2003.

The Revised Handschu Guidelines are a part of the proposed settlement. The revisions change the Modified Handschu Guidelines in a number of ways. The two principal changes relate to the timing and form of internal NYPD authorizations for the opening, extension or closure of the several levels of investigation; and the creation of a "Handschu Committee" to oversee and perform those administrative functions. An important aspect of the new Handschu Committee is the inclusion of a "Civilian Representative" who "shall be a lawyer who has never previously been an employee of the NYPD." Revised Handschu Guidelines, Part VI (3). The effect of the changes made by the proposed Revised Handschu Guidelines may best be understood by comparing the relevant provisions in both sets of guidelines.

A.      **Levels of Investigation**

Under the Modified Handschu Guidelines, the "Checking of Leads" by police officers requires no authorization by higher authority. The activity is defined as the "prompt and extremely limited checking out of initial leads," conducted "with an eye toward promptly determining whether

further investigation (either a Preliminary Inquiry or a Full Investigation) should be conducted." Modified Handschu Guidelines, Part V.A. No specific time limits are stated.

With respect to the authorization of higher levels of investigatory activity, the Modified Handschu Guidelines are the same for a Preliminary Inquiry, a Full Investigation, and a Terrorism Enterprise Investigation. Authorization is required. Each procedure may be authorized by the Commanding Officer or Executive Officer of the NYPD Intelligence Division, or the Commanding Officer of the Criminal Intelligence Section ("the Authorizing Officials"). "Upon such authorization a notification must be made for final approval by the Deputy Commissioner of Intelligence," except that "when exigent circumstances exist, . . . a Terrorism Enterprise Investigation may be commenced upon the verbal authorization of an Authorizing Official," in which event "the required written recommendation must be submitted as soon as practicable." *Id.*, Part V.D.4.

These forms of investigations are not open-ended as to duration. The Modified Guidelines provide that a Preliminary Inquiry must be completed within 180 days after the first investigative step. Extensions of time for succeeding 90-day periods may be granted by the Deputy Commissioner of Intelligence. A Full Investigation and a Terrorist Enterprise Investigation may each be initially authorized for a period of up to one year, and may be continued upon authorization obtained from the Deputy Commissioner of Intelligence for additional periods, each not to exceed one year. At each of these levels of investigation, authorizations for extensions of time must be reviewed by the Authorizing Official before the expiration of the period for which the investigation and each renewal thereof is authorized.

**B.      Investigatory Provisions of Proposed Revised Handschu Guidelines**

The Revised Handschu Guidelines which form a part of the proposed settlement bring about

13

significant changes in these NYPD investigatory protocols. The first modifications relate to the manner in which the several levels of investigation are *authorized*.

As for the Checking of Leads, there is no change. Authorization for that low-level activity is not presently required; the Revised Guidelines do not do so.

A Preliminary Inquiry may be authorized by the Chief of Intelligence or Executive Officer of the Intelligence Bureau, or the Commanding Officer of the Criminal Intelligence Section ("the Authorizing Officials"). Written notification of an authorization "must be made for final approval by the Deputy Commissioner of Intelligence."

The same provisions apply to authorization for a Full Investigation and a Terrorism Enterprise Investigation. Where "exigent circumstances" exist, a Terrorism Enterprise Investigation may be commenced on the verbal authorization of an Authorizing Official, with the required written recommendation to the Deputy Commissioner of Intelligence submitted "as soon as practicable."

As for the *duration* of these levels of investigation, the present Modified Guidelines' 180-day limit on a Preliminary Inquiry, and the Deputy Commissioner of Intelligence's discretionary power to grant succeeding 90-day extension periods, remain the same. However, the Revised Guidelines add the provisions that a Preliminary Inquiry "shall be subject to a review every 6 months by the Chief of Intelligence, or an appropriate executive of the Intelligence Bureau designated by him," Part V.B. (5), and a Preliminary Inquiry "shall be presumptively limited to a total duration of 18 months," a period which "may be exceeded in the sole discretion of the Deputy Commissioner of Intelligence, in consultation with the Handschu Committee," Part V.B. (6).[2]

_____

[2]   The "Handschu Committee," a new creation of the Revised Handschu Guidelines, is discussed in text, *infra*.

Similarly, with respect to a Full Investigation, the present one-year limit, and one-year extension periods, remain the same.  However, the Revised Guidelines call for a review of a Full Investigation every 6 months, and a presumptive limitation "to a total duration of 3 years," subject to extension by the Deputy Commissioner of Intelligence in consultation with the Handschu Committee," Part V.C (4)(d)-(e).

A Terrorism Enterprise Investigation remains with an initial authorization of one year.  There are additional possible extensions not to exceed a year, and a 5-year presumptive limitation.  Revised Handschu Guidelines, Part V.D (4)(d)-(e).

These modifications in authorization and duration, while notable, are not as substantive as the provisions in Part VI of the Revised Handschu Guidelines for the "Handschu Committee." Previous versions of the Guidelines called for administrative or review boards or groups bearing the title "Handschu," but this "Handschu Committee" is something new.  The subject is best introduced by quoting Part VI (1) of the proposed Revised Guidelines:

> There is hereby established a committee (the "Handschu Committee") whose members may attend and participate in monthly meetings at which investigations are presented for opening, extension or closure by the Deputy Commissioner for Intelligence. All attending members will be provided with the investigative statement pertaining to each proposed opening, extension or closing for the monthly meeting. At the monthly meeting, any member of the Handschu Committee may ask questions and offer opinions regarding the opening, extension or closure of an investigation presented.

Part VI (2) provides that "Members of the Handschu Committee from the NYPD will include the Deputy Commissioner of Intelligence" (first-listed and clearly *primus inter pares*) and ten other high-ranking police officers or deputy commissioners, drawn from those holding "positions of authority or expertise" in the NYPD's ranks engaged in intelligence and related legal activities.

15

Part VI (3) provides for the presence on the Handschu Committee of a "Civilian Representative." Class Counsel, supporting the proposed settlement, characterize the emergence and placement of this "civilian" on the Handschu Committee as an innovative and vitally important feature of the Revised Guidelines.  It will be recalled that when Class Counsel filed the present motion which the proposed settlement would resolve, the Class asked the Court to appoint an "auditor or monitor" to "supervise compliance with the NYPD" with "the Modified Handschu Guidelines."  During the fairness hearing on the proposed settlement, it became apparent that at the beginning of the negotiations resulting in the settlement, Corporation Counsel resisted the appointment and participation of any person outside the NYPD.  Class Counsel stated at the hearing that while the provision in the Revised Guidelines for a "Civilian Representative" as a member of the Handschu Committee did not achieve everything the Class desired in respect of civilian monitor oversight, it was all that the City would agree to for purposes of settlement (an appraisal which Mr. Farrell, counsel for the City, vigorously endorsed at the hearing).  A number of members of the Muslim community contended during the hearing that, for a variety of reasons, the proposed provision for civilian participation is inadequate.

The Court's obligation is to determine whether this settlement of this aspect of the present litigation is fair and reasonable.  The Revised Guidelines' provisions for the Civilian Representative must be considered in detail.

We begin with Part VI (3) of the Revised Guidelines, which provides:

> There shall also be a Civilian Representative on the Handschu Committee who may attend and participate in the monthly meetings for opening, extension, or closure of investigations on the same terms and conditions as set forth in paragraph (1) above.  The Civilian Representative shall be a lawyer who has never previously been an

employee of the NYPD. The Civilian Representative shall be appointed by the Mayor upon consultation with the Police Commissioner. The Civilian Representative may be replaced by the Mayor for good cause, with 14 days' advance notice to Class Counsel prior to such replacement. The position of Civilian Representative will exist for a minimum of five years from the appointment of the first person to fill that role. After that initial five year period, the position of Civilian Representative will continue unless abolished or modified by the Mayor, upon which Class Counsel will receive 90 days' notice in advance of such abolition or modification.

The following subparagraphs of Part VI describe the actions required of the Civilian Representative (sometimes hereinafter "CR"). If the CR, during the course of his or her attendance at a monthly meeting of the Handschu Committee, "concludes that an investigation is being opened or extended in violation of the Modified Handschu Guidelines," the CR "shall record his or her objection to the investigation and the grounds for the objection in the minutes of the Handschu Committee meeting," Part VI (e), and "shall bring such [violative] investigation to the attention of the Police Commissioner," who "shall inquire into the investigation and report the findings of the inquiry to the Civilian Representative." Part VI (f). If the CR "concludes that the NYPD is systematically and repeatedly violating the Modified Handschu Guidelines to a degree sufficient to show a NYPD policy to act in such a fashion, the Civilian Representative shall report the alleged systematic violation to the Judge assigned to the Handschu case in the Southern District of New York," a report that "shall be submitted directly to the Judge in a confidential manner, shall be kept confidential, and shall be filed under seal." Part VI (g). The subparagraph contains further provisions for notification to Class Counsel of the filing of such a report (not its contents), procedures for a confidentiality order, and disclosure of the report's contents, in whole or in part, to Class Counsel.

The members of the Handschu Committee, be they high-ranking NYPD officers and administrators or the Civilian Representative, do not by virtue of that membership have any substantive authority with respect to a "proposed opening, extension or closing" of any particular investigation. Any member "may ask questions and offer opinions regarding the opening, extension or closure of an investigation presentation," but that is the limit of the member's power. A member may be passionately convinced that an investigation presented for opening at a Committee meeting would violate the Handschu Guidelines; he may argue that objection with sound and fury; if he does not persuade those with authority, it signifies nothing and the investigation will proceed. If there were doubt about that, it is removed by Part VI (4) of the Revised Handschu Guidelines, which provides:

> Nothing herein shall effect, limit or diminish the authorization and approval provisions for investigations, which grant exclusive approval authority to the Authorizing Officials or the Deputy Commissioner of Intelligence.

The Civilian Representative on the Handschu Committee differs from his NYPD colleagues in one respect. If an NYPD member on the Committee expresses the opinion that the opening or extension of a particular investigation would violate the Handschu Guidelines, and that opinion is rejected, there is nothing the NYPD member can do about it (except, one supposes, obey the orders of higher authority). The Civilian Representative, on the other hand, may attend the same meeting, express the same opinion, and at the end of the day (and the meeting) also see his or her opinion rejected. In such circumstances, Part VI (f) of the Revised Guidelines directs the CR to inform the Police Commissioner about the incident. That subparagraph provides that the Civilian Representative "shall bring such investigation to the attention of the Police Commissioner"; the

language is cast in mandatory terms.   Similarly, Part VI (g) provides that if the Civilian Representative, during the course of attendance at Handschu Committee meetings, concludes that the NYPD is systematically and repeatedly violating the Guidelines as the result of a policy to act in such a fashion, "the Civilian Representative shall report the alleged systematic violation to the Judge assigned to the Handschu case" in this Court: again, the language is mandatory.

These mandates imposed by the Revised Guidelines require the Civilian Representative on the Handschu Committee to act, in the common parlance, as a "whistle blower." Whistle blowers cannot control if the whistles they blow are heard, or what, if anything, is done in response. In this case, if a single incident is involved, the CR blows his whistle in the office of the Police Commissioner, who is directed by the Guidelines to "inquire into the investigation and report the findings of the inquiry to the Civilian Representative." Apparently the Commissioner can do anything about the substance of the inquiry that seems right to him, which puts an end to the matter. If an alleged systematic violation is involved, the CR blows his whistle in the chambers of a District Judge, who can do anything he or she thinks is just and appropriate under the rule of law (subject, of course, to the limited but potent views of the Court of Appeals).

There are other, unrelated provisions in the Revised Handschu Guidelines which the Court must take into account in evaluating whether the proposed settlement is fair and reasonable. However, the provisions for authorization and duration of the several levels of investigation, discussed in this Part, must be further considered, in the light of a relevant Report of Investigation dated August 23, 2016, submitted by the Inspector General of the NYPD.

## VII

On August 23, 2016, the New York City Department of Investigation, Office of the Inspector General for the NYPD ("OIG-NYPD") issued a 36-page report, with accompanying appendices. The report is titled: "An Investigation of NYPD's Compliance with Rules Governing Investigations of Political Activity." The report is signed by Philip K. Eure. While Mr. Eure is identified as the "Inspector General for the NYPD," it appears that he is a not an employee or officer of the NYPD. Rather, Eure is a member of the City's Department of Investigation, an agency separate from the NYPD, headed by Commissioner Mark G. Peters.[3] I have hand-marked a copy of this report ("OIG-NYPD Report" or "the Report) as Court Exhibit 1 on this hearing.

The Report begins with this summary of its purpose and scope:

> New York City Police Department (NYPD) investigations of political activity in New York City are regulated by a set of court-mandated rules, also known as the *Handschu* Guidelines. The Department of Investigation's (DOI) Office of the Inspector General for the NYPD (OIG-NYPD) has completed an investigation into NYPD's compliance with these rules. Specifically, OIG-NYPD sought to examine whether NYPD's Intelligence Bureau was conforming to rules concerning the informational threshold required to open an investigation, deadlines for closing or extending an investigation, restrictions on the use of human sources (confidential informants and undercover officers), and requisite approvals from senior management for other investigative activities. This investigation included a review of a randomly selected set of highly confidential intelligence files not available to non-police entities, and thus never before subjected to a review of this type.

OIG-NYPD Report, at 1.

---

[3] The City of New York Department of Investigation is "the law enforcement agency of the government of New York City that serves as an independent and nonpartisan watchdog for New York City government. . . . DOI currently has oversight of about 300,000 City employees in 45 City agencies . . . and, as of 2014, the independent Office of the Inspector General for the New York City Police Department (OIG-NYPD)." *Wikipedia* (visited October 24, 2016).

The Inspector General and his staff conducted their investigation by reviewing "relevant documents in a random sample of NYPD Intelligence Bureau cases closed between 2010 and 2015." Report, at 4.    According to the Report, "the review focused largely on three categories of investigations: (1) Preliminary Inquiries; (2) Full Investigations; and (3) Terrorism Enterprise Investigations." *Id.*  The review consisted principally of examination of these documents:

* **Investigative Statements,** "also referred to as *Handschu* Statements, which NYPD's Intelligence Bureau uses to summarize case facts, note  procedural history, secure requisite approvals, and memorialize relevant dates."

* **Human Source Authorization Memoranda,** "which are used to request authorization for use of undercover officers or confidential informants."

* **Discontinuance Memoranda,** "which memorialize the closure of an investigation."

I have continued to quote from page 4 of the Report.

The Report contains a revealing footnote in its introductory section, captioned "Overview." That footnote reads in its entirety:

> Based on its review, OIG-NYPD determined that the individuals under investigation were predominantly associated with Muslims and/or engaged in political activity that those individuals associated with Islam – more than 95% of all files reviewed for this investigation – although NYPD does not use such categorizations in its approval documents.  However, in the past, investigations have focused on others, including Black and Latino activists, student groups, socialists, and political protesters.  This Report addresses only NYPD's compliance with specific investigative rules and makes no conclusions about NYPD's strategic decisions regarding investigations.  As noted below, in all files reviewed, NYPD articulated facts sufficient to meet the informational threshold required to open an investigation.

Report, at 1 n.1.

It is reasonable to infer that this near-exclusive investigatory focus the NYPD directed upon the Muslim community accounts for the conduct reported by the press in 2011, *see* Part IV, *supra*, and for the expansion in 2014 of the City Department of Investigation's responsibilities to include oversight of the Inspector General for the NYPD, *see* n.3, *supra*.

The Inspector General's favorable conclusion with respect to the opening of these predominantly Muslim-related investigations, foretold by the last sentence in the quoted footnote, appears at page 7 of the Report.  The discussion quotes the Modified Handschu Guidelines, which specify that the NYPD may open a Preliminary Inquiry when it receives an allegation or information "indicating the possibility of unlawful activity."  The Guidelines also provide that a Full Investigation may be launched if the "facts or circumstances reasonably indicate that an unlawful act has been, is being, or will be committed."  A Terrorist Enterprise Investigation may be initiated when the "facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of (i) furthering political or social goals wholly or in part through activities that involve force, violence or other unlawful acts; (ii) engaging in terrorism as defined in N.Y. Penal Law § 490.05; or (iii) committing any offense described in [specific sections of the penal code]." Report, at 7.

Under the Modified Guidelines protocol, the opening or initiation of each of these inquiries or investigations must be preceded by an Investigative Statement, whose purpose is described *supra*. The Investigative Statements form the universe of documents from which the Inspector General's staff selected random examples in order to review the NYPD's compliance with the Guidelines.  The Report reaches this conclusion:

When reviewing Investigative Statements through the perspective of

22

> the "prudent investigator" – as indicated by the Guidelines – OIG-
> NYPD determined that the Investigative Statements for Preliminary
> Inquiries, Full Investigations, and Terrorism Enterprise Investigations
> articulated facts sufficient to meet the required thresholds. This
> finding is important because it demonstrates that NYPD has been
> articulating valid reasons for its general decisions to open particular
> cases. OIG-NYPD found nothing to suggest improper motives in
> these documents.

*Id.*

In its public comments after the Report was published, the NYPD predictably said a good deal about this particular determination, which was favorable to the Department. Its spokesman said practically nothing about the Inspector General's other determinations, each of which found repeated, near-systemic violations by the NYPD Intelligence Bureau of a pertinent Handschu Guideline.

Those Guidelines relate to inquiries or investigations which were properly initiated and are continuing. As the Report notes at page 5: "Investigations of political activity are subject to strict time limitations which can be renewed." Specifically, Preliminary Inquiries are initially authorized for a period of 180 days and may be extended for additional 90-day periods. Full Investigations and Terrorism Enterprise Investigations are initially authorized for a period of one year and may be extended for additional one-year increments. Applications for extensions of time must be made to supervisory authority within the NYPD and memorialized by contemporaneous documents.

The OIG-NYPD Report describes a near-systemic failure on the part of the NYPD to comply with these particular Guidelines. It is said at page 5: "More than half the time, investigations continued even after approval of the operation expired." The Report contains an elaborate series of appendices which demonstrate that failing. They need not be discussed at length in this Ruling; it is sufficient for present purposes to quote the Report's summary at page 5: "Even when calculating

deadlines in a light favorable to the NYPD, OIG-NYPD found that the Department failed to renew

investigations before the authorization expired more than 53.5% of the time, resulting in

investigations of political activity that continued without the requisite authorization."

This is a serious failing, as the Report observes in forceful language that cannot be improved

upon:

> The failure to adhere to time limitations cannot be discounted as
> merely technical or administrative.  The Guidelines were designed to
> establish certain baseline controls on NYPD's considerable
> investigative power.  When NYPD does not follow these rules, an
> investigation is proceeding without the required authorization and the
> Guidelines have been violated.  Because there has historically been
> no third-party review and NYPD is self-monitoring, careful
> compliance is particularly important.

Report, at 5.

The Report also describes a similar and equally serious failure with respect to the NYPD's

use of confidential informants and undercover officers while investigating political activity.  The

Report states at 5:

> The Guidelines permit the use of confidential informants and
> undercover officers when investigating political activity, but such
> usage is also subject to strict but renewable 120-day time limitations.
> NYPD failed to timely authorize the use of human sources 57.3% of
> the time, resulting in undercover officers and confidential informants
> who were potentially working investigations without the requisite
> authorization.

The OIG-NYPD Report concludes with a number of recommendations to the NYPD which

are intended to remedy these and related failings.  The NYPD, presumably becoming increasingly

aware of its shortcomings as the OIG's review continued, "informed OIG-NYPD that in July 2016,

it began using a new case tracking system that apparently allows NYPD to more efficiently track

24

cases." *Id.*, at 8.  The Inspector General regards this as "a promising development," and adds that "the OIG-NYPD looks forward to evaluating whether the new system effectively addresses the deficiencies outlined in this Report." *Id.*

The NYPD responded to the Inspector General's Report in a letter dated August 23, 2016 signed by John J. Miller, Deputy Commissioner for Intelligence and Counterterrorism, and addressed to Commissioner Peters of the DOI, Inspector General Eure, the Mayor of the City, and the Speaker of the New York City Council.  I have hand marked this document as Court Exhibit 2 on this hearing.

In his letter, Deputy Commissioner Miller politely expresses the NYPD's appreciation of the OIG's work (Miller calls it an "audit"); advises that the NYPD has implemented a number of steps designed to remedy any perceived shortcomings; and takes issue with the OIG-NYPD Report's paraphrased declaration that "because some extension documents were late, investigation activity, including the use of confidential informants and undercover officers, necessarily occurred without authorization in the interim between expiration and renewal of the investigation." Ex. 2, at 4.  Miller argues that "at no point during its inquiry did OIG ask the NYPD to determine whether in fact investigative activity had occurred during that time interval," and accordingly "OIG had no factual basis for declaring that 'unauthorized activity' or 'unauthorized conduct' inevitably occurred." *Id.*[4]

## VIII

The question that now arises is whether it is appropriate for this Court to consider the

---

[4]  With all due respect, this argument seems to be something of a quibble.  Deputy Commissioner Miller does not dispute that authorizations for extension were not timely made in over half of all inquiries and investigations.  It is fanciful to suggest that the NYPD stopped investigative activity in every case on the date when the initial authorization expired.

contents of the Department of Investigation's August 23, 2016 Report during the Court's evaluation

of whether to approve or disapprove the proposed settlement in this class action.

As enclosures to a letter dated August 24, 2016, Mr. Eisenstein, Class Counsel, sent to the

Court "for your information" copies of the Inspector General's Report of August 23 (Court Ex. 1) and

the NYPD's response of that date (Court Ex.2).  Mr. Eisenstein's letter then said:

> Plaintiff's counsel in Raza and counsel for the plaintiff class in
> Handschu do not agree with all the findings of the Inspector General
> or with the positions taken by the NYPD in response.  We stand by
> the positions we have previously expressed.  Nonetheless, *all the
> parties* in Handschu and in Raza continue to endorse and support the
> proposed settlement that is pending before you for approval.

(emphasis added).   Copies of Mr. Eisenstein's letter were sent to Corporation Counsel and all other

counsel of record.  The Court has not received any further correspondence on the subject of the

Inspector General's Report.

If this joint declaration by counsel for the parties is intended to convey, at least implicitly,

the suggestion that the Court should not consider the Report in evaluating the fairness of the

proposed settlement, I am unable to agree.

The proposed settlement would resolve the present litigated issue in the *Handschu* class

action.  That issue surfaced when Class Counsel moved for injunctive relief on the theory that the

NYPD's policies and practices in investigating individuals and organizations who were Muslim or

associated with Islam violated the Modified Handschu Guidelines.  Class Counsel sought injunctive

orders "mandating obedience to the Modified Handschu Guidelines in investigations of political

activity by members of the plaintiff class," Motion, Doc. 408, those individuals being members of

the City's Muslim community.  According to its title, the Inspector General's Report describes the

26

results of "an Investigation of NYPD's Compliance with Rules Governing Investigations of Political Activity." The "Rules" are the Handschu Guidelines, and the "Political Activity" was conducted by the Muslim community. In short, the inquiries conducted through discovery in the Plaintiff Class's motion address the same question as that posed by the Inspector General's Report: Whether the NYPD's Intelligence Bureau, in its investigations of the Muslim community, complied with the Handschu Guidelines or violated them. Indeed, both inquiries focus upon the same source of evidence: the Investigative Statement, by which the Intelligence Bureau seeks authorization to commence a particular investigation.

In those circumstances, it is entirely appropriate for the Court, charged with the responsibility of approving or disapproving the proposed settlement of the Class's motion, to consider the Inspector General's critique of the NYPD's non-compliance with specified Handschu Guidelines. The Second Circuit held at an earlier stage of this case that this Court must determine whether a proposed settlement is "fair and reasonable." *Handschu v. Special Servs.*, 787 F.2d 828, 833 (2d Cir. 2012). A settlement is "fair" if it is "not a product of collusion" and the parties' interests "were represented adequately"; it is "reasonable" if "based upon well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors." *Id*. The Inspector General's Report is a "relevant factor" in evaluating the proposed settlement because it addresses head-on the core issue of the NYPD's compliance with the Handschu Guidelines. Class Counsel and Corporation Counsel may disagree with certain of the Report's contents; indeed, it is clear that they do so. However, the Report is a well-crafted analysis prepared by professionals from an independent agency, who conducted what appears to have been a careful review of NYPD conduct. These indicia of trustworthiness militate in favor of the Court taking the Report into consideration on the present

motion.

The determination to approve or disapprove the proposed settlement is vested in this Court's discretion because, as the Court of Appeals said earlier in this case: "The trial judge knows the litigants and the strengths and weaknesses of their contentions and is in the best position to evaluate whether the settlement constitutes a reasonable compromise." 787 F.2d at 833. Counsel for the parties acted properly in forwarding the Inspector General's Report to this Court as soon as the Report was issued, while this Ruling was *sub judice*. The Report thereby became part of the record on this fairness hearing. It is incumbent upon me to consider the Report, as relevant to, and inconsistent with, the NYPD's repeated contention that it always complies with the Handschu Guidelines.

Lest there be any misunderstanding, the Court does not regard the Inspector General's Report's contents as binding findings or conclusions in this fairness hearing. The Inspector General, an independent officer of the City's Department of Investigation, is not a party to and did not participate in this fairness hearing. Class Counsel and Corporation Counsel alike have indicated that they disagree with certain aspects of the Report. It is not this Court's function to resolve such disputes. However, the Court may consider the Report's conclusions as one of the many circumstances relevant to the proposed settlement. The Rules of Evidence do not preclude such consideration. Fed. R. Evid. 1101(d)(3) provides that the Rules "do not apply" to "miscellaneous proceedings" before the district courts, of which this fairness hearing is a quintessential example. Indeed, much of the evidence offered by participants during the hearing would have been barred by the Hearsay Rule at a plenary trial. No one suggested that the Rules applied to this hearing.

**IX**

The preceding Parts of this Ruling constitute a lengthy but necessary background.  The Court now turns to the question presented: Whether the Court should approve the proposed settlement. I begin with a general observation.

**A.      The Nature of the Fairness Hearing and the Proposed Settlement**

It is important to recall the nature of this fairness hearing, and the part that the proposed settlement plays in it.  The purpose of the hearing is not to give initial judicial consideration to the question of whether the NYPD should be conducting *any* surveillance or investigations into the Muslim community.  During the course of the hearing, some members of that community submitted articulate written or oral presentations contending forcefully and with unmistakable conviction and sincerity that any and all investigatory conduct by the NYPD within the City directed at Muslims, Muslim Americans or organizations associated with Islam violated rights of the Muslim community protected by the United States Constitution and other laws.

For those experiencing such police surveillance for the first time, such an outraged reaction is entirely natural and worthy of respect.  However, it must be kept in mind that the class certified by the Court in this action is broadly drawn.  It includes "all individuals resident in the City," "all other persons who are physically present in the City," and "all organizations located or operating in the City" who "engage in lawful political, religious, educational or social activities" and as a result of those activities have attracted the attention of the NYPD.  The careful reader will note that the class is not confined to any one ethnic group or religious faith.  Thus it is an historical fact that as the decades passed, one group or another came to be targeted by police surveillance activity.  In the

Court's ruling approving the first settlement which brought the Handschu Guidelines into existence, I had occasion to note that then Police Commissioner Murphy traced the origin of the Intelligence Bureau's predecessor unit "back to an 'Italian Squad' formed in 1904 to curtail the illegal activities of a group of Italian immigrants called the 'Black Hand Society.'" 605 F. Supp. at 1396. And I quoted at page 21, *supra,* the Inspector General's observation in his Report that while the NYPD's most recent investigations predominantly target Muslim and Islamic individuals, "in the past, investigations have focused on others, including Black and Latino activists, student groups, socialists, and political protesters." *See* Report, at 1 n.1.

When this Court certified the class and approved the 1985 settlement including the Original Handschu Guidelines, and the Second Circuit affirmed that approval, the Original Handschu Guidelines became settled law, binding upon the NYPD and all class members, including members of the Muslim community, although they were not singled out for NYPD attention in those pre-9/11 days. The NYPD moved to modify the Guidelines in certain respects following the events of September 11, 2001. The Court granted those modifications in the opinion reported at 273 F. Supp. 2d 327 (S.D.N.Y. 2003). The Court did not hold a fairness hearing prior to making that ruling because the modifications had not been agreed upon by the Class and the NYPD as part of a settlement agreement; rather, they had pressed diametrically different positions in briefs and arguments.[5] The Court's ruling on the modifications could have been appealed to the Second Circuit, but no appeal was taken.

Thus the Modified Handschu Guidelines came into existence. They control the rights and

_____

[5] The Federal Rules of Civil Procedure governing class actions require fairness hearings, on notice to all class members, only when counsel for the parties propose to enter into a settlement which would affect the claims of class members. *See* Fed. R. Civ. P. 23(e).

obligations of the Class and the NYPD today, and have since 2003. The present dispute arises because Class Counsel claims that the NYPD's investigations of the Muslim community violate the Guidelines, and Corporation Counsel claims the NYPD has complied with them. The proposed settlement, if approved by the Court, would resolve that dispute, by means of additional modifications to the Guidelines. I have carefully considered objections made by members of the Muslim community to certain of the proposed modifications. However, it is not open to the Muslim community (or any other group, should a question arise in future) to argue today that any form of NYPD investigations into specified activity violate the Constitution or are otherwise illegal. NYPD investigations are legal if they comply with the Handschu Guidelines, as presently modified or as they may be further modified in the future.

I turn now to a particular objection that Muslims, lay or represented by attorneys, make to the Revised Handschu Guidelines which lie at the heart of the proposed settlement. That objection has to do with the Civilian Representative on the retooled and reinstated Handschu Committee.

**B.   The Civilian Representative on the Handschu Committee**

The status and functions of the Civilian Representative ("CR") on the Handschu Committee are described in detail in Part VI of this Ruling. These subjects have generated more comments and objections from the Muslim community and the public at large than any other. These submissions focus principally upon perceived flaws in the manner of the CR's selection and retention, and upon the scope of the CR's authority. To set the stage, I recapitulate the prior description.

**1.   *Recapitulation***

The Handschu Committee is created by the Revised Handschu Guidelines, which in turn would be created by the proposed settlement if approved by the Court. Part VI (1) of the Revised

Guidelines proclaims the establishment of the Committee, "whose members may attend and participate in monthly meetings at which investigations are presented for opening, extension or closure by the Deputy Commissioner for Intelligence." Presumably to ensure that such participation be informed, the paragraph further provides: "All attending members will be provided with the investigative statement pertaining to each proposed opening, extension or closing for the monthly meeting." Any member of the Committee "may ask questions and offer opinions regarding the opening, extension or closure of an investigation presented." Members of the Committee "from the NYPD" will include the Deputy Commissioner of Intelligence and ten other high-ranking officers or administrators. Revised Handschu Guidelines, Part VI (2).

Part VI (3) provides: "There shall also be a Civilian Representative on the Handschu Committee who may attend and participate in the monthly meetings for opening, extension, or closure of investigations on the same terms and conditions" as set forth in Part VI (1). The CR must be "a lawyer who has never previously been an employee of the NYPD." The CR is appointed by the Mayor, who may replace the CR "for good cause." The position of CR exists for a minimum of five years, and continues thereafter "unless abolished or modified by the Mayor" on 90 days' advance notice to Class Counsel. The powers of the CR are limited to calling the Police Commissioner's attention to an investigation that the CR concludes is being opened or extended in violation of the Guidelines, Part VI (3)(f), and reporting to the Court the CR's conclusion that "the NYPD is systematically and repeatedly violating the Modified Handschu Guidelines to a degree sufficient to show a NYPD policy to act in such a fashion," Part VI (3)(g).

2.    *Objections and Comments with Respect to the Settlement*

These provisions with respect to the Civilian Representative prompted a number of

objections and suggestions from members of the Muslim community and the public at large. They included the following:

1. The Civilian Representative should be appointed by an authority other than the Mayor: for example, appointed by the Court; or appointed in consultation with the City's Public Advocate; or selected by Majlis Ash-Shura, a group representing 83 Muslim organizations in New York.

2. The Civilian Representative should be a permanent and "fairly paid" position, its incumbent not subject to dismissal without judicial review.

3. The Civilian Representative does not balance the Handschu Committee. "The Handschu Committee's composition appears to have an overwhelming shadow of police control. . . .[T]here is just one civilian representative, [in] a team of twelve." Submission of Elizabeth Kimundi, Esq., of the Omar T. Mohammedi law firm. June 1 Tr. (hearing transcript) at 58.

4. The Civilian Representative's attendance at monthly meetings of the Handschu Committee should be mandated, not simply permissive (the concept conveyed by the present phrase "may attend and participate").

5. The Civilian Representative's powers are too limited. In that regard, certain objectors argue: The CR should be able to access all documents upon which an investigative report is based, and have subpoena power to access records, including those not presented to the Handschu Committee. The CR should have "full investigative powers" (not be just a whistleblower) in order that the CR "will be in a position of strength . . . in order to protect [the] people" of the Muslim community. Submission of Iman Abdur-Rashid, June 1 Tr. at 12. The CR should be given the capacity to "initiate investigations and to carry out [his/her] proper oversight role." Submission of Dr. Karyn Carlo, June 1 Tr. at 39. The CR "needs to have investigatory powers" in order to "provide

meaningful oversight."   Submission of Samir Hashmi, June 1 Tr. at 63.   The CR "should have authority to bring all alleged violations to the Handschu [C]ommittee and to the Court regardless of whether there's evidence of systematic and repeated violations."   Kimundi, June 1 Tr. at 58-59.

Objections and comments of this envision the Civilian Representative as an individual authorized to conduct, and actually conducting, an independent parallel investigation, replete with subpoena power, into the NYPD's compliance with the Handschu Guidelines.   These submissions, forcefully and sincerely made, emanate from a considerable spectrum of the City's Muslim community:  religious leaders, the laity, professional men and women, social activists, senior citizens, and college students.   However, it is necessary to repeat a point previously made in this Ruling.   One must distinguish between, on the one hand, the remedies a district judge mandates in a judgment entered after full litigation of disputed issues, and on the other hand, the judge's evaluation of whether a mutually agreed settlement, fashioned by the parties in the hope of avoiding full litigation, is fair and reasonable in the totality of circumstances.   That is a quite different, and more limited, judicial function.   After a full evidentiary trial, a district judge may impose such remedies as he or she thinks right (subject to the possible scrutiny of the Court of Appeals).   This Court does not possess that power at this stage of this case, where the issue is whether the Court should approve or disapprove the proposed settlement.

This distinction is illustrated, after a fashion, in comments made by Class Counsel during the fairness hearing on April 20.   The Mayor's power under the proposed Revised Guidelines to eliminate the position of Civilian Representative after five years, without judicial review or approval, came up during the colloquy.   Class Counsel said that the Mayor's power to eliminate the position was

34

> certainly among the most contentious issues in the negotiations. We
> sought to have it be a permanent position. We didn't prevail. We
> sought then to have the position's abolition only possible through
> judicial review. We didn't prevail. . . . On balance we're obviously
> here having concluded that this is the best that we can get, that while
> imperfect this is enough protection for the class to warrant
> recommending it to the Court for approval.

April 20 Tr. at 37-38.

Within the context of settlement negotiations, the NYPD has every right to insist upon its preferences regarding the duration and abolition of the Civilian Representative's position, and to opt for full litigation of the Class's motion for injunctive relief if agreement is not reached upon them. If litigation continues and concludes with a district court injunction the NYPD dislikes, it will not suffice for the NYPD to disagree with the decree: it must convince the Court of Appeals that this Court got it wrong. But that is a hypothetical concept at this stage; in point of fact, this Court is presently concerned with a settlement that able counsel for the Class and the City propose jointly.

My present responsibility is to determine whether the proposed settlement's provisions with respect to the Civilian Representative on the newly formed Handschu Committee are fair and reasonable: *fair* to both the NYPD and the Muslim community, *reasonable* in the totality of circumstances revealed by the record. After careful consideration, and meaning no denigration of Class Counsel, whose representation of the class over the decades in this challenging case has been exemplary, I am constrained to conclude that the proposed role and powers of the Civilian Representative do not furnish sufficient protection from potential violations of the constitutional rights of those law-abiding Muslims and believers in Islam who live, move and have their being in this City.

Responsible NYPD supervisors have been conscientious in instructing police officers about

the Handschu Guidelines and including them in the Department Patrol Guide.  Nonetheless, it must be acknowledged that the history of the NYPD's adherence to the Handschu Guidelines has been problematic at times.  In the 2003 opinion reported at 288 F. Supp. 2d 411, the Court had to deal with NYPD detention and questioning of anti-war demonstrators inconsistent with letter and spirit of the newly enacted Modified Handschu Guidelines; those events "reveal an NYPD in need of some discipline," and "entitle the plaintiff class, operating through Class Counsel, to an enhanced level of judicial review."  *Id.* at 417, 419.

More to the present point, the Court has now been made aware of the Department of Investigation NYPD Inspector General's Report, stating that although the NYPD's investigation statements "articulated facts sufficient to meet the informational threshold required to *open* an investigation," thereby *complying* with the existing Modified Handschu Guidelines, in over half of those cases the NYPD subsequently *violated* the Guidelines in *continuing* the investigations and in the use of confidential informants and undercover officers. Report, Ex. 1, at 1 n. 1 (emphasis added), 2. "OIG-NYPD's investigation found that NYPD, while able to articulate a valid basis for commencing investigations, was often non-compliant with a number of the rules governing the conduct of these investigations." *Id.*, at 1.[6] Those failures suggest a systemic inclination on the part of the Intelligence Bureau to disregard the Guidelines' mandates.  That disquieting impression is heightened by the Inspector General's additional observation that in preparing applications for permission to use an undercover officer or confidential informant, a sensitive area where the

---

[6] I have said *supra* that the Inspector General's Report's conclusion that the NYPD repeatedly violated the Handschu Guidelines is not a finding of fact binding on this Court on this motion. However, the manner of the Report's compilation and expression give probable cause to believe in its accuracy (to borrow a phrase from another area of the law).

requisite need for such resources was fact specific, the NYPD "repeatedly used generic, boilerplate text to seek such permission. Tellingly, this boilerplate text was so routine that the same typographical error had been cut and pasted into virtually every application OIG-NYPD reviewed, going back over a decade." *Id.*

These circumstances are more consistent with an NYPD accustomed to disregarding the Handschu Guidelines once an investigation or its continuance is *authorized*, rather than with a department dedicated to compliance with the Guidelines governing how the investigation is to be *conducted*. That problem resonates in the context of this fairness hearing. The function of the proposed Handschu Committee, of which the Civilian Representative is a member, is confined to asking questions and making comments about the facial sufficiency of requests for authorization of the opening, extension, or closing of an investigation. The separate Guidelines that the Inspector General's Report says the NYPD routinely violated fall outside the purview of the proposed Handschu Committee, as well as outside the limited ability of the Civilian Representative to express concern to other authority (Police Commissioner or Court). Approval of the settlement in its present form, with the Revised Handschu Guidelines as its centerpiece, would in these circumstances be unreasonable.

The Inspector General's Report says that the NYPD is aware of these shortcomings, is attempting to rectify them, and the matter will have the continuing attention of the Inspector General. Those are encouraging declarations, but the Inspector General's presence and activity do not abrogate the responsibility of this Court, which presides over the class action and is required to form its own judgment with respect to a proposed settlement such as the present one.

On a separate but related aspect, the Civilian Representative's ability to communicate

concerns and reactions to this Court, which presides over the class action, should be expanded. I do not think that the proposed limitations on the CR's ability to communicate with the Court, at present confined to only one instance at the extreme end of hypothetical NYPD misconduct, are reasonable.

In the Court's view, in order to render the proposed settlement fair and reasonable in the circumstances of the case, the parties should give consideration to agreeing upon the following points:

1.   Specific provision would be made for the review and monitoring of the NYPD's compliance with all of the Handschu Guidelines for investigations involving political activity. The Handschu Committee would seem to be an appropriate body to perform that function. The Civilian Representative would participate in that process.

2.  In addition to the powers conferred by the present provisions of the Revised Handschu Guidelines, the Civilian Representative may at any time communicate to the Court comments or concerns arising out of his or her functioning in that position. Moreover, the CR must file quarterly reports with the Court, which describe in some detail the CR's actions and observations during that period. Copies of those communications and reports must be given to Corporation Counsel and Class Counsel. The Court will place them under seal. Counsel must treat them as confidential.

3. The Mayor appoints the Civilian Representative, who will act in that position for five years, subject to removal by the Mayor for good cause, on notice to Class Counsel and the Court. The Civilian Representative will continue in that position after five years, provided, however, that thereafter the Mayor, if so advised, may apply to the Court for an amendment to the Guidelines to do away with the position. I suggest that alteration because one cannot foretell what will happen over time in this sensitive and volatile part of life, and it is questionable whether it is fair or

38

reasonable to give the Mayor this unfettered veto power.[7]

The parties are entirely at liberty to decide whether they are willing to settle the motion of the Plaintiff Class for injunctive relief on terms which include these considerations, in words or substance. If such an agreement is reached, the Court will approve it as fair and reasonable. Failing agreement, and if Class Counsel decides to press the issue, litigation on the Class's motion for an injunction will resume. The Court will then decide the injunction motion, including the Class's request that the Court appoint a monitor, on a full evidentiary record, which does not presently exist. Nothing said in this Ruling should be read to intimate any view of the Court about what decision would be made on the basis of a full record.

Several other objections to the proposed settlement may be resolved briefly. It was said that some authority other than the Mayor should appoint the Civilian Representative. When the first Handschu Authority, a three-person body, was installed in 1985, the Mayor appointed the civilian member and the other two were deputy police commissioners. Objectors complained that this made the oversight function "totally internal." 605 F. Supp. at 1410. I rejected that contention because I declined to assume that the Mayor "would knowingly appoint a complaisant, silent booby to an important body whose work may be subject to court review." *Id.* I reposed that confidence in then Mayor Koch; I extend it today to Mayor De Blasio. I also rejected then, and reject again, the objection that police officers and administrators formed a majority of the Handschu body in question.

---

[7] Class Counsel says that if the Mayor "chooses to abolish this position, Class Counsel must be given 90 days advance notice. The plaintiff class will thus have an opportunity to mobilize popular opposition to the elimination of the civilian member, if it should ever be proposed." Memo of Plaintiff's Class Counsel in Support of Motion, at 20 n.8. With due respect to counsel, that is an inadequate response. Transforming counsel, to whom judges must listen, into lobbyists, whom the public may ignore, constitutes an unacceptable diminution of protection owing to the class.

Other provisions in the proposed settlement are salutary, and in the absence of the problems discussed *supra*, would strongly militate in favor of approval. The Revised Handschu Guidelines explicitly tie the guarantee of equal protection under the Constitution to the right to be free from investigations in which race, religion or ethnicity is a substantial or motivating factor. Fact-based and articulable allegations or information are required to initiate a Preliminary Inquiry. All levels of investigations are subject to presumptive time limits. The Handschu Committee is revived and re-established, with a civilian member included in its ranks; the questions concerning this body, discussed *supra*, should not obscure the beneficial effects of its presence. The Guidelines require a choice of investigative techniques that take into account the political or religious activities of individuals or organizations, and place necessity-based limitations on the deployment of undercover police officers and confidential informants.

The proposed settlement and the Revised Handschu Guidelines bear witness to the mutual professionalism and good will of Class Counsel and Corporation Counsel in seeking to arrive at a settlement of this important and challenging case. The benefits conferred by these Guideline provisions prompted a number of members of the Muslim community to urge that the Court approve the settlement promptly. Approval is also urged by the Brennan Center for Justice, New York University School of Law, in a thoughtful written submission.

The Court is grateful for all the submissions received from the many individuals and organizations who, recognizing the importance of the issues, wished to be heard. For the reasons this Ruling attempts to explain, the Court must ask able counsel for the parties to revisit the subject.

## X

For the foregoing reasons, the proposed settlement is DISAPPROVED, without prejudice to resubmission after the parties and counsel have had an opportunity to consider this Ruling.

If the case has not been resolved prior to that time, counsel are directed to advise the Court of the status of the case by letter, not later than December 9, 2016.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        October 28, 2016

CHARLES S. HAIGHT, JR.
Senior United States District Judge

41