USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#_____
DATE FILED _3/13/2107_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

BARBARA HANDSCHU, et al.,

        Plaintiffs,                  No. 71 Civ. 2203 (CSH)

   -against-

POLICE DEPARTMENT OF THE CITY OF         MARCH 13, 2017
NEW YORK, et al.,

        Defendants.

-----------------------------------------------------------------------X

## RULING AND ORDER ON PROPOSED REVISED SETTLEMENT AGREEMENT

**HAIGHT, Senior District Judge:**

In this civil rights class action, the Court is required for the second time to approve or disapprove a proposed settlement between the plaintiff Class and the City of New York regarding important issues affecting the City's Muslim community.

The settlement agreement now before the Court is a revision of the initial settlement proposal that the Court declined to approve for the reasons stated in a Ruling reported at 2016 WL 7048839, signed on October 28, 2016 (the "October Ruling"), familiarity with which is assumed. The October Ruling declined to approve what I will refer to herein as the "Initial Settlement Agreement." Thereafter, counsel for the parties conducted further negotiations. The parties eventually agreed upon a revised proposal (the "Revised Settlement Agreement"). The parties submitted the Revised Settlement Agreement to the Clerk for filing on March 6, 2017, and jointly request that the Court

1

approve it.[1]

For the reasons that follow, the Court approves the Revised Settlement Agreement.

I

Understanding a district judge's duties and responsibilities in evaluating the proposed settlement of a class action begins with Rule 23 of the Federal Rules of Civil Procedure, which creates and governs class actions in the federal courts. Rule 23(e) provides: "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." The court must give notice "to all class members who would be bound by the proposal," Fed. R. Civ. P. 23(e)(1), and "[i]f the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate," *id.* 23(e)(2).

The Rule does not undertake to define the adjectives "fair, reasonable, and adequate," and given the infinite complexities of the human spirit and the disputes it is capable of generating, that is understandable: the application of so broadly stated *desiderata* to a particular settlement in a particular case is necessarily fact specific. Nevertheless, the Second Circuit's series of decisions, reviewing for abuse of discretion a district court's approval or disapproval of a class action settlement, furnishes guidance on the practical meaning of these salutary objectives.

One of those decisions was rendered at an earlier stage of this case. In *Handschu v. Special Services Division*, 787 F.2d 828 (2d Cir. 1986), the Second Circuit affirmed this Court's approval of a settlement jointly proposed by the Class and the City that included the initial Handschu Guidelines. I conducted a lengthy fairness hearing at which a number of individuals and entities,

---

[1] Although the parties presented the Revised Settlement Agreement to the Clerk for filing on March 6, 2017, the actual date the document appeared as filed on the case docket was March 9, 2017. *See* Doc. 470.

2

represented by counsel or appearing *pro se*, objected to the proposal on one ground or another, and pressed their objections to the settlement on appeal following this Court's approval of it. Judge Van Graafeiland's opinion for the court of appeals focused upon the necessity of showing that "the settlement agreement was fair and reasonable," 787 F.2d at 833, and expressed the view that the trial judge "knows the litigants and the strengths and weaknesses of their contentions and is in the best position to evaluate whether the settlement *constitutes a reasonable compromise*," *id.* (emphasis added), phrasing that suggests the reasonableness of a settlement may depend upon the parties' demonstrated ability to compromise their contentions on important contested issues. Additional responsibilities of the district judge are articulated by the Second Circuit in *Handschu*: "The district court must, of course, ensure that the settlement is fair and not a product of collusion, and that class members' interests were represented adequately." *Id.* A trial judge who heeds this appellate guidance may look forward, in sure and certain hope, to the benediction the Second Circuit bestowed in *Handschu*: "If the court then approves a settlement based upon well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, the settlement should be upheld on review." *Id.* (citations omitted).

The Second Circuit adheres to these principles in its more recent cases, exemplified by *McReynolds v. Richards-Cantave,* 588 F.3d 790 (2d Cir. 2009). *McReynolds* affirmed the settlement of a class action relating to the removal of abused and neglected children from their homes. Judge Miner's opinion quoted the requirements of Rule 23(e)(2), and then said:

> We have recognized a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery. Such a presumption is consistent with the strong judicial policy in favor of settlements, particularly in the class

> action context. This Court will disturb a judicially-approved [class action] settlement only when there is a clear showing that the District Court abused its discretion.
>
> In determining whether a settlement is fair, reasonable, and adequate, the District Court examines the negotiating process leading up to the settlement[, *i.e.*, procedural fairness,] as well as the settlement's substantive terms[, *i.e.*, substantive fairness].

588 F.3d at 803-04 (citations and internal quotation marks omitted).

As for procedural fairness in *McReynolds*, the Second Circuit cautioned that the trial court "must pay close attention to the negotiating process, to ensure that the settlement resulted from arm's length negotiations and that plaintiff's counsel possessed the necessary experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *Id*. at 804 (citation, internal quotation marks, ellipsis, and brackets omitted). Agreeing with the trial judge, the Second Circuit held that "there was no question that the Settlement is the product of arm's length, good faith negotiation," there was "no indication that the Settlement was the product of bad faith or collusion," and "[t]he extended and transparent negotiations involved in this case were sufficient evidence for the District Court to conclude that the settlement process was procedurally fair." *Id.* (citations and internal quotation marks omitted). As for substantive fairness, the Second Circuit held that the District Court paid sufficient attention to potential factors listed in lead cases like *Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974). *McReynolds*, 588 F.3d at 804.

These principles will inform this Court's evaluation of the Revised Settlement Agreement.

## II

The Initial Settlement Agreement included, indeed was structured around, further revisions to the Modified Handschu Guidelines which the Court had approved in 2003. A prominent feature

4

of the proposed Settlement and Guidelines was the presence on the newly created Handschu Committee of a "Civilian Representative" ("CR"), whose appointment, functions and responsibilities were described in Section VI(3) of the Guidelines.[2] *See* the October Ruling, 2016 WL 7048839, at *8-9.

When counsel for the parties jointly recommended that the Court approve the Initial Settlement Agreement, Class Counsel's submissions referred with pardonable satisfaction to the City's acceptance of the Civilian Representative, whose presence would fill a vacancy that had developed in the Guidelines structure. Notwithstanding that understandable exercise in self-approbation, I had occasion to note in the October Ruling, which was preceded by the fairness hearing, that "[t]he status and functions of the Civilian Representative ('CR') on the Handschu Committee" were the subjects which "have generated more comments and objections from the Muslim community and the public at large than any other." *Id.* at *16. The October Ruling held that because of the limitations and restrictions placed upon the Civilian Representative's functions, coupled with the nature and duration of the CR's appointment and retention by the Mayor, "the proposed role and powers of the Civilian Representative do not furnish sufficient protection from potential violations of the constitutional rights of those law-abiding Muslims and believers in Islam who live, move and have their being in this City." *Id*. at *18. In that regard, and in the parlance of class action settlement jurisprudence, I regarded the Initial Settlement Agreement as *unreasonable*, and consequently declined to approve it.

The October Ruling concluded with these judicial observations:

---

[2] The October Ruling referred to the several divisions of the Guidelines as "Parts." The Guidelines themselves use the internal designation "Sections." I use that designation in this Ruling.

> In the Court's view, in order to render the proposed settlement fair and reasonable in the circumstances of the case, the parties should give consideration to agreeing upon the following points: . . . . [suggested additional Guidelines provisions omitted].
>
> The parties are entirely at liberty to decide whether they are willing to settle the motion of the Plaintiff Class for injunctive relief on terms which include these considerations, in words or substance. If such an agreement is reached, the Court will approve it as fair and reasonable. Failing agreement, and if Class Counsel decides to press the issue, litigation on the Class's motion for an injunction will resume. The Court will then decide the injunction motion, including the Class's request that the Court appoint a monitor, on a full evidentiary record, which does not presently exist. Nothing said in this Ruling should be read to intimate any view of the Court about what decision would be made on the basis of a full record.

*Id.* at *19-20.

A hypercritical reader might question whether this was appropriate conduct on the part of a trial judge, whose function under Rule 23 could be interpreted as limited to deciding whether a class action settlement proposed by the parties is fair and reasonable. A judge must resist the temptation of thinking that what he does must be right because he has done it. On this occasion, however, I am reassured by the Second Circuit's approval in principle, as expressed in *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982), which affirmed the district court's disapproval of a proposed settlement of an employment discrimination class action. The Second Circuit said in the text of its opinion at 655: "This affirmance is without prejudice therefore to a renewed application by appellants, with such changes, if any, in substance and procedure as *court and counsel* deem proper." *Id.* at 655 (emphasis added). At that point the court of appeals drops footnote 1, which reads:

> The district judge should not take it upon himself to modify the terms of the proposed settlement decree, nor should he participate in any bargaining for better terms. However, a dissatisfied judge may, with circumspection, "edge" the parties in what he believes to be the right

6

direction.

*Id.* at 656 n.1 (citations omitted).

In the case at bar, the closing paragraphs of the October Ruling constituted the Court's effort to "edge" the parties toward more reasonable provisions for the Civilian Representative. That effort may have been devoid of subtlety, but I prefer to think it was sufficiently circumspect, given the Court's declarations that the parties were entirely free to move in what the Court believed to be the right direction, or dig in their heels and not budge, in which event we would all get on with the trial, the Court having declared its preservation of an open mind pending completion of the evidentiary record.

### III

The parties have now signified through counsel their joint agreement to the additional Guidelines provisions the Court asked them to consider.

The process of further negotiation and ultimate acceptance took considerable time. The considerations in question were voiced in a Ruling signed on October 28, 2016; Mr. Eisenstein's declaration announcing the joint agreement is dated March 6, 2017. During that interval, counsel for the parties found it necessary to request, and the Court granted, a number of extensions of previously set time limits.

The Court stressed throughout the concern of members of the Muslim community, powerfully articulated during the fairness hearing, for approval of a settlement they regarded as favorable as quickly as possible. Counsel for all parties concerned responded to the circumstances with characteristic skill, good will, and devotion. However, the issues were sensitive, complex and not without difficulty. Corporation Counsel, for example, had to deal with tensions inherent in

7

suggestions to professional police commanders and officers that they must put up with civilian oversight of any degree. A lawyer's certificate to practice recites that he or she is an "attorney and counselor at law." These are related but different skills. The profession requires that a lawyer have both. An attorney tries to persuade a judge how to decide; a counselor tries to persuade a client how to behave; both tasks can be difficult. This important and sensitive case has reached the stage of proposed settlement in large measure because of the professional and personal quality of the lawyers involved.

Part III of this Ruling analyzes the particular changes to the Handschu Guidelines which would be achieved by the Revised Settlement Agreement. I begin that exercise by referring to "Tab A" to the Eisenstein declaration of March 6, which at ¶ 3 describes Tab A as "a blackline of the Revised Handschu Guidelines showing the changes now proposed compared to the 2016 proposal." Tab A accomplishes that task by displaying the presently proposed printed text of the Revised Guidelines, with deleted language indicated by blue lines striking what is deleted, and added language indicated by underlined blue text specifying what is new. This presentation enables the reader to see at a glance what changes have been made to the Guidelines presented with the Initial Settlement Agreement: a useful perception, since the Court, having rejected the Initial Settlement as unreasonable, is now asked to approve the Revised Settlement Agreement and attendant Guidelines as reasonable.

It is immediately apparent that the only changes in these two versions of the Guidelines are found in Section VI, captioned "Handschu Committee," which contains in subsections VI(5) and (5)(a)-(k) detailed provisions for the inclusion of "a Civilian Representative" on the Handschu Committee, as well as the powers, functions and responsibilities of the Civilian Representative

within the Committee.

The Handschu Committee's *raison d'être* is introduced by the provision in Section VI(1) that its members "are expected and authorized to attend and participate in monthly meetings at which investigations are presented for opening, extension or closure by the Deputy Commissioner for Intelligence." Almost all of the current Guidelines changes relate to the Civilian Representative ("CR"), an unsurprising focus, since the disapproval of the Initial Settlement Agreement was based principally upon the Court's conclusion that the initial Guidelines provisions for the CR's appointment, retention, role and powers were unreasonable. The Court's October Ruling undertook to "edge" the parties (so to speak) in a different direction. The parties now attempt to do so, in the following specific ways, graphically revealed by Tab A.

* While the initial Guidelines provided only that members of the Handschu Committee "may" attend and participate in monthly meetings of the Committee, the revised Guidelines strike the word "may" and substitute "are expected and authorized to attend" the monthly meetings. Section VI(1). This heightened responsibility impacts the Civilian Representative because his or her presence on the Handschu Committee is mandated by Section VI(5).

* Subsections VI(2) and (4) of the revised Guidelines clarify and expand the power of all Handschu Committee members, at monthly or quarterly Committee meetings, to "inquire into" or "raise concerns regarding" a particular investigation (the subject of the monthly meetings) or general compliance with the Handschu Guidelines (the subject of the quarterly meetings). The revised Guidelines which provide specifically for the Civilian Representative are found in Section VI(5). The most important provisions and changes appear in that subsection. For the sake of clarity, I will refer in what follows to "initial VI(3)" and "revised VI(5)."

9

* Initial VI(3), after mandating that "[t]here shall also be a Civilian Representative on the Handschu Committee," modulates into permissive terms and provides that the CR "may attend and participate in the monthly meetings" of the Committee. No mention is made of the CR's attendance at the quarterly meetings. Revised VI(5), shifting from permissive to mandatory, provides that the Civilian Representative "shall, unless able to do so for good cause, attend and participate in all of the monthly meetings for opening, extension or closure of investigations and in all of the quarterly discussions led by the Special Counsel for Intelligence Affairs," the Special Counsel being directed by Section VI(4) to "lead a quarterly discussion for the Handschu Committee related to the NYPD's compliance during that period" with the Guidelines' operational requirements.

* Initial VI(3) provides, as does revised VI(5), that the Civilian Representative shall be a lawyer who has never been an NYPD employee, appointed by the Mayor upon consultation with the Police Commissioner, and may be replaced by the Mayor "for good cause," on 14 days' advance notice to Class Counsel. No mention is made in initial VI(3) of the CR's possible resignation. Revised VI(5) provides: "In the event the Civilian Representative resigns, the Mayor in consultation with the Police Commissioner will appoint a replacement."

* A significant change occurs with respect to the termination of the Civilian Representative's appointment. Initial VI(3) provides:

> The position of Civilian Representative will exist for a minimum of five years from the appointment of the first person to fill that role. After that initial five year period, the position of Civilian Representative will continue unless abolished or modified by the Mayor, upon which Class Counsel will receive 90 days' notice in advance of such abolition or modification.

Following the first quoted sentence, which remains the same, revised VI(5) provides:

> After that initial five year period, the position of Civilian Representative will continue unless the Mayor applies to the Court for an amendment to the Revised Handschu Guidelines abolishing the position, upon 30 days' advance notice to Class Counsel prior to such application. The amendment to the Revised Handschu Guidelines abolishing the position shall be granted by the Court if the Court finds there have not been systematic and repeated violations of the Guidelines to a degree sufficient to show an NYPD policy to act in such a fashion for a period of three years immediately prior to the application, as shown in the reports submitted to the Court by the Civilian Representative.

The phrase "as shown in the reports submitted to the Court by the Civilian Representative," as used in the quoted language from revised Section VI(5) of the Guidelines, refers to several forms of reports contemplated by subsections VI(5)(g), (h) and (i). The provisions in those subsections are new additions to the Guidelines. To comprehend them, one must also consider VI(5)(e) and VI(5)(f), which also contain new language, and provide pertinent background.

* Revised VI(5)(e) applies "[i]f the Civilian Representative concludes that an investigation is being opened, extended or conducted in violation of the Revised Handschu Guidelines, or that the NYPD is otherwise violating the Revised Handschu Guidelines." The revision adds the phrases "or conducted" and "is otherwise violating" to the text of initial VI(3)(e). In such circumstances, the CR "shall record his or her concerns regarding the purported violation and/or his or her objection to the investigation and the grounds for the objection in the minutes of the Handschu Committee meeting." The revision to VI(5)(e) adds a mandatory recording in the minutes of the CR's "concerns"; the initial VI(3)(e) spoke only of recording a CR's "objection."

* Revised VI(5)(f) follows up on VI(5)(e) by providing that "[i]f the Civilian Representative concludes that an investigation is being opened, extended, or conducted" in violation of the Guidelines, the CR "shall be provided with means to present his or her conclusion to the Police

11

Commissioner directly." The revision denominates such a presentation by the Civilian Representative as "a VI(5)(f) communication." Revised VI(5)(f) then provides: "The Police Commissioner shall inquire into the investigation and report the findings of the inquiry to the Civilian Representative within seven (7) days after receipt of the VI(5)(f) communication." The Police Commissioner's obligation to report his findings to the Civilian Representative within seven days is new. Initial VI(3)(f) obligated the Commissioner to respond, but there was no time limit for doing so.

 * Revised VI(5)(g) differs significantly from the Guidelines which accompanied the Initial Settlement Agreement. Revised VI(5)(g) does not mention a systemic violation by the NYPD; that subject is dealt with in a revised VI(5)(h). Revised VI(5)(g), containing new language I need not quote in full, provides in summary that if the Civilian Representative "has concerns about the NYPD's compliance with the Revised Handschu Guidelines, and the Police Commissioner has not provided a timely response to the Civilian Representative's VI(5)(f) communication regarding such concerns, or the Civilian Representative is not satisfied with the Police Commissioner's response, the Civilian Representative may communicate those concerns to the Judge assigned to the Handschu case in the Southern District of New York [hereafter 'the Court'] at any time." That is a change, because the initial VI(3) protocols did not allow for a communication between the Civilian Representative and the Court at that stage. In the October Ruling, 2016 WL 7048839 at *9, I observed that "if a single incident is involved, the CR blows his whistle in the office of the Police Commissioner, who is directed by the Guidelines to 'inquire into the investigation and report the findings of the inquiry to the Civilian Representative.' Apparently the Commissioner can do anything about the substance of the inquiry that seems right to him, which puts an end to the matter."

12

Perhaps it was arguable that the initial VI(3) provisions impliedly authorized the Civilian Representative to complain to the Court about the Commissioner's disregard of the CR's discontent about a particular incident, but that argument need not now be made – revised VI(5)(g) expressly confers upon the CR the discretion to do so.

    \* Revised VI(5)(h) deals with a conclusion by the Civilian Representative that the NYPD is systematically and repeatedly violating the Guidelines. The subparagraph begins by saying: "After complying with provision VI(5)(f) hereof, if the Civilian Representative concludes at any time that the NYPD is systematically and repeatedly violating the Revised Handschu Guidelines to a degree sufficient to show a NYPD policy to act in such a fashion, the Civilian Representative *shall report* the alleged systematic violation" (emphasis added) to the Handschu case assigned Judge. The next sentence creates some ambiguity about whether the CR's reaction in that circumstance is mandatory or discretionary, since it begins with the phrase "[i]n the event the Civilian Representative *decides to communicate such concerns* to the Court . . ." (emphasis added), but I hold that a mandatory report to the Court by the CR is the only reasonable construction, since one cannot imagine why a Civilian Representative would conclude that the NYPD had embarked upon an illicit policy of violating the Handschu Guidelines (and consequently a Court order) and not tell the Court about it. After providing for notice to be given by the CR to the NYPD of such an intended report, revised VI(5)(h) ends with the recitation: "Submission to the Court shall be effectuated in compliance with Section VI(5)(k) below."

    \* Revised VI(5)(i) is a new subparagraph which introduces an additional report from the Civilian Representative to the Court: a mandatory annual report. The subparagraph begins with the direction: "In addition, the Civilian Representative shall file an annual report with the Court related

13

to his or her actions and observations as a member of the Handschu Committee." It then sets forth a comprehensive list of subjects to be covered by the report. That list includes all activities, observations, and opinions falling within the Civilian Representative's personal role and responsibilities (as discussed in this Ruling) during the year covered by the report, and (painting with a broader brush) the CR's perceptions of whether the NYPD has complied with a number of operational obligations imposed by the Guidelines upon the NYPD. The Civilian Representative is directed to give the Police Commissioner and two Deputy Commissioners 21 days' advance notice of the submission of this annual report to the Court.

* Revised VI(5)(j) contains provisions for the exclusion from any of these reports and communications of any classified, privileged or protected information under federal or state law. Revised VI(5)(k) contains detailed instructions about how these concerns are to be implemented, and the manner in which the Court would resolve any questions about whether a particular document should be kept under seal, redacted, or made public. These sensible provisions do not implicate the fairness, reasonableness or adequacy of the proposed Revised Settlement Agreement, and I say nothing further about them.

## IV

Having carefully considered the history and recent circumstances of this case, the Court concludes that the Revised Settlement Agreement is fair, reasonable, and adequate to and for all parties affected by it. The Court will approve the settlement.

The revisions to Section VI of the Guidelines adequately address the concerns which prevented the Court from approving the Initial Settlement Agreement. Those concerns focused upon the role and functions of the Civilian Representative. The reintroduction of some measure of civilian

oversight had become necessary because "the history of the NYPD's adherence to the Handschu Guidelines has been problematic at times." October Ruling, 2016 WL 7048839, at *18. The most recent problems have surfaced in connection with the NYPD's surveillance of the City's Muslim community, giving rise to the present motion by the Plaintiff Class for equitable relief. While the Guidelines accompanying the Initial Settlement Agreement created a "Civilian Representative" and seated that individual among the members of the newly formed Handschu Committee, the conditions and limitations placed upon the Civilian Representative's appointment, retention, role, and responsibilities rendered the CR perilously close to a state of muzzled impotence which the Court was constrained to regard as unreasonable.

The Revised Settlement Agreement and attendant Guidelines effectively cure that unsatisfactory condition. The Civilian Representative is now unbound, given voice, and freed from the Mayor's unfettered discretion in respect of the term of appointment. To recapitulate: As a result of the revisions, the Civilian Representative must attend the previously existing monthly meetings and newly mandated quarterly meetings of the Handschu Committee; the CR is required to enter his or her concerns in the meeting minutes; the CR must receive prompt responses from the Police Commissioner about concerns the CR has expressed to the Commissioner; the CR may communicate to the Court his discontent with any response from the Commissioner; the CR must send a comprehensive annual report to the Court; the CR must report to the Court if at any time the CR concludes that the NYPD is systematically and repeatedly violating the Guidelines; and the position of Civilian Representative will continue after the initial five-year term unless the Mayor applies to end it and persuades the Court to find that "there have not been systematic and repeated violations of the Guidelines to a degree sufficient to show an NYPD policy to act in such a fashion for a period

15

of three years immediately prior to the application, as shown in the reports submitted to the Court by the Civilian Representative."

These revisions amount to a material, effective, and reasonable restructuring of the position of Civilian Representative on the Handschu Committee. It does not go as far as Class Counsel requested in the underlying motion. Their outrage at media revelations of NYPD surveillance of Muslims prompted counsel to seek a Court order "appointing an auditor or monitor to supervise compliance by the NYPD, its employees and agents with the injunctive orders made herein mandating obedience to the Modified Handschu Guidelines in investigations of political activity by members of the plaintiff class." October Ruling, 2016 WL 7048839, at *4. Corporation Counsel, professing full compliance by the NYPD with the Guidelines, contended that no monitor or other civilian presence should be appointed. Under the Revised Settlement Agreement, a Civilian Representative comes into being where the City would have preferred none, but with less than the broad powers and responsibilities Class Counsel requested. This is the essence of compromise. The settlement is fair and reasonable because, having passed through the revision process, it now strikes a proper balance between the private rights of the members of the City's Muslim and Islamic communities, and the public safety, entrusted to the NYPD, of all who dwell in or visit the City.

This settlement also satisfies the other standards and criteria required by appellate authority. When the Second Circuit affirmed the first *Handschu* settlement, its opinion emphasized a comparison of "the terms of the compromise with the likely rewards of litigation," and noted approvingly this Court's determination that limitations on its equity power "would not permit it to grant much of the injunctive relief that plaintiffs sought." 787 F.2d at 833 (citations and internal quotation marks omitted). The risks and uncertainties of litigation continue to affect the parties'

prospects in keeping on with the litigation. The October Ruling noted and took into consideration a finding by the City's Inspector General that the NYPD repeatedly failed to follow Guidelines relating to the ongoing supervision of "inquiries or investigations which were properly initiated and are continuing." 2016 WL 7048839, at *12. That factor, in the Court's view, argued for increasing the powers and responsibilities of the Civilian Representative. However, the Inspector General's report also concluded (in a passage to which the NYPD gave greater prominence) that the NYPD "has been articulating valid reasons for its general decisions to open particular cases." *Id*. at *11. One would expect the City to stress that aspect in continuing litigation, as a substantive reason why the Court should not appoint a monitor with the broad powers demanded by Class Counsel in their present motion. The proposed settlement, now revised to enhance the Civilian Representative's role, constitutes "a reasonable compromise" and "a fair resolution of the parties' differences," to quote again the Second Circuit's earlier *Handschu* opinion, 787 F.2d at 833.

The other recognized factors all militate in favor of approving the Revised Settlement Agreement. There is no indication that the settlement is a product of collusion. The attorneys for all parties – Class, City, the *Raza* plaintiffs before Judge Chen in the Eastern District – are able and experienced, and have given their respective clients exemplary representation. The revised settlement is the product of extended negotiations, preceded by a substantial amount of discovery, whose boundaries were supervised by the Court; indeed, negotiations had to be resumed after the Court declined to approve the initial settlement proposal. The revised settlement is, in short, fair, reasonable and adequate, achieved without collusion and after lengthy arm's length negotiations between attorneys of high professional quality.

V

**CONCLUSION**

For the foregoing reasons, the Revised Settlement Agreement described in the Eisenstein Declaration executed on March 6, 2017 [Doc. 470] is APPROVED by the Court.

The Revised Handschu Guidelines, which contain all the changes proposed by the parties, are attached as Tab C to the Eisenstein Declaration. Those Guidelines are also APPROVED by the Court. They are incorporated by reference in this Ruling and Order.

This Ruling is marked "SO ORDERED" by the Court for the purpose, *inter alia*, of ensuring that the undertakings specified in the Guidelines, including the appointment, funding, and support of the Civilian Representative, will be faithfully performed by the party or parties concerned. This follows the Court's prior practice of making Guidelines revisions and related directions orders of the Court.

The foregoing is SO ORDERED.

Dated: New Haven, Connecticut
March 13, 2017

_____
CHARLES S. HAIGHT, JR.
Senior United States District Judge