# Sixth Annual Report of the Civilian Representative
# To the New York City Police Department's
# Handschu Committee

## I. Introduction

On February 21, 2023, I was appointed as the "Civilian Representative" (or the "Representative") to the Handschu Committee of the New York City Police Department (the "NYPD"). The Handschu Committee stems from a 1985 consent decree, as modified several times, that governs the NYPD's investigations of crimes that may involve political activity. The committee's work is governed by the Handschu Guidelines (the "Guidelines"), which have been revised several times since their promulgation in 1985.

In their current form, the Guidelines require that requests to open, extend, or close certain inquiries and investigations that implicate political activity must be reviewed by the Handschu Committee. The Handschu Committee meets monthly to review requests and ensure that they are consistent with the standards set forth in the Guidelines. While most members of the Handschu Committee are NYPD personnel, the Guidelines also require the participation of the Civilian Representative who is not affiliated with the NYPD. Ultimate authority for approving requests rests with the current Deputy Commissioner of Intelligence and Counterterrorism and the Commanding Officer of the NYPD's Intelligence Division[1]. However, the Civilian Representative is given the authority to object to a request if the Representative believes the request is in violation of the Guidelines. The Representative is also required to report any violations of the Guidelines to the Police Commissioner and may elevate any concerns to the Court overseeing the consent decree. Finally, the Representative is required to provide an annual report noting any objections, communications with the Court, and whether the NYPD substantially fulfilled its obligations under the Handschu Guidelines.

This annual report covers my work as the Civilian Representative on the Handschu Committee from February 2023 to February 2024 (the "Relevant Period").[2] In this report, I first provide some background on the Handschu Committee that may be useful to a reader who is not familiar with the process.

## II. Background on the Handschu Committee

The Handschu Committee traces its roots to a 1971 class action lawsuit that challenged various surveillance and investigative practices directed at political organizations by the NYPD's investigatory unit, then known as "Security and Investigation Section" or "SIS." The lawsuit alleged that SIS's activities "were designed to and have the effect of chilling, discouraging and inhibiting plaintiffs … from expressing and advocating unpopular political and social views and

---

[1] As with any organization, ranks and titles and division names may change. This report will refer to the current organizational structure, ranks, and titles that are in effect as of the date of this report.

[2] For the avoidance of doubt, this report is written only in my capacity as the Civilian Representative, and not in my capacity as the President of the New York City Bar Association.

15212458v.1

from communicating and associating with one another for that purpose."³ The lawsuit outlined seven specific categories of practices and conduct on the part of SIS that, according to plaintiffs, infringed upon their constitutional rights: "(1) informers; (2) infiltration; (3) interrogation; (4) overt surveillance; (5) summary punishment; (6) intelligence gathering; [and] (7) electronic surveillance."⁴ According to plaintiffs, the foregoing practices had a "chilling effect" on "the exercise of their constitutional rights of freedom of speech, assembly and association," violated "their rights against unlawful search and seizure because the SIS proceed[ed] without obtaining warrants or judicial authorization," "violate[d] their rights of privacy and to substantive and procedural due process," and resulted in the infliction of "cruel and unusual punishment."⁵

The then-presiding federal district judge overseeing the case, Hon. Edward Weinfeld, denied the defendants' motion to dismiss the complaint.⁶ Following discovery and certification of the class, the parties negotiated and jointly proposed a settlement of the case, which was approved in 1985 by the incoming judge on the case, Hon. Charles S. Haight, and subsequently affirmed in 1986 by the U.S. Court of Appeals for the Second Circuit.⁷

The cornerstone of the 1985 settlement was what has come to be known as the "Handschu Guidelines," which take their name from Barbara Handschu, the attorney and social activist who was the first-named plaintiff in the lawsuit. The 1985 guidelines, referred to herein as the "Original Guidelines," focused upon and regulated any NYPD "investigation of political activity," defined as "[t]he exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions."⁸ "The [Original] Guidelines deal[t] with future collection, retention and dissemination of information by the PSS," the then-existing Public Security Section of the NYPD.⁹ The Original Guidelines established "an Authority to oversee the activities of the PSS" consisting of three members: two high-ranking NYPD officers and a third "civilian member appointed by the Mayor upon consultation with the Police Commissioner for a term revocable at will."¹⁰ The Mayor appointed Hon. Harold R. Tyler, Jr., an attorney then in private practice at the law firm of Patterson Belknap Webb & Tyler LLP and former U.S. District Judge and Deputy Attorney General of the United States, as the civilian member to the Authority.

Among other things, the Original Guidelines required that the NYPD present fact-specific reasons for commencing an investigation involving covert surveillance operations and prohibited the NYPD from targeting suspects based on political, religious, sexual, or economic preference. They also gave the Authority the power to conduct "inquiries" of the NYPD upon the request of

---

³ *Handschu v. Special Servs. Div.*, 349 F. Supp. 766, 767 (S.D.N.Y. 1972) ("*Handschu I*").

⁴ *Id.* at 768.

⁵ *Id.* at 768–69.

⁶ *Id.* at 771.

⁷ *Handschu v. Special Servs. Div.*, 605 F. Supp. 1384 (S.D.N.Y. 1985) ("*Handschu II*"), *aff'd*, 787 F.2d 828 (2d. Cir. 1986).

⁸ *Id.* at 1420.

⁹ *Id.* at 1389.

¹⁰ *Id.* at 1390.

persons or entities with reason to believe they were being investigated in connection with political activity, to ensure that any such investigation complied with the Original Guidelines.

In the wake of the tragic events of September 11, 2001, in 2003, the NYPD moved to modify the Original Guidelines on the grounds that their continued enforcement "limit[ed] the effective investigation of terrorism and prevent[ed] cooperation with federal and state law enforcement agencies in the development of intelligence," contrary to the public interest.[11] The NYPD claimed that the Original Guidelines constituted "an operational handicap" because they required that a single unit within the NYPD's Intelligence Division conduct intelligence investigations of political activity when "the entire resources of the NYPD must be available to conduct investigations into political activity and intelligence related issues."[12] In response, the Court modified the Original Guidelines. The modified guidelines are referred to herein as the "2003 Guidelines." The 2003 Guidelines replaced the detailed instructions set forth in the Original Guidelines with the FBI Guidelines for investigations issued post-9/11 by Attorney General John Ashcroft in May 2002.[13] While the Handschu Authority continued to exist, under the 2003 Guidelines, it no longer had detailed oversight responsibilities for investigations; its sole function was to review records that the NYPD was directed to generate and retain.[14] The 2003 Guidelines were made a part of an order and judgment of the Court.[15]

The 2003 Guidelines remained in force over the next several years. That began to change when, in 2011, class counsel informed the Court that they believed, based on public reporting, that the NYPD maintained a policy of "retain[ing] information about [Muslim] class members' political activity that does not relate to potential unlawful or terrorist activity."[16] In 2013, class counsel moved for injunctive relief and for the appointment of a monitor to supervise the activities of the NYPD's Intelligence Bureau. Following years of negotiations, in 2016, class counsel and the NYPD jointly proposed a settlement and attendant revisions of the 2003 Guidelines (the "2016 Proposed Settlement").[17] The 2016 Proposed Settlement also sought to settle claims in a separate lawsuit, *Raza, et al. v. City of New York, et al.*, 13-cv-3448 (PKC)(JO) (E.D.N.Y.), which alleged that the NYPD had engaged in unlawful surveillance of Muslims in New York under the guise of investigating terrorism. Among other things, the 2016 Proposed Settlement sought to change certain NYPD investigatory protocols in the 2003 Guidelines. The 2016 Proposed Settlement also provided for a newly-created 11-member Handschu Committee, which would contain a Civilian Representative appointed by the Mayor.

The 2016 Proposed Settlement was rejected by the Court on the grounds that it did not establish sufficiently meaningful oversight procedures with respect to the Civilian

---

[11] *Handschu v. Special Servs. Div.*, 273 F. Supp. 2d 327, 333 (S.D.N.Y. 2003) ("*Handschu III*").

[12] *Id.*

[13] *Id.* at 346.

[14] *Id.* at 334–35.

[15] *Handschu v. Special Servs. Div.*, 288 F. Supp. 2d 411 (2003) ("*Handschu IV*").

[16] *Handschu v. Police Dep't of the City of New York* ("*Handschu V*"), 219 F. Supp. 3d 388, 391 (S.D.N.Y. 2016).

[17] *Id.*

3

Representative.[18] Thereafter, the parties submitted a revised proposal that strengthened the powers and responsibilities of the Civilian Representative, requiring, among other things, that the Civilian Representative attend and participate in quarterly and monthly meetings of the Handschu Committee; document any concerns regarding the propriety of an investigation in the applicable meeting minutes; submit annual reports to the Court; and report to the Court if the Civilian Representative concludes, at any time, that the NYPD is systematically and repeatedly violating the guidelines.[19] The Court adopted the proposal, finding that, with these changes, the parties' proposal was fair and reasonable and "str[uck] a proper balance between the private rights of the members of the City's Muslim and Islamic communities, and the public safety, entrusted to the NYPD, of all who dwell in or visit the City."[20] The new guidelines, referred to herein as the "Operative Guidelines," govern the work of the Handschu Committee and the NYPD to this day.

Upon the Court's approval of the Operative Guidelines, the Mayor appointed Hon. Stephen Robinson, an attorney then in private practice at the law firm of Skadden, Arps, Slate, Meagher & Flom and former U.S. District Judge and Deputy General Counsel of the FBI, as the Civilian Representative to the Handschu Committee. Upon completion of Hon. Robinson's five-year term, the Mayor appointed the undersigned as the Civilian Representative.

### III. The Operative Guidelines and the Process

As reflected in the Operative Guidelines (which are attached to this report), it is the stated policy of the NYPD that investigations involving political activity conform to the guarantees of the Constitution, including the guarantee of equal protection. It is further the stated policy of the NYPD that care must be exercised in the conduct of those investigations so as to protect constitutional rights, including the right to be free from investigations for which race, religion, or ethnicity is a substantial or motivating factor. In addition, matters investigated by the NYPD must be confined to those supported by a legitimate law enforcement purpose.

The Operative Guidelines (i) limit the investigation of political activity to those circumstances where there is specific information of criminal activity; (ii) establish the Handschu Committee to oversee compliance; and (iii) establish the role of the Civilian Representative. The Operative Guidelines provide for the following levels of investigative activity by the NYPD:

a) <u>Checking of Leads</u>. This is the lowest level of investigative activity. It encompasses the prompt and extremely limited checking-out of initial leads, which is warranted when NYPD receives information regarding the possibility of unlawful activity.

b) <u>Preliminary Inquiries</u>. A Preliminary Inquiry is the second-lowest level of investigative activity. A Preliminary Inquiry is warranted when the responsible handling of an allegation or information requires some further scrutiny beyond the prompt and extremely limited

---

[18] *Id.* at 407–08 (finding that "the proposed role and powers of the Civilian Representative do not furnish sufficient protection from potential violations of the constitutional rights of those law-abiding Muslims and believers in Islam who live, move and have their being in this City").

[19] *Handschu v. Police Dep't of the City of New York*, 241 F. Supp. 3d 433, 438, 440–41 (S.D.N.Y. 2017) ("*Handschu VI*").

[20] *Handschu VI*, 241 F. Supp. 3d at 442.

4

checking of an initial lead. The possibility of unlawful activity to initiate a Preliminary Inquiry requires an allegation or information that is articulable and factual. However, such an allegation or information need not have been verified as true or accurate. Whether it is appropriate to open a Preliminary Inquiry immediately, or instead to engage first in a Checking of Leads, depends on the circumstances.

c) <u>Full Investigation</u>. A Full Investigation is the second-highest level of investigative activity. A Full Investigation is appropriate when facts or circumstances reasonably indicate that an unlawful act has been, is being, or will be committed. A Full Investigation may be conducted to prevent, solve, or prosecute such unlawful activity. The standard of "reasonable indication" is substantially lower than probable cause.

d) <u>Terrorism Enterprise Investigation</u>. A Terrorism Enterprise Investigation is the highest level of investigative activity. A Terrorism Enterprise Investigation is an investigation to determine the identity and nature of a group or organization involved in unlawful acts; that group or organization's geographic dimensions; that group or organization's past acts and intended goals; and that group or organization's capacity for harm, among other factors. A Terrorism Enterprise Investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of: (i) furthering political or social goals wholly or in part through activities that involve force, violence, or other unlawful acts; (ii) engaging in terrorism as defined in N.Y. Penal Law § 490.05; or (iii) committing certain offenses described in N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, or 490.35, or other related statutes currently in effect or later enacted. In determining whether a Terrorism Enterprise Investigation should be conducted, the NYPD shall consider all of the circumstances, including the magnitude of the threatened harm, the likelihood that it will occur, the immediacy of the threat, and any danger to privacy or free expression posed by an investigation.

Members of the Handschu Committee include (current titles/ranks): (i) the Deputy Commissioner of Intelligence and Counterterrorism; (ii) the Executive Officer of the Intelligence and Counterterrorism Bureau; (iii) the Commanding Officer of the Intelligence Division; (iv) the Executive Officer of the Intelligence Division; (v) the Commanding Officer of the Intelligence Operations and Analysis Section ("IOAS"); (vi) the Commanding Officer (or Executive Officer) of the Criminal Intelligence Section; (vii) the Assistant Commissioner of Intelligence Analysis; (viii) the Deputy Commissioner of Legal Matters; (x) the Director of Intelligence Matters; and (ix) the Civilian Representative.

Although all members review the requests and can provide their input during the monthly meetings, the Deputy Commissioner of Intelligence and Counterterrorism and the Commanding Officer (or in his or her absence, the Executive Officer) of the NYPD's Intelligence Division have the ultimate responsibility for approving the opening and extension of all Handschu Investigations.

The Handschu Committee members participate in monthly meetings during which the Committee reviews requests to open, close, or extend Handschu investigations. Prior to each meeting, I receive a briefing book that contains: (1) the minutes of the previous Handschu Committee meeting; (2) the agenda for the current meeting; (3) all requests to open or extend Preliminary Inquiries, Full Investigations, or Terrorism Enterprise Investigations; (4) any

corresponding authorization or extension of undercover operations in those investigations; and (5) any requests to close investigations. The briefing book contains the facts and background information that the NYPD believes justifies each request, as written in the Investigative Statement.

The Civilian Representative's responsibilities include the following:

a) Unless unable to do so for good cause, the Civilian Representative is required to attend and participate in all of the monthly meetings of the Handschu Committee, and all of the quarterly discussions led by the Special Counsel for Intelligence Affairs (whose current title is Director of Intelligence Matters).

b) If the Civilian Representative deems that a Preliminary Inquiry, Full Investigation, or Terrorism Enterprise Investigation is being opened, extended, or conducted in violation of the Operative Guidelines or the law, the Civilian Representative is required to bring the investigation to the attention of the Police Commissioner. The Police Commissioner shall inquire into the investigation and report the findings of the inquiry to the Civilian Representative within seven days of receipt of the Civilian Representative's concerns. If the Police Commissioner has not provided a timely response to the Civilian Representative's concerns or if the Civilian Representative is not satisfied with the Police Commissioner's response, the Civilian Representative may communicate those concerns to the U.S. District Judge assigned to the Handschu case.

c) The Civilian Representative is authorized to review the use or extension of the use of undercover officers and/or confidential informants. The Civilian Representative shall record his or her concerns and/or his or her objections in the minutes of the Handschu Committee meeting if he or she concludes: (1) that the opening, extension, conduct or use of undercover officers and/or confidential informants in an investigation violates the Operative Guidelines or (2) that the NYPD is otherwise violating the Operative Guidelines or the law in the use or extension of the use of undercover officers and/or confidential informants.

d) The Civilian Representative is empowered to report to the Court at any time if there are violations of the Operative Guidelines. If at any time, the Civilian Representative deems there are systematic and repeated violations of the Operative Guidelines to a degree sufficient to show an NYPD policy to act in such a fashion, the Civilian Representative shall report the alleged systematic violation directly to the U.S. District Judge assigned to the Handschu case.

e) The Civilian Representative shall file an annual report with the Court related to his or her actions and observations as a member of the Handschu Committee. The annual report will:

   1) Indicate whether the Civilian Representative has objected to any investigations over that period and provide the basis for any objections;

   2) State whether the NYPD has (i) substantially obtained timely approval for extending and closing investigations, (ii) substantially obtained timely approval for the use of human sources, and (iii) substantially fulfilled its obligation to

review Preliminary Inquiries, Full Investigations, and Terrorism Enterprise Investigations every six months; and

3) Address any communication during the annual period by the Civilian Representative to the Court.

As the Civilian Representative, prior to each meeting of the Handschu Committee, I reviewed all of the pending requests for discussion. Although each investigation is unique, I generally considered the following questions when evaluating requests to open or extend Preliminary Inquiries, Full Investigations, or Terrorism Enterprise Investigations:

a) What is the threatened harm?

b) What is the magnitude of the threatened harm?

c) What is the likelihood that such harm will occur?

d) Does the proposed investigation pose any danger to privacy, freedom of association, or free expression?

e) Can investigators obtain the information in a timely manner using less intrusive means?

f) Is there a reasonable basis to believe that the proposal meets the applicable standard for opening or extending a Handschu investigation?

g) How imminent is the threat?

  1. Is the information provided remote in time or in relation to the proposed target of the investigation?

  2. Is there a threat to life or substantial property interests?

  3. Is there an imminent risk of evidence being hidden, destroyed, or altered?

h) How reliable is the source of the information?

  1. Has law enforcement used this source before?

  2. Has previously provided information been obtained legally?

  3. Has previously provided information proved verifiable?

  4. Under the circumstances, is it necessary to investigate an individual to obtain this information, and is this investigation the most effective means of obtaining it?

i) When a request targets a location or institution, is there a reasonable indication that the leadership or staff members are involved in unlawful activity?

j) To what extent does the threatened criminal activity implicate free expression or association, political speech, or religious speech?

k) Is there any indication that the request is motivated or biased by race, religion, or ethnicity?

## IV.  Community Concerns

Throughout my first year as Civilian Representative, I engaged with many community organizations to better understand their concerns regarding NYPD investigations and the Handschu process. I detail only some of the concerns raised below. Because many of the concerns raised fall outside that scope of the Operative Guidelines, they cannot be addressed by the Civilian Representative. However, I did have an opportunity to discuss these issues with the NYPD. And, where appropriate, I conveyed the NYPD's response to the relevant community organizations.

The first concern related to the generation of leads. Several organizations raised the concern that even legitimate leads may disproportionately target Muslims or other protected groups if there is bias in the lead generation process. For example, some leads originate as information provided by third parties, such as an individual calling in a "tip." If those third parties are biased against a certain group, the result could be that more leads are checked, and ultimately, more investigations are initiated, into individuals from that group. A similar result might be seen if the lead generation process involves searching social media for certain threatening language associated with only some groups, without searching for analogous language associated with other groups, or lawfully deploying more resources to monitor protests on one topic than another. Community organizations were particularly concerned about *how* technology is used to surveil individuals. For example, some technologies may rely on opaque (and proprietary) algorithms which make it difficult to understand how they are used and test them against biases.

In theory, bias in the lead generation process does not undermine the legitimacy of the investigations conducted under the Operative Guidelines because the Handschu Committee would still need to determine that there is adequate cause to conduct an investigation. Nevertheless, such bias could result in the over-policing of some communities as compared to others. From a legal standpoint, that certainly could raise equal protection issues, among others. More importantly, over-policing can cause anxiety and mistrust, serve to chill free speech, reinforce harmful stereotypes, undermine perceptions of fairness, and erode the rule of law.

Although the lead generation process occurs prior to a request brought before the Handschu Committee, the NYPD provided me with extensive briefings on the lead generation process and its use of technology. The NYPD contracts with third-party vendors to provide technology to support the lead generation process. It is my understanding that, to the NYPD's knowledge, these third-party algorithms are not disparately impacting certain groups.

The second area of concern related to the NYPD's interactions and coordination with other law enforcement agencies, such as the FBI. It is a matter of public record that the NYPD frequently works with other agencies in at least three ways: (1) NYPD officers can be deputized to work for other agencies, most notably to the FBI's Joint Terrorism Task Force ("JTTF"); (2) other agencies may request to use the NYPD's resources; and (3) the NYPD may request to use other agencies' resources. Community organizations frequently asked me how the Operative Guidelines apply in these contexts.

I had several conversations with the NYPD on these issues. Based on those discussions, I learned of the following, which I relayed to the community groups. First, officers deputized to JTTF are obligated to follow the United States Attorney General's guidelines, and as such are

9

likely not beholden to the Operative Guidelines. Nonetheless, following our discussions, the NYPD agreed to provide training on the Operative Guidelines to officers who are deputized to JTTF so that these officers are aware of the spirit of the Operative Guidelines and can apply it in their work where appropriate. Second, other agencies are permitted to (and often do) request to use the NYPD's resources. When this happens, the NYPD is obligated to follow the Operative Guidelines. Therefore, if, for example, the FBI requests to use an undercover NYPD officer, that request must be approved under the process governing the Handschu Committee. I can confirm that I have reviewed these types of requests from other agencies during Handschu Committee meetings. Third, the NYPD may receive information from other agencies. The NYPD may accept this intelligence, even if it was not obtained by means compliant with the Operative Guidelines. However, the NYPD may not request to use a resource, such as an undercover officer, from another agency without going through the process set forth in the Operative Guidelines.

The third area of concern related to the NYPD's use of informants and undercover officers, particularly in the Muslim community. Community organizations expressed a variety of concerns, including that NYPD's informants and undercover officers may be conducting investigations that have not received the requisite approval under the Operative Guidelines or may continue investigations that have been closed. I raised these and other related issues with the NYPD. The NYPD provided me with extensive briefing on these issues, including a meeting with the leaders of the unit that run undercover operations. As I reported back to the community groups, it is my understanding based on briefings, that the NYPD has certain internal controls in place that go above and beyond the Operative Guidelines to ensure that the use of informants and undercover officers comply with the Operative Guidelines. These controls include: (1) daily review of the activity reports from Handschu investigations by the Legal Matters Unit ("LMU")[21]; (2) weekly case review meetings on Handschu investigations attended by the LMU; and (3) annual Handschu training for investigators given by the LMU.

The fourth area of concern related to the NYPD's activities following Hamas's October 7, 2023 attacks in Israel. Following Hamas's attack, Israel initiated an invasion of the Gaza Strip, which has sparked substantial amounts of political activity nationwide. Many community organizations have expressed concerns that the rise in political activity could result in the loosening or circumvention of protocols under the Operative Guidelines. Following the October 7 attacks, the NYPD invited me to several briefing sessions where it informed me about the steps it was taking to address the protests. The NYPD assured me that there was no loosening or circumvention of the process in place. Since October 2023, I have also continued to carefully and thoroughly review all requests put before the Handschu Committee to ensure that the process is followed.

## V.   Summary of Findings

In my first year as Civilian Representative, I have found the Handschu Committee to be highly receptive to my input and the Investigative Statements presented to me to be thorough and appropriate. I have had numerous discussions with the Handschu Committee and Intelligence Division regarding my perspective on how the Operative Guidelines apply to various scenarios. Likely as a result of this ongoing feedback, the NYPD has made no requests to open an

---

[21] The LMU is part of the NYPD's Legal Bureau and is integrated into the daily activities of the NYPD's Intelligence and Counterterrorism Bureau.

investigation that the Deputy Commissioner of Intelligence and Counterterrorism denied, or provisionally denied pending additional information or revision of the request.

During the Relevant Period, as compared to the preceding year:

a) the total number of approved requests to open new investigations *increased* by 27%;

b) the total number of approved requests to extend pending investigations *increased* by 70%;

c) the total number of approved requests to authorize undercover investigations *increased* by 27%;

d) the total number of approved requests to extend pending undercover investigations *increased* 16%;

e) the total number of approved requests to close pending investigations *increased* by 86%;

f) the *average length* of all Handschu investigations that closed *decreased* from 376 days to 280 days (representing a decrease of 26%);

g) the *average length* of Preliminary Investigations that closed was 241 days;

h) the *average length* of Full Investigations that closed was 1,073 days; and

i) no Terrorism Enterprise Investigations closed.

## VI. Required Reporting Pursuant to Section VI (5)(i) of the Revised Handschu Guidelines

Pursuant to Section VI (5)(i) of the Handschu Guidelines, the Civilian Representative is required to report on five items:

> *1. Whether the Civilian Representative has objected to any investigation over the period covered by this report and the Civilian Representative's basis for any objection.*

I have not made any formal objections to any investigation within the past twelve months. All of the members of the Handschu Committee discussed at great length each decision to open or extend an investigation. The Handschu Committee made no final recommendation to open or extend an investigation that I, after substantive participation in these discussions, did not agree with. Additionally, there has not been an occasion where I believed that a request should not be approved and where other members of the Handschu Committee expressed disagreement.

At Handschu Committee meetings, the Handschu Committee discusses every request in detail. Typically, the Director of Intelligence Analysis leads the discussion while other Committee members join to provide additional information, background and insights as necessary. Everyone in attendance, both Committee members and other relevant personnel, participate in the discussion of each request. Everyone in the meeting is free to ask questions. If my questions are not addressed by the presentation or the ensuing discussion, I raise those questions thereafter. My questions have

11

included, among other things, concerns about: (1) the remoteness of the latest information provided; (2) the reliability of the person(s) providing the considered information; (3) the potentially protected nature of the speech at issue; and (4) the quantum of reliable information supporting the request. Through this process, the Handschu Committee has reached consensus on the propriety of each request.

If I am concerned about an application after reviewing it in advance of the Handschu Committee meeting, I generally note my questions for discussion during the meeting. Occasionally, I alert the Director of Intelligence Matters, head of the Legal Matters Unit for Intelligence Affairs, of such questions prior to the meeting, so that the NYPD can come to the meeting prepared with any additional materials or personnel to provide more detail regarding the application.

The Deputy Commissioner has been deferential to the Committee's recommendations. On some occasions, the denial of an extension was driven by concerns raised by the Deputy Commissioner or other NYPD personnel.

> 2. *Whether the NYPD has substantially obtained timely approval for extending and closing investigations.*

I find that over the last twelve months, the NYPD has met their deadlines for extending and closing investigations 100% of the time. This observation is based upon my review of the NYPD data on the extension and closing of its investigations, in addition to quarterly presentations on the deadlines by the Director of Intelligence Matters.

The Intelligence Division's tracking system includes automated alerts notifying certain Intelligence Division and Legal Bureau personnel when all active investigations and undercover authorizations are due for renewal. This system became active on July 1, 2016. As a redundancy, the Legal Matters Unit also revised its spreadsheet for tracking Handschu-related deadlines in September 2016. The Legal Matters Unit's spreadsheet tracks, among other things, deadlines for investigations, undercover authorizations, operational reviews, and presumptive time limits for investigations. Both of these developments were undertaken to assist in complying with the Guidelines. Neither the Intelligence Division's tracking system nor Legal Matters Unit's spreadsheet have changed since the Operative Guidelines were revised in March 2017.

> 3. *Whether the NYPD has substantially obtained timely approval for the use of human sources.*

I find that over the past twelve months, the NYPD has met their deadlines for approving the use of human resources 100% of the time. This observation is based upon my review of the NYPD data.

> 4. *Whether the NYPD has substantially fulfilled its obligations to review Preliminary Investigations, Full Investigations, and Terrorism Enterprise Investigations every six months.*

12

I find that the NYPD has a 100% compliance rate with its obligation to review Preliminary Investigations, Full Investigations and Terrorism Enterprise Investigations every six months. This observation is based upon my review of the NYPD data.

5. *Whether or not I have addressed any communication during the annual period to the Court under VI(5)(g) or (h).*

I have not communicated with the Court under VI(5)(g) or (h) during the Relevant Period. I have not had any concerns regarding the NYPD's compliance with the Operative Guidelines and have not observed any violations therewith.

Respectfully Submitted,

*[signature]*

Muhammad U. Faridi
NYPD Handschu Committee
Civilian Representative

August 14, 2024