```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     BARBARA HANDSCHU et al.,
 3                 Plaintiffs,

 4          v.                           71 Civ. 2203 (LJL)
     SPECIAL SERVICES DIVISION, ET
 5   AL,
                                         Hearing
 6
                 Defendants.
 7   ------------------------------x
                                         New York, N.Y.
 8                                       November 21, 2024
                                         4:00 p.m.
 9   Before:

10                    HON. LEWIS J. LIMAN,

11                                       District Judge

12                         APPEARANCES

13   PROFETA & EISENSTEIN
          Attorney for Plaintiff Class
14   BY:  JETHRO M. EISENSTEIN

15   NEW YORK CIVIL LIBERTIES UNION
          Attorneys for Plaintiff Class
16   BY:  ARTHUR N. EISENBERG
          PERRY GROSSMAN
17        DANIEL R. LAMBRIGHT

18   GIDEON ORION OLIVER
          Attorney for Plaintiffs
19
     FRANKLIN SIEGEL
20        Attorney for Plaintiffs

21   NEW YORK CITY LAW DEPARTMENT
          Attorneys for Defendants
22   BY:  PETER GERARD FARRELL
          ALEXIS LEIST
23        REBECCA WEINER
          MICHAEL GERBER

24

25   MUHAMMAD FARIDI, Civilian Representative
```

 1                    (In open court; case called)

 2                    DEPUTY CLERK:  Starting with counsel for plaintiffs,

 3    please state your appearance for the record.

 4                    MR. EISENSTEIN:  Jethro Eisenstein, Profeta &

 5    Eisenstein.  Good afternoon, your Honor.

 6                    THE COURT:  Good afternoon.

 7                    MR. EISENBERG:  Arthur Eisenberg, New York Civil

 8    Liberties Union for the plaintiffs.

 9                    MR. GROSSMAN:  Perry Grossman, New York Civil

10    Liberties Union for the plaintiffs.

11                    MR. LAMBRIGHT:  Daniel Lambright, New York Civil

12    Liberties Union for the plaintiffs.

13                    MR. OLIVER:  Gideon Orion Oliver, co-counsel for

14    plaintiffs.

15                    MR. SIEGEL:  Franklin Siegel, S-I-E-G-E-L, for

16    plaintiffs.

17                    MR. FARRELL:  Peter Farrell from the New York City Law

18    Department.  I'm joined today by several representatives from

19    the New York City Police Department.  Starting on the far end

20    is Michael Gerber, who is the Deputy Commissioner of legal

21    matters; Rebecca Weiner, Deputy Commissioner of intelligence

22    and counterterrorism; and Alexis Leist, who is the Director of

23    intelligence matters.

24                    THE COURT:  Good afternoon.

25                    MR. FARIDI:  Muhammad Faridi, Civilian Representative.

```
 1              THE COURT:  Good afternoon.

 2              So I scheduled this conference at the invitation of

 3    Mr. Faridi recognizing that the case has a 1971 Docket No. and

 4    that I just inherited the case.  There is a history to it.

 5    Mr. Faridi offered to inform me about the history and what I

 6    needed to know to be the person to manage and handle this case.

 7    So I will turn it over to Mr. Faridi, and then I have a letter

 8    which indicates that there are others who would like to be

 9    heard.

10              So, Mr. Faridi, welcome.

11              MR. FARIDI:  If your Honor would allow, I'll use the

12    podium.

13              THE COURT:  That's fine.  I should inform all of you

14    that while I had anticipated and expected that it might proceed

15    more quickly, I do have a jury out, and it's possible that we

16    will be interrupted with a note.  If we are, I will just have

17    to handle that and ask you to step back.

18              MR. FARIDI:  Certainly, your Honor.

19              So I want to begin by thanking your Honor for holding

20    this hearing to allow me, in my capacity as the civilian

21    representative, to give you an overview of the type of work

22    that I do in connection with the Handschu Committee and also to

23    the parties to give them an opportunity to give you a deep

24    background going back to 1971 about the case.

25              I want to introduce two of my colleagues, your Honor,
```

1    who helped me on the Handschu matter:  Cassie Deskus and Emma

2    Brill from Patterson Belknap.  They have been very helpful to

3    me in managing some of the responsibilities that have been

4    bestowed upon me in connection with this work.

5         Before I go over my written remarks, your Honor, I

6    should note that there are members of the Muslim community and

7    other marginalized communities who are here in the audience

8    today.  I was told in the hallway that they are here today to

9    underscore the importance of this long-running litigation and

10   also to hear from me about the work that I've done in my

11   capacity as a civilian representative.

12        I can tell you, your Honor, that based on my personal

13   experience that surveillance has left a generation of Muslim

14   Americans in a shadow of distrust and fear.  Mosques, which are

15   supposed to being sacred places reserved for worship and also

16   the center of both religious and Muslim social life, have

17   become quiet places where people are afraid to talk about

18   issues that are important to their communities.  Why?  Because

19   they believe that they may be talking to an informant or an

20   undercover law enforcement agent who may misinterpret what they

21   may be saying.  And I suspect that the same is true for many

22   other communities of color, communities of faith and

23   marginalized communities that gather in public places and are

24   subject to law enforcement surveillance.

25        I say this to underscore the significant protections

 1    that are afforded with respect to police surveillance under the

 2    framework that was established as a result of the consent

 3    decree entered in this litigation and the operative Handschu

 4    guidelines.  The guidelines are not perfect, but they do

 5    provide an important check on the NYPD's ability to surveil

 6    suspected criminal activity that has a nexus to protect its

 7    speech.  And it is because of the importance of this framework

 8    that you see so much public interest in this litigation and in

 9    this hearing.

10            The annual report that I filed with the report, and

11    that's reflected on docket entry number 502, provides some

12    background as to this litigation and my work as a civilian

13    representative, but there are a few aspects of my work that I

14    wish to highlight for the Court today.

15            During my tenure as a civilian representative, I have

16    made a significant effort to hold regular sessions with members

17    of the community, whether it's the Muslim American community or

18    the Black Lives Matter community and other communities of color

19    and communities that engage in protected speech, to better

20    understand their concerns about NYPD's investigations.  And

21    they have relayed several concerns, and there are three of them

22    that I wish to highlight for the Court.

23            The first is the NYPD's use of undercover officers and

24    informants.  The second is the potential bias in the lead

25    generation process, which I will speak about in a moment.  And

1    the third is whether and how the Handschu framework applies to

2    the NYPD's work with other law enforcement agencies, and, more

3    specifically, the FBI's joint terrorism task force.

4         Focusing on the first issue.  I would be remiss if I

5    did not mention that there is no area of concern that is more

6    paramount and more traumatizing for marginalizing communities

7    in New York than the use of informants and undercover officers.

8    The *Raza* litigation, which was litigation filed in the Eastern

9    District of New York, the settlement of which in 2017 revived

10   the now operative Handschu guidelines, was based on allegations

11   that the NYPD had infiltrated mosques and college Muslim

12   students' associations with informants and undercover officers.

13   An undercover detective actually converted to is Islam to spy

14   on Muslim students and --

15        THE COURT:  Give me one moment, Mr. Faridi.  I

16   apologize.

17        I received a note.  It's going to take a little bit of

18   time for the lawyers in the criminal case to come in.  When

19   they do come in, I think what I am going to ask is just that

20   the lawyers who are at the table just move to the side.  I then

21   will read the note to the lawyers, and there may be some

22   colloquy about how to handle it.

23        MR. FARIDI:  Certainly, your Honor.

24        One of the allegations made in connection with the

25   *Raza*  litigation was that the NYPD had sent an undercover

1    officer who actually had converted to Islam to a CUNY college

2    to surveil the students there, none of whom was ever charged

3    with a crime.  So the Muslim community has a long, and

4    rightfully troubled, view of these practices.

5          And the community's concerns about the use of

6    informants and undercover officers are, in my view, more

7    amplified today given that law enforcement using false

8    identities now uses undercover officers, undercover accounts on

9    social media, to connect with individuals and obtain

10   information to private information that it would not otherwise

11   have access to, including posts, pictures, information about

12   family and friends.

13         The Brennan Center out of the NYU Law School has

14   reported that given the advances in technology, law enforcement

15   can populate fake accounts with a sufficient range of interests

16   and connections to look legitimate and are designed to entice

17   people to curtail -- designed to entice people in certain

18   groups to engage.

19         THE COURT:  Say that to me again.  I couldn't pick up

20   everything you said.  That law enforcement uses what?

21         MR. FARIDI:  Law enforcement uses undercover officers

22   or undercover accounts on social media that are based on

23   fictional names to monitor social media activity, and in some

24   instances also to befriend or connect with individuals, who law

25   enforcement may have difficulty connecting with if the activity

1    was not taking place over social media but was taking place in

2    person.

3         When you're engaged in in-person interaction with

4    someone as an undercover officer or informant, you may need to

5    establish your link to that community, your heritage, you may

6    have to demonstrate certain aspects of your background in order

7    to be able to solicit information from that individual.  Doing

8    that online through the use of social media is made easier by

9    the fact that there are many companies out there that will

10   create accounts and populate those accounts with information

11   that may make an individual on the other end believe that this

12   person actually shares a common trait, a heritage, and make

13   that person feel comfortable enough to provide information.

14   And this is something that is taking place, and the Brennan

15   Center has focused on this particular issue.

16        This practice may violate, let's say, Facebook's or

17   Instagram's terms of use and the policies, the creation of fake

18   accounts.  But as long as the surveillance companies evade

19   detection, police departments can buy licenses to use these

20   products to gather information on individuals or on groups on

21   an anonymous basis.

22        I want to be clear about one thing though.  Based on

23   the files that I have seen in connection with my work as a

24   civilian representative, I am very glad from a public safety

25   standpoint that the NYPD is undertaking the investigations over

1    which I have oversight through my role on the Handschu

2    committee.  But at the same time I think everyone appreciates

3    the tension between ensuring against an infringement on our

4    constitutional rights and the need to protect public safety.

5              THE COURT:  Give me one moment, Mr. Faridi.

6              I'm going to ask you and the other lawyers to step

7    aside, and the lawyers in the Colon case to step forward as

8    well as the court reporter.

9              (Recess)

10             MR. FARIDI:  I should note that based on the files

11   that I have seen in my capacity as the civilian representative

12   on the Handschu Committee, I do feel comfortable that the

13   investigations that the NYPD is undertaking and that are being

14   handled within the framework are very much necessary from a

15   public safety standpoint.  If that wasn't the case, I would not

16   have certified in my annual report to your Honor that I have

17   not lodged a single objection to the NYPD's desire to undertake

18   investigative activity during the Handschu process.

19             THE COURT:  Can you describe for me a little bit more

20   what your process is and how you are comfortable making that

21   statement?

22             MR. FARIDI:  Right.  So the Handschu Committee meets

23   on a monthly basis.  About a week or so, and sometimes less

24   than a week, but, generally speaking, more than a few days in

25   advance of the meeting, the NYPD delivers to my office a packet

1    that has files associated with investigations that the NYPD

2    wants to undertake.  Sometimes they have identified a suspect

3    based on the lead generation process who needs to be

4    investigated under the preliminary investigation framework, and

5    sometimes those investigations become more significant, and

6    there's also a temporal restriction based on each

7    investigation.  And when the NYPD wants to expand that temporal

8    restriction, that has to be all documented.

9         My process is I get those files.  I look at them

10   carefully as soon as I get them.  Sometimes there is some

11   back-and-forth between me and the NYPD counterparts as to what

12   is in the files to make sure that I am understanding the

13   information in the way that it was intended to be conveyed.  We

14   then have a meeting.  Most of the times it's in person at the

15   NYPD's headquarters.  In some instances, it has been over Zoom.

16   And at that meeting there is, generally speaking, a robust

17   discussion about each individual file:  Whether or not we

18   should open up an investigation, whether a particular

19   investigation needs to be extended, whether the investigation

20   has reached a phase where the use of undercover officers needs

21   to be authorized.

22        My process is to go back through the guidelines and to

23   follow the framework that's set forth in those guidelines to

24   evaluate whether the NYPD has met the criteria to open up an

25   investigation or extend an investigation or take additional

 1  steps towards that investigation.

 2          The main point of inquiry for me is whether or not

 3  there is factual information that establishes that there is

 4  criminal activity afoot or someone is about to engage in

 5  criminal activity, and that there is this nexus between that

 6  criminal activity and political speech, and the amount of

 7  information that is required of the NYPD is commensurate with

 8  the level of investigation that the NYPD wants to undertake.

 9          So for the very basic inquiry that the NYPD undertakes

10  that's a process of generating a lead, that's where the NYPD

11  responds to a phone call made by someone or based on scrapping

12  of information that's developed on social media, that's a very

13  basic investigative step that the NYPD undertakes.  And that's

14  limited because the evaluation there is as to whether or not

15  this is worthy of a preliminary investigation.

16          Generally speaking, I am not involved in that process.

17  I have been briefed by the NYPD as to the process that they

18  undertake with respect to generating a lead and how the lead

19  generation process complies with the Handschu framework at

20  large.  But when that lead has now turned into a request to

21  open a preliminary investigation, there is a set of bullet

22  points that I and my team have that I go through to evaluate

23  whether or not there's factual information that is worthy or

24  sufficient enough to warrant an investigation.

25          At the meeting we have a lot of back-and-forth about

1    these issues.  Sometimes based on our discussion at the

2    meetings, the NYPD retracts its desire to undertake an

3    investigation just based on the discussion and the colloquy

4    that's had, but most often, I would say a significant majority

5    of the times, the committee agrees, and I do not lodge an

6    objection to that agreement, that investigation is warranted.

7    That's the process at a very high level.

8                  THE COURT:  Thank you.

9                  MR. FARIDI:  When the process mandates or the NYPD is

10   requesting the use of undercover officers, that's where my

11   alarm bell rings higher because of the history of the use of

12   informants and undercover officers, particularly in the

13   community that I come from.  I grew up in the Brighton Beach

14   and Coney Island sections of Brooklyn.  And I have lived in

15   those areas in the time period immediately after 9/11.  And I

16   remember the time when neighbors were calling in on the FBI and

17   the NYPD because they did not like their Muslim neighbors, not

18   because they had actual information.

19                  And as a result of that, I remember a time period when

20   all of us in our community were suspect of any stranger who

21   came to the community or even suspect of each other because we

22   couldn't trust each other.  We couldn't trust whether our

23   friend was an actual friend or someone who was an informant for

24   the FBI or the NYPD.  So that's a reason why the community at

25   large is suspect of these practices, and that's an area where I

1    pay special attention.

2            Now, these issues with respect to the use of

3    informants and undercover officers, I had raised all of these

4    issues with the NYPD.  They have organized -- they did organize

5    a briefing session with the NYPD supervisors and managers who

6    oversee the undercover operation.  And based on my discussions

7    with them, I was satisfied at that moment that the process that

8    the NYPD has in place with respect to the use of undercovers

9    complies with the Handschu framework.  These are issues that I

10    often, after having discussed with the NYPD, I will report back

11    to the community and the community organizations who often call

12    on me to investigate and focus in on some of these particular

13    issues that they are seeing on the ground.

14            One of the things that I think worth mentioning is

15    that the NYPD has confirmed to me and also has stated publicly

16    that it treats undercover and investigatory efforts performed

17    by human resources online to be subject to the Handschu

18    guidelines, and I can also confirm that I have received

19    requests as a part of the Handschu process for the initiation

20    of preliminary investigations based on online activity.

21    Generally speaking, when folks think about the Handschu

22    guidelines, I think there is a misperception that the Handschu

23    guidelines govern undercover operations and informant

24    operations that take place in person, someone walking into a

25    bodega or a mosque.

1          THE COURT:  But not in the virtual world.

2          MR. FARIDI:  But not in the virtual world.

3          Based on my experience, and the NYPD has confirmed,

4    the Handschu process also operates in the virtual world.  And

5    this is an important safeguard that is lacking in many other

6    parts of the country and certainly at the federal level.

7          THE COURT:  I guess at some point, you're also going

8    to get to the joint terrorism task force.

9          MR. FARIDI:  Yes.  I can get to it now or I want to

10   focus a little bit more on the lead generation process.

11         THE COURT:  I am going to let you go in the order you

12   want, but your comments led to that logical comment by me.

13         MR. FARIDI:  The next issue that I received

14   significant feedback from the community on is the process of

15   generating these so-called leads, and the community has raised

16   a concern that the lead generation process may

17   disproportionately target certain groups.

18         As I mentioned earlier, the operative Handschu

19   guidelines, they allow the NYPD to check on leads, whether it's

20   based on information provided to them by the public through an

21   anonymous tip or otherwise, or generated internally by the

22   NYPD; for example, through surveillance of social media.  And,

23   as I mentioned, checking of leads is the lowest level of

24   investigative activity that takes place before my process

25   actually begins.

 1          The members of the community are concerned that the

 2    processes that are used to generate these leads may be biased.

 3    So some leads are provided by third parties, such as

 4    individuals calling in with a tip.  And the biases and

 5    motivations of these individuals who call in with tips are

 6    typically unknown.  Yet, the need to investigate the tip is an

 7    important aspect of ensuring public safety.  And, again, I go

 8    back to the time --

 9          THE COURT:  The law enforcement does rely upon

10    anonymous tips all the time.

11          MR. FARIDI:  As they must.

12          The concern is that if the callers are biased against

13    a certain group, for example, Black Americans, Muslim

14    Americans, the result may be that there are more leads and

15    ultimately more investigations into individuals or entities or

16    communities against whom the bias is directed.

17          A similar result may be seen I think from the lead

18    generation process that takes place internally.  For instance,

19    if you're scouring social media posts, you may be targeting

20    social media posts that bear on an issue that is of particular

21    importance to one community and perhaps not another.  And if

22    that's what you're focused on, the process of generating a lead

23    is going to yield scrutiny of groups that engage in that

24    particular type of speech.

25          And the impact of this -- when police engage in this

1    type of activity is, of course, that people within that

2    particular group engage in self-censorship.  There's a very

3    good study out there by Professor Elizabeth Stoycheff from

4    Wayne State University, who analyzed this issue based on data

5    from the early two thousand teens, and she concluded that

6    people are less willing to share minority viewpoints when they

7    are reminded that their activities are monitored by the

8    government.  So in the end, this phenomenon, in addition to

9    chilling free speech and curtailing the freedom of association,

10    in my view also weakens civic connection in the groups that are

11    being surveilled.

12          A related concern expressed by many members of the

13    community have been about how technology is being used to

14    surveil individuals and entities and particular social groups.

15    It is no secret that law enforcement throughout America, and

16    also the NYPD, utilizes and leverages artificial intelligence

17    tools to surveil social media posts and other virtual activity.

18          But as we learn more about AI, the more we realize

19    that many of the AI models rely upon opaque algorithms that

20    reinforce existing biases and debunk stereotypes, many of these

21    models are not good at accurately assessing the meaning of

22    posts, of pictures, of music, of music videos and other videos

23    and other forms of expression.  This is also something that the

24    Civil Liberties community, including, for instance, the Brennan

25    Center and the ACLU have spent a lot of time analyzing and

1    reporting on.

2            In the Handschu context, the lead generation process

3    as I mentioned, occurs before I get involved, before the

4    request is brought before the committee, and at that point I am

5    supposed to be the check to provide an oversight role on

6    whether the next level of investigative activity should not

7    need to take place.  But there is a problem with the lead

8    generation process perhaps that may result in over-policing

9    certain communities over others and of course, in addition, to

10   chilling free speech, it also raises equal protection concerns,

11   which is one of the claims that was alleged in the original

12   complaint when it was filed in 1971.

13           The last issue that I will focus on very briefly is

14   the limited application of the Handschu guidelines to the

15   NYPD's work with other law enforcement agencies and, more

16   specifically, the FBI's JTTF.  I think it's safe to say, your

17   Honor, that while most Americans don't know the term JTTF, JTTF

18   is a household term in Muslim households throughout America.

19   And the task force, and I'm sure your Honor is familiar with

20   it, consists of -- it's a multiagency task force that is led by

21   the FBI and includes many other federal, state, and local law

22   enforcement agencies.  And currently, I think, based on the

23   data from 2022, there are approximately 200 JTTFs throughout

24   the United States, and they comprise of several thousand law

25   enforcement agents from federal, state, and local authorities.

1          The work of the JTTF has been under significant

2     scrutiny by civil liberties and other groups.  And the

3     criticism is that the JTTF's work on the ground operates with

4     minimal oversight and very limited and scant accountability.

5     And the JTTF, it has been alleged, has a long history for only

6     targeting activists and communities of color, often associating

7     them with terrorism without much evidence of any actual

8     wrongdoing.

9          The ACLU reported recently in connection with a

10    lawsuit that they filed against the FBI that in the early

11    2000s, the FBI used JTTFs to conduct widespread voluntary

12    interviews of Muslim communities throughout the United States

13    where JTTF members would show up at a mosque or a cafe or

14    someone's house and ask for a voluntary meeting and interview,

15    and most folks, not realizing and appreciating the rights that

16    they have under our country's Constitution, and also being

17    afraid of what may lie ahead, often participated in these

18    so-called voluntary interviews.

19         You will remember, your Honor, that in 2020, more

20    recently, then Attorney General Barr deployed JTTFs in the

21    country to surveil racial justice activists who were protesting

22    the killings of George Floyd and other Black Americans in our

23    country.

24         It is a matter of public record that the NYPD is a

25    member of the JTTF and frequently works with the JTTF in three

1   specific ways:  The first is when an NYPD officer becomes a

2   deputized agent of the JTTF, the individual, as I understand

3   it, is still on the NYPD payroll, but that individual now has

4   effectively been seconded over to the JTTF and has been

5   deputized to be in that role.

6          The second is when the JTTF requests the use of the

7   NYPD's resources.  The NYPD has vast resources, the police

8   department in the most cosmopolitan and diverse city in the

9   world, and the language resources at the NYPD's disposal are

10  overwhelming and significant.  So it is not uncommon for the

11  JTTF to reach out to the NYPD and ask the NYPD for its

12  assistance in connection with an investigation that the JTTF is

13  undertaking.

14         The third is when the NYPD itself requests the use of

15  JTTF resources in connection with investigations the NYPD is

16  undertaking.  These are the three different areas that, as I

17  understand it, the NYPD interacts with the JTTF.

18         So how does that relate to my work as a civilian

19  representative?  I think I can demonstrate that through the use

20  of an example.  I have received reports from people in the

21  Muslim community and questioning of them by people whom they

22  believed were NYPD officers, questioning regarding what I

23  believe to be facially innocuous activity on social media or

24  protesting, for instance, in the street.

25         When I go back and I check the activity at issue as it

1   has been relayed to me, and I check that activity against the

2   Handschu guidelines, in my view that activity in many instances

3   does not meet the criteria in the Handschu guidelines.  I then

4   raised that issue with my counterparts at the NYPD, and I said

5   I got this phone call from an individual or representative, and

6   they have indicated to me that they were questioned by a law

7   enforcement agent who they believed was an NYPD officer, and

8   they told me what the questioning focused on.  I took a look at

9   the social media posts, and I'm not seeing any factual

10  information bearing on criminal activity.  It may just be that

11  they are engaging in political speech that is not popular based

12  on the current political climate.

13          The NYPD often responds to me that the individual that

14  this particular NYPD interacted with is not an NYPD officer.

15  It's probably an FBI agent or someone who has been seconded to

16  the FBI and is a deputized member of the JTTF.

17          THE COURT:  What do you do in that circumstance?

18          MR. FARIDI:  In that circumstance, I go back to the

19  member of the community and I say to them that it is the NYPD's

20  position that an officer of the police department who's been

21  seconded over to the FBI is not subject to the Handschu

22  guidelines, and that the NYPD has no control over the conduct

23  of the JTTF.  Here after JTTF.

24          It's the second or the third scenario in which the

25  NYPD interacts with the JTTF where the JTTF is asking the NYPD

1   for its help second scenario, or the NYPD is asking the JTTF

2   for its help in the third scenario.  In those situations, the

3   NYPD's interaction with the JTTF is subject to the Handschu

4   framework.  And that's where I have the occasion to participate

5   in these robust discussions about whether or not that activity

6   that the NYPD wants to undertake on its own or at the behest or

7   direction or request of the JTTF satisfies the criteria set

8   forth in the Handschu guidelines.

9           With respect to the first bucket of the interaction,

10  that is, according to the NYPD, outside of the Handschu

11  guidelines.  And the problem there is acute and significant

12  because certainly the FBI does not follow the Handschu

13  framework.  And the FBI is subject to the Department of Justice

14  guidelines regarding investigation into criminal activity,

15  suspected criminal activity that may have a nexus to political

16  speech.

17          In October of 2023, the Department of Justice issued

18  guidance to law enforcement agencies as to the use of protected

19  characteristics such as race, religion, national origin,

20  ethnicity in law enforcement investigative activity.  That

21  guidance has been under significant scrutiny and criticism by

22  civil liberties groups.  So, for instance, the Brennan Center

23  the ACLU, the lawyers leadership -- I'm sorry -- the Leadership

24  Conference and Civil and Human Rights and the NAACP's legal

25  defense fund sent a letter to Lisa Monaco, who is the deputy

1    attorney general who issued this guidance criticizing the

2    guidance for not completely disallowing the use of protected

3    characteristics as a basis to undertake an investigation into

4    suspected criminal activity.

5            Under this guidance that came out in 2023, federal

6    officials can consider these protected characteristics and

7    traits when two vague and relatively broad criteria are met:

8    First, is whether there is trustworthy context and content

9    specific information that provides an assurance that the

10    information is reliable and links that particular individual or

11    entity a group or individual that has a protected

12    characteristic.  And the second is when law enforcement

13    reasonably believes that there's a threat to national security.

14    So when you're talking about threats to national security or --

15    then in those instances with the controls put into place by

16    that guidance, federal agents can effectively stereotype.  And

17    that's problematic.

18            The Handschu process, however, guards against that, at

19    least with respect to the second and third buckets of

20    interactions between the NYPD and the FBI.

21            THE COURT:  Right.  Right.

22            MR. FARIDI:  And the last question that I often get

23    from members of the community with respect to the JTTF

24    interaction with the NYPD is, what happens when the NYPD

25    receives information from the JTTF, and, more specifically, I'm

1    talking about information that the NYPD cannot obtain under the

2    Handschu framework, but the FBI has obtained under its

3    framework, and that information is then provided to the NYPD?

4    Should the NYPD disregard that information because the process

5    of obtaining the information did not comply with the Handschu

6    process?

7            It's my view, and it's consistent with the NYPD's

8    view, that the NYPD should not be handicapped because the law

9    enforcement agency that obtained the information did not comply

10    with a process that is unique to the NYPD.  So the NYPD can,

11    and often does, utilize that information in connection with its

12    investigations.  And in my view that is appropriate from a

13    public safety standpoint.

14            So those are the three issues that I wanted to

15    highlight for your Honor today.  Unless your Honor has any

16    questions that you have, and I'm happy to answer, I would like

17    to thank the Court for facilitating this dialogue, and I hope

18    that your Honor holds this hearing on a more regular basis,

19    perhaps on an annual basis so that the Court and the public can

20    have an opportunity to discuss this matter of significant

21    public concern.

22            THE COURT:  That last suggestion is an interesting

23    one.  Has that been done in the past?  Because it does seem to

24    me to be of public value to have hearings like this from time

25    to time.

 1            MR. FARIDI:  I have been in this role for only about a

 2    year and a half, so I can't speak to the process before me, but

 3    plaintiff's counsel or the NYPD's counsel, I think, can

 4    probably answer that question.

 5            THE COURT:  And I may have some followup questions for

 6    you after I hear from the others.  But thank you, and thank you

 7    for suggesting this hearing.

 8            MR. FARIDI:  Thank you, your Honor.

 9            THE COURT:  Okay.  Who is going next?

10            MR. EISENSTEIN:  I will, with the Court's permission.

11            THE COURT:  I should let the parties know that I told

12    the parties in the criminal case to come back at 5:30.  My hope

13    would be that we would be done by 5:30.  If we're not done by

14    5:30, we are going to take another break, and I am going to

15    focus on the criminal case.  But proceed.

16            MR. EISENSTEIN:  Your Honor, first of all, I want to

17    thank the Court for permitting us to participate in this and

18    introduce ourselves to you as counsel in this long-running

19    case.  I am Jethro Eisenstein.  I am the last surviving

20    original Handschu lawyer.  I filed the complaint over at 40 on

21    May 18, 1971.  And together with my colleagues Arthur Eisenberg

22    and Franklin Siegel, we have been attending the flame of

23    Handschu ever since.

24            THE COURT:  It's an interesting history, and 1971 was

25    an interesting year.

1          MR. EISENSTEIN:  It sure was.  All you have to do is

2     read the complaint to know how interesting it was.

3          Against the possibility that we are mortal, we have

4     asked three other extremely competent lawyers, Perry Grossman

5     from the Civil Liberties Union, Daniel Lambright from the Civil

6     Liberties Union and Gideon Oliver, to join us so that there is

7     a next generation.  And the reason why that is important is

8     that the Handschu guidelines have become part of the fabric of

9     New York City.  And the process is, if I may say, embedded not

10    just in the action, but, frankly, in the police department as

11    well.

12         And the thing that I really want to focus the Court on

13    is if you read one document in the docket, it is Judge Hague's

14    decision of March 27, 2017, which is document 474.  That

15    describes the process by which he -- this is his word "nudged

16    the parties" towards a more robust role for the civilian

17    representative.

18         The civilian representative in our view is the

19    absolute centerpiece of the Handschu guidelines.  The

20    guidelines themselves are words, and they are flexible and

21    squishy as words can be.  But what's of constant and central

22    importance is the vigilance of the civilian representative, and

23    the fact that he has the power and the duty in the event that

24    he sees systemic violations of the rules to come to the Court.

25         If the Handschu rules and the Handschu process is

1    functioning properly, the Court, if I may say, is like the

2    Maytag repairman who is there, who is available, but who is

3    never called on.  But the fact that you are available, and the

4    fact that he is obliged to come to you creates a setting in

5    which he is a powerful force within the committee.  And he's

6    important because we have no visibility into the process.  But

7    he is the eyes and ears of the community, and the robust

8    discussion that he described is exactly what we have hoped

9    would occur from the very beginning from the first settlement

10   of the case which was to have a civilian voice in who would

11   potentially push back against received truths about what should

12   be done.

13        THE COURT:  Maybe even just the mere fact of the

14   civilian representative has a positive effect.

15        MR. EISENSTEIN:  Well, it's very interesting that you

16   say that because the previous civilian representative described

17   a process in which his very presence encouraged police brass,

18   officials within the Handschu Committee, to push back; that his

19   availability, his voice encouraged other voices in the process.

20   And exactly what you're describing has occurred, and I'm sure

21   it's occurring with Mohammed Faridi as well.  And that process,

22   which the Cass Sunstein in an article recently called "Making

23   Dumb Groups Smarter" described Priming Critical Thinking.  If

24   you prime critical thinking, the process becomes better.  And

25   just by virtue of that, the presence of the civilian

1    representative, I think the process has improved.  If the Court

2    has any questions for me, I'd be very happy to answer them.

3        THE COURT:  Maybe to followup on Mr. Faridi's point, I

4    mean, he is obviously a person of stature, which is a very good

5    thing for the civilian representative to be.

6        Do you have a view on whether there should be periodic

7    hearings or what the Court can do to make sure that the

8    civilian representative's important role is known and

9    respected?

10        MR. EISENSTEIN:  Your Honor, I think it would be

11    terrific if you would, for example, each year after the

12    civilian representative files his report, conduct a hearing,

13    because the -- if the process is working well, the civilian

14    representative will say, "I have not reported to the court."

15    But that doesn't tell the whole story.  That doesn't tell

16    what's happened over the previous year, and I think the

17    community members would be enormously benefited by some

18    visibility into an interaction between the civilian

19    representative and the court about what's gone on in the last

20    year.  Judge Hague in recent years has been, of course, in New

21    Haven and not available for this.  But I would love it, and I

22    think we would all love it if your Honor, newly assigned to

23    this case, would do that on a regular basis.

24        THE COURT:  I will keep that in mind.  Obviously, I'll

25    hear from whoever else wants to be heard from.  Thank you.

1              Just reintroduce yourself again.

2              MR. FARRELL:  Your Honor, good afternoon.  Peter

3     Farrell from the New York City Law Department, also known as

4     the Office of the Corporation Counsel.  I am not an employee of

5     the NYPD.  I am their attorney in this case.  Your Honor, I can

6     appreciate the position you're in because you're coming onto a

7     case that has a 50-year history.  I was assigned to this case

8     approximately 20 years ago, so at that time I had a 30-year

9     history.  So, you know, the Handschu rules are unique.  It took

10    me awhile to acclimate myself to them and understand the

11    guidelines.

12             Just a couple things I'd like to highlight for the

13    Court, appreciating the Court's time here tonight.  You know,

14    essentially there's been three sets of rules in Handschu.  The

15    first set of rules was in 1985 when the Court approved the

16    consent decree at that time.  And then after the tragic events

17    of 9/11, in 2003 the City moved to modify the Handschu rules

18    and the consent decree.  And the reason it did that was because

19    under the 1985 decree, the police department could not conduct

20    an investigation into political activity until there was a

21    predicate that criminal activity was afoot or was about to be

22    afoot.

23             And after the events of 9/11, the police department in

24    the City realized that that did not allow the police department

25    to provide for the safety and security of the City because it

 1    couldn't do anything in advance of actually coming into

 2    specific information that there's going to be criminal

 3    activity.  So it modified the consent decree which Judge Hague,

 4    your predecessor, granted in 2003.  And as part of that

 5    modification, it adopted what's now called the Modified

 6    Handschu Guidelines.  And those guidelines were based upon

 7    guidelines that the DOJ and the FBI had promulgated.

 8            So now, without going into a lot of detail about those

 9    guidelines, there's various levels of investigation.  You heard

10    basically the civilian representative describing those.  That's

11    going beyond the scope of this conversation, your Honor.

12    That's within the guidelines.  You can go through the

13    guidelines and see there are different levels and for each

14    level of investigation, there is a threshold that has to be

15    met, a possibility of unlawful activity or a reasonable

16    indication of unlawful activity.

17            So then what happened, your Honor, we were operating

18    under those guidelines until the most -- I want to step back

19    for one second, your Honor, because this is important.  This

20    case, the Handschu case, involves and is applicable to

21    investigations of political activity.  Not more than that,

22    okay?  So investigations of political activity for purposes of

23    the Court and for purposes of our discussion today, include

24    investigations into terrorism.  All right?  So the intelligence

25    division, the intelligence bureau is the entity that's charged,

1  along with counterterrorism bureau, with developing that

2  information about potential so that it did can deter and detect

3  counterterrorism.

4          The Handschu rules by their own terms only apply to

5  investigations of political activity.  So for everyday law

6  enforcement that goes on outside, the Handschu rules don't

7  apply to that.  So we're talking about the way it works as a

8  practical matter is a specific division within the police

9  department that is tasked with deterring and detecting

10  terrorism.  So that's kind of the one important overarching

11  issue.

12          The other thing is is that an investigation, all

13  right, that complies with the Handschu guidelines is a lawful

14  investigation.  So if there were no Handschu guidelines, when

15  you think about police activity, the question is, is there a

16  legitimate law enforcement purpose for that investigation or

17  that activity.  And what the Handschu guidelines basically take

18  you to is that if the police department is operating or

19  conforming to those guidelines, that it is a lawful police

20  activity or lawful investigation.

21          I'm going to jump back forward now to the most recent

22  dispute, if you will, between the parties, which was the

23  dispute about whether the police department was unlawfully

24  surveilling the Muslim community solely based upon their

25  religion.  That was the most recent litigation.

 1          What that led to, Judge, is that led to the 2017

 2   modification of the guidelines.  So you had the 1985 consent

 3   decree.  That gets modified in 2003.  There's a set of

 4   guidelines that gets adopted.  That set of guidelines gets

 5   modified again in 2017, and that's the operative guidelines

 6   that now control the investigation of political activity for

 7   the New York City Police Department.

 8          Now, importantly, at the time of that litigation, we

 9   as the City and the police department are concerned about two

10   broad issues.  One was, you know, we had to make sure that any

11   changes to the guidelines, right, would not prevent the police

12   department's ability, right, to provide for the safety and

13   security of this City.  Right?  So they couldn't be handcuffed,

14   if you will, to provide for the safety and security of the

15   city.  That was one issue that was paramount to defendants

16   during this last spat of litigation.

17          The second issue was that the City and the police

18   department understood the serious concerns of the citizens of

19   the City and the Muslim community to what they perceived as

20   potentially unlawful investigations taking place.

21          So the outcome of that, your Honor, was two things:

22   One is as to the first point on maintaining the ability to

23   investigate unlawful activity.  The threshold within the 2003

24   guidelines were not changed.  Those stayed the same in the

25   modified 2017 guidelines, the current guidelines.  So those

1    changes were kept that it happened.

2           But as to issue number two, we realized that it was

3    important to provide, you know, a level of understanding that

4    there were concerns; what could the police department do to

5    provide some level - I don't know if comfort is the right word

6    - but of either openness or, you know, a way for the community

7    to be able to say or have some belief it's not a black box

8    that's happening and you don't know what's going on inside.

9           So this last set of changes, your Honor, was geared

10   toward that.  And, again, it would take too long, right?  We

11   don't have time to go through all the changes that took place,

12   but as the civilian representative has highlighted and as class

13   counsel has highlighted, one of the centerpieces of that was

14   having a civilian representative come onto the Handschu

15   Committee.  The Handschu Committee is basically a committee of

16   people who hear whether investigation should be opened or

17   extended or closed.  It had been happening *de facto* in the

18   police department prior to the 2017 adoption of the modified

19   Handschu guidelines.  The guidelines made that a formality by

20   putting it into the guidelines and, significantly, for the

21   first time -- well, significantly, at that time it added for

22   the first time a civilian representative to the Handschu

23   Committee.  All right?

24          So the first time since the -- you know, of any recent

25   past, 2017 is now a civilian representative on the Handschu

1    Committee who then by the terms of the guidelines has to

2    prepare an annual report, among other things, and send it to

3    your Honor.

4            So I think those are the -- again, I'm going to be

5    respectful of the Court's time.  It's a 50-year-old case, your

6    Honor.  There's been a lot of litigation even in the past 20

7    years.  There are a lot of things if the time comes we can

8    discuss, but I think those are the overarching points I wanted

9    to draw your Honor's attention to tonight

10           THE COURT:  That's also very helpful.  Thank you.

11           Do you have a view with respect to whether the Court

12    should have public hearings from time to time with the civilian

13    representative or not?  What's your sense?

14           MR. FARRELL:  Having been through the litigation, your

15    Honor, you know, at the time it was that, you know, Judge Hague

16    in the first instance, in the 2016, 2017 period, the parties

17    had presented a set of modifications that the Court then said

18    didn't go far enough, and he had us go back and look at it

19    again, and we made some additional changes to those Handschu

20    guidelines which are the ones that are currently adopted.

21           One of the changes was to provide an annual report to

22    the Court.  From my perspective, that was, you know, something

23    that -- a concession or, you know, to have the Court have this

24    availability of information.  So from the City's perspective,

25    that is the vehicle.  Then that report gets docketed on the

 1    public docket, and I think that serves the purpose and that was

 2    the agreement that we had entered into and had bargained for.

 3            THE COURT:  Thank you.

 4            Anyone else who would like to be heard?  Mr. Faridi.

 5            MR. FARIDI:  I will just say one thing, briefly, your

 6    Honor. I did prepare some written remarks.  I didn't have an

 7    opportunity to go through some of the minor points.  I think it

 8    may be useful for the members of the community and the public

 9    if I sent the written remarks over to your Honor and we can

10    docket them on the public docket.  The main points are the ones

11    that I already highlighted to your Honor, but there are a

12    couple of minor points that others may find to be interesting

13    and intriguing.

14            THE COURT:  You're welcome to do so, and I'll put them

15    on the docket.

16            I want to thank you, Mr. Faridi, for suggesting this

17    hearing.  I think it was your suggestion, if I'm not mistaken.

18    And I want to thank everybody for attending.  And I want to

19    thank the folks in the gallery for listening and for their

20    attention to these issues.  It's important.  Thank you.

21            MR. FARIDI:  Thank you, your Honor.

22            THE COURT:  Is there somebody else who wishes to be

23    heard?

24            MS. LEIST:  Yes, there is.

25            Thank you, your Honor.  Good evening.  I'm Alexis

1  Leist.  I'm the Director of Intelligence Matters for the NYPD

2  Legal Bureau.  I just wanted to just say very quickly welcome

3  to this case.  I actually have been working on this case for 13

4  years, so I --

5          THE COURT:  So you are next to me, the real new comer.

6          MS. LEIST:  That's exactly right.  But I did just want

7  to highlight sort of echoing what class counsel had said and

8  what Mr. Faridi had said, that as inhouse counsel to the

9  intelligence division, we take these guidelines to heart.  And

10  they really, as Mr. Eisenstein said, they have become embedded

11  into the fabric of the intelligence division.  You know, we

12  daily have discussions about the cases.  Now under the new

13  guidelines, there needs to be an operational review of every

14  single case at least every six months, so there are now time

15  limits that were not present before on some of the -- on the

16  investigations.  Those could be overcome, of course, but I just

17  want to convey to the Court and also to the public how

18  seriously the department takes compliance with the Handschu

19  guidelines and how much we have benefited also from the

20  civilian representative.

21          THE COURT:  Thank you.

22          Does anybody else wish to be heard?

23          Okay.  I think we are -- oh, one more.  Okay.

24          MS. WEINER:  Just a very brief thank you.  Rebecca

25  Weiner.  I'm the Deputy Commissioner for Intelligence and

1    Counterterrorism at NYPD.  A slightly different vantage point.

2    In my capacity, I am immersed all day and every day in threats,

3    and threats to public safety, and threats to national security

4    that are serious, that are actionable, and that of late have

5    been very plentiful.  So it's a robust threat environment that

6    we're operating within, and echoing all the comments that have

7    been made over the last hour, the Handschu process is

8    invaluable as we navigate them because of their complexity, the

9    feedback that we've come to rely on internally as a department

10   but now externally with the civilian rep has made our job

11   better, and we have absolutely, as Alexis just commented,

12   metabolized the consent decree within everything that we do.

13   So it might surprise the public that we are deeply committed,

14   have always been deeply committed, and will remain so as we

15   understand, and will do everything in our power to make sure

16   that we are keeping the City safe.

17           THE COURT:  Okay.  Anybody else?

18           I want to thank you all again and once again, and

19   thank the folks in the gallery for their careful attention to

20   this.  It's helpful.

21           (Hearing concluded)

22

23

24

25