

January 6, 2025

Muhammad U. Faridi
Partner
(212) 336-2874
mfaridi@pbwt.com

**Via E-Mail**

The Honorable Lewis J. Liman
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312
LimanNYSDChambers@nysd.uscourts.gov
(212) 805-0226

Re:   *Handschu, et al v. Special Serv. Div., et al* **71-cv-02203**

Dear Judge Liman:

      I write in my capacity as the Civilian Representative to the Handschu Committee of the New York City Police Department ("NYPD") to follow-up on the hearing Your Honor held on November 21, 2024 regarding the history of this long-pending case. During that hearing, for completion of the record, the Court granted my request to submit my remarks in writing for filing on the public docket. I have my enclosed my remarks herewith.

Respectfully submitted,

Muhammad U. Faridi

cc:   Jethro Eisenstein, Esq. (Class Counsel)
      Franklin Siegel, Esq. (Class Counsel)
      Arthur Eisenberg, Esq. (Class Counsel)
      Peter Farrell, Esq. (Corporation Counsel)
      Alexis Leist, Esq. (NYPD Counsel)
      Mallory McGee, Esq. (NYPD Counsel)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA HANDSCHU *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| *v.* | ) Case No. 1:71-cv-02203 |
| SPECIAL SERVICES DIVISION *et al.*, | ) ) ) |
| Defendants. | ) ) ) ) ) |

**WRITTEN REMARKS OF MUHAMMAD U. FARIDI,
CIVILIAN REPRESENTATIVE TO THE NYPD'S HANDSCHU COMMITTEE,
AT PUBLIC HEARING ON NOVEMBER 21, 2024**

**Introduction**

I would like to begin by thanking the Court for holding this hearing (i) to give the parties an opportunity to discuss the history of this long-running and important civil rights litigation and (ii) to give me an opportunity to discuss my work as the Civilian Representative to the Handschu Committee.

I would like to introduce the Court to two of my colleagues at Patterson Belknap, Cassie Deskus and Emma Brill, who have been helping me with the important job that I have been entrusted.

I can tell you based on personal experience, and it has also been widely reported, that the use of undercovers and informants, a law enforcement technique, has left a generation of Muslim Americans in a shadow of distrust and fear.[1] As PBS has reported, mosques, which are supposed to be sacred places for worship and the center of both religious and social life, have become quiet places where people are afraid to talk about issues that affect them and their communities, because of fear that they may be talking to an informant or an undercover law enforcement officer who may misinterpret what they are saying.[2] I suspect that the same is true for gathering

---

[1] *See, e.g.*, PBS, "Post-9/11 Surveillance Has Left a Generation of Muslim Americans in a Shadow of Distrust and Fear," Sept. 16, 2021, https://www.pbs.org/newshour/nation/post-9-11-surveillance-has-left-a-generation-of-muslim-americans-in-a-shadow-of-distrust-and-fear.

[2] *Id.* ("Mosques, once the center of social life in a community, had become a quiet place where people felt like a stranger could be an informant or an undercover police officer.").

places for many other religious, racial, social, and political groups that have been subject to investigation by law enforcement.

I say this to underscore the significant protections against police investigation that are provided by the framework set forth in the operative Handschu guidelines.[3] The guidelines are not perfect, but they do provide an important check on the NYPD's ability to investigate suspected criminal activity that has a nexus to protected speech. And it is because of the importance of this framework that you see so much public interest in today's hearing.

The annual report that I filed with the Court and that was made public on October 1, 2024 (docket entry no. 502) provides some background on this litigation and my work as the Committee's Civilian Representative. There are a few aspects of my work—specifically, concerns raised by members of the community—that I discuss in my report that I think are worth highlighting for the Court.

During my time as Civilian Representative, I have made it a priority to engage with community members to better understand their concerns about the NYPD's investigations. I have relayed several concerns to the NYPD and the NYPD has facilitated briefings to educate me about their practices. I would like to provide an overview of three particular areas of concern that have been brought to my attention: (1) the NYPD's use of undercover officers and confidential informants; (2) the potential for bias in the lead generation process; and (3) how the Handschu guidelines apply (or do not apply) when the NYPD works with other law enforcement agencies, more specifically the FBI and its Joint Terrorism Task Force.

## Informants and Undercovers

There is no area of concern that is more paramount and traumatizing for many marginalized communities in New York than the use of informants and undercover officers, in and of itself a valid law enforcement method of investigation.[4]

The *Raza* litigation—the settlement of which revived the Handschu guidelines in 2017—was based in part on allegations that the NYPD had infiltrated mosques and college Muslim student associations with informants and undercover officers.[5] The Muslim community has long, and rightfully, been troubled by these practices.

The community's concerns about use of informants and undercover officers are more amplified today given that, as the Brennan Center has reported, law enforcement agents, using false identities, now use undercover accounts on social media to connect with individuals and obtain access to information that law enforcement would not have otherwise had, allowing law

---

[3] *Handschu v. Special Services Division*, 241 F. Supp. 3d 433 (S.D.N.Y. 2017).

[4] PBS, *supra* note 1 ("'It was so invasive it covered everyday life … undercover informants or undercover officers, their job was to live the life of a fake Muslim inside these communities….'").

[5] Complaint, *Raza v. City of New York*, 13 CV 3448 (PKC) (JO) (E.D.N.Y.).

2

enforcement officers access to a wealth of private information, including posts, pictures, and information about friends and family.[6]

As the Brennan Center has also reported:

- Given the advances in technology, law enforcement can populate "fake accounts with a sufficient range of interests and connections to look legitimate" and are designed to entice people in certain groups to engage.[7]

- "Some digital monitoring companies even create fake accounts in bulk, using them to scrape millions of data points from public social media accounts."[8]

- "This practice violates Facebook's and Instagram's terms of use and policies, but as long as the surveillance companies evade detection, police departments can buy licenses to use these products to gather information on individuals and groups anonymously."[9]

Let me be clear about one thing: based on the files that I have seen I am glad from a public safety standpoint that the NYPD is undertaking the investigations over which I have oversight through the Handschu Committee. As I have stated in my annual report, the investigations that I have seen and that the Handschu Committee has authorized *are* warranted and *do* comply with the framework set forth in the guidelines.

But at the same time, I think everyone appreciates the tension between ensuring against an infringement of our constitutional rights and the need to protect public safety. Justice Sotomayor's observation in a case involving GPS monitoring applies with equal, if not more, force in the social media context: "Awareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. The net result is that GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the Government, in its unfettered discretion, chooses to track—may 'alter the relationship between citizen and government in a way that is inimical to democratic society.'"[10]

---

[6] Rachel Levinson-Waldman, "Principles for Social Media Use by Law Enforcement," Brennan Center for Justice, Feb. 7, 2024, https://www.brennancenter.org/our-work/research-reports/principles-social-media-use-law-enforcement (noting that "the use of undercover accounts or false identities on social media presents particular opportunities for mischief and privacy intrusions"; noting also that "[a]lias identities can be used to trick people into accepting connections they would not have permitted in real life, allowing law enforcement officers to see a wealth of information that they would not otherwise be privy to — including posts, pictures, and information about friends and family members — and even exchange and view private communications").

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring) (quoting *United States v. Cuevas-Perez*, 640 F.3d 272, 285 (7th Cir. 2011)) (internal quotation marks omitted).

I have raised all these issues with the NYPD. To its credit, the NYPD has allowed me access to a significant amount of information. That includes briefing on these issues by leaders of the unit that run undercover operations.

As I reported back to the community groups, it is my understanding based on briefings that the NYPD has certain internal controls in place that go above and beyond the Handschu guidelines to ensure that the use of informants and undercover officers comply with the guidelines. The NYPD's compliance framework is robust and multi-layered. Internally, a Handschu investigation, including the use of undercover officers and informants during such investigation is: 1) discussed weekly, if not daily, through briefs to the Intelligence Division's executive staff; 2) vetted at its inception and throughout its duration by both executive staff and the Legal Matters Unit[11]; 3) discussed at weekly case review meetings on Handschu investigations held by executive staff and also attended by the LMU; and (4) the NYPD provides annual Handschu training for investigators given by the LMU.

The NYPD has also confirmed, both to me and publicly, that it treats undercover and investigatory efforts performed by human resources online to be subject to the Handschu guidelines where such investigations involve political activity, and I have received such requests as part of the Handschu process.

### Generation of Leads

The next issue I would like to discuss is how the process of generating so-called "leads" may disproportionately target certain groups.

The operative Handschu guidelines allow the NYPD to check on leads—whether from information provided by the public (for example, tips) or are generated internally by the NYPD (for example, through the use of social media). Checking of leads is the lowest level of investigative activity and does not require a presentation to the Handschu Committee.

It is worth emphasizing, however, that further scrutiny or investigation beyond the prompt and extremely limited checking of an initial lead is subject to the Handschu process. This means that, before the NYPD can initiate a preliminary inquiry, a full investigation, or a terrorism enterprise investigation, the NYPD must support its request to do so with facts and information allowing the Handschu Committee to have a thorough discussion regarding whether or not the predicate has been met for the level of investigation, and for the Deputy Commissioner of Intelligence and Counterterrorism to approve or deny such investigation.

Community members are concerned that the processes that generate leads may be biased. Some leads are provided by third parties, such as an individual calling in a "tip." The biases and motivations of these callers are typically unknown, yet the "tip" needs to be investigated. Plainly put, the NYPD must investigate these leads regardless of their source. To not do so could jeopardize public trust and safety.

---

[11] The LMU is part of the NYPD's Legal Bureau and is integrated into the daily activities of the NYPD's Intelligence and Counterterrorism Bureau.

I remember the time immediately following the events of 9/11 when people in the neighborhood where I grew up—Brighton Beach and Coney Island—who did not like Muslim neighbors because of bigotry began to call the authorities without a valid reason. If those callers are biased against a certain group—for example, Muslims—the result may be that there are more leads, and ultimately, more investigations into individuals or entities against whom the bias is directed. A similar result may be seen if the lead generation process involves targeting social media for issues more often associated with certain groups, without also searching for analogous language associated with other groups. However, the NYPD must be led by the current threat environment which at different times may involve an emphasis on different issues. In other words, the NYPD investigates where the threat environment takes them.

The impact is that if police target certain groups for investigation, people within that group engage in self-censorship. A study by Professor Elizabeth Stoycheff from Wayne State University demonstrates that people are less willing to share minority viewpoints when reminded that their activities are monitored by the government.[12] So in the end, this phenomenon—in addition to chilling free speech and curtailing freedom of association—weakens civic connection in the group investigated.

A related concern expressed by members of the community has been about how technology may be used to aid an investigation. It is no secret that many law enforcement agencies across America now use artificial intelligence tools to enhance an investigation of an individual's social media activity.[13] But many AI models rely on algorithms that may reinforce biases and debunked stereotypes.[14] Many of the models are also not good at accurately assessing the meaning of posts, pictures, music, videos, and other forms of expression. For example, the Brennan Center recently reported that algorithmic tools may not be adept at recognizing sarcasm, satire, and hyperbole.[15] The Center also pointed out that "trying to interpret posts by young people, who often use memes and pop culture references that may be inscrutable to outsiders, can intensify these challenges. This effect is likely to be heightened for young people of color and immigrant youths, who are more heavily policed and more susceptible to inaccurate or biased presumptions that gestures, clothing, and other characteristics viewed online indicate gang activity or other criminal behavior."[16] However, the NYPD has informed me that, to the NYPD's knowledge, these third-party algorithms are not disparately impacting certain groups.[17] I have not yet formed my own view on this issue.

---

[12] Kevin Waddell, "How Surveillance Stifles Dissent on the Internet," The Atlantic, Apr. 5, 2016, https://www.theatlantic.com/technology/archive/2016/04/how-surveillance-mutes-dissent-on-the-internet/476955/.

[13] Brandon Epstein et. al,, "Navigating the Future of Policing: Artificial Intelligence (AI) Use, Pitfalls, and Considerations for Executives," Police Chief Online, Apr. 3, 2024, https://www.policechiefmagazine.org/navigating-future-ai-chatgpt/ ("From predictive policing to AI-enhanced video analysis, law enforcement agencies are increasingly leveraging these technologies.").

[14] Leonardo Nicoletti and Dina Bass, "Humans Are Biased. Generative AI Is Even Worse.," Bloomberg Technology + Equality, June 9, 2023, https://www.bloomberg.com/graphics/2023-generative-ai-bias/.

[15] Levinson-Waldman, *supra* note 7.

[16] *Id.*

[17] Sixth Annual Report of the Civilian Representative to the NYPD's Handschu Committee, *Handschu*, 71-CV-2203, Dkt. No. 502 at p. 9 (hereinafter "Sixth Annual Report").

In the Handschu context, the lead generation process occurs prior to a request brought before the Committee. At that point, I am supposed to serve as a check on whether the next level of investigative activity—a preliminary inquiry, a full investigation, or a terrorism enterprise investigation—should be opened, with the final determination lying in the hands of the Deputy Commissioner of Intelligence and Counterterrorism. But problems in the lead generation process could result in the over-policing and biased policing of some communities as compared to others, which would raise equal protection issues.

### The NYPD's Interactions with FBI

The last issue I would like to raise is the limited application of the Handschu guidelines to the NYPD's work with other law enforcement agencies—particularly the JTTF.

While most Americans probably do not know of the acronym "JTTF" or what it stands for, unfortunately, JTTF is a household term in many Muslim households across America. The Joint Terrorism Task Force, or the JTTF, consists of multi-agency partnerships across the United States. They are led by the FBI and involve various federal, state, and local enforcement agencies tasked with investigating allegations of terrorism. There are approximately 200 JTTFs across America, and they are made up of several thousand federal, state, and local law enforcement agents.[18]

Muslim civic groups and other civil liberties organizations, such as the ACLU, have criticized the JTTF's work, arguing that the Task Force operates with minimal oversight and scant accountability, and has a long history of wrongly targeting activists and communities of color, often associating protest with "terrorism," without evidence of wrongdoing. The ACLU has reported that, in the early 2000s, the FBI used JTTFs to conduct widespread "voluntary" interviews in Muslim communities, and, in 2020, then-Attorney General Barr deployed JTTFs to surveil racial justice activists protesting the police killings of George Floyd and other Black people.[19]

It is a matter of public record that the NYPD is a member of the JTTF and frequently works with the JTTF and other agencies in at least three ways: (1) NYPD officers can be deputized to work for the JTTF; (2) the JTTF and other agencies may request to use the NYPD's resources; and (3) the NYPD may request to use the JTTF's and other agencies' resources.[20]

So how does the JTTF relate to my work as the Civilian Representative? I will give you an example. I have received reports from people in the Muslim community of questioning by

---

[18] Federal Bureau of Investigation, Joint Terrorism Task Forces, https://www.fbi.gov/investigate/terrorism/joint-terrorism-task-forces ("Today there are about 200 task forces around the country, including at least one in each of the FBI's 55 field offices, with hundreds of participating state, local, and federal agencies.").

[19] ACLU, "ACLU v. DOJ – FOIA Lawsuit Seeking Records About the Use of JTTFs and Fusion Centers to Target Protesters and Communities of Color," July 29, 2024, https://www.aclu.org/cases/aclu-v-doj-foia-lawsuit-seeking-records-about-the-use-of-jttfs-and-fusion-centers-to-target-protesters-and-communities-of-color#:~:text=JTTFs%20and%20fusion%20centers%20have,voluntary%E2%80%9D%20interviews%20in%20Muslim%20communities.

[20] Sixth Annual Report at 9.

people whom they believed were NYPD officers—questioning regarding what they assert is facially innocuous activity on social media or protesting in the streets. When I have checked the activity at issue (as it had been relayed to me) against the Handschu guidelines, in my view, the activity did not always meet the requirements of the Handschu guidelines.

So the first question I have to deal with—and this is also a question that I receive from community organizations on a regular basis—is whether and how the operative Handschu guidelines apply to the work the NYPD does on behalf of the JTTF.

It is the NYPD's position that officers deputized to JTTF follow the United States Attorney General's guidelines, and are not bound by the Handschu guidelines.[21] It is important to note however, that the predicates set forth in the Handschu Guidelines were taken directly from the Attorney General's guidelines. The Attorney General's guidelines do not require input from a civilian representative. And although the Department of Justice recently issued guidelines regarding law enforcement's consideration of certain protected characteristics,[22] many civic organizations have criticized the guidelines for posing risk of perpetuating bias and failing to provide sufficient constraints on the use of protected characteristics. More specifically, the DOJ guidelines permit federal officials to consider protected traits such as race and religion in deciding whom to surveil or investigate when two vague and overly broad criteria are met:

(1) "trustworthy" context- and content-specific information provide assurance that the information is reliable and links persons possessing a particular protected characteristic to, among other things, threat against national security; and

(2) law enforcement personnel reasonably believe the law enforcement activity is merited under the totality of the circumstances.

This standard has been criticized by civil liberties organizations as protecting against only the most blatant and explicit bias and failing to account for the full scope of systemic, structural, and implicit bias that too often infects law enforcement and intelligence decision-making.[23]

In this regard, the Handschu guidelines provide a check that the DOJ guidelines do not. But NYPD officers tasked to the JTTF follow the DOJ guidelines, not the Handschu guidelines—although the predicates in both are the same. Following our discussions, the NYPD has agreed to provide training on the Handschu guidelines to officers who are deputized to JTTF so that these officers are aware of the spirit of the guidelines and can apply it in their work where appropriate. Whether this will have any impact remains to be seen.

---

[21] *Id.* at 9-10.

[22] U.S. Dep't of Justice, "Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, Gender Identity, and Disability," May 2023, https://www.justice.gov/d9/2023-05/Sec.%209%28e%29%20-%20Guidance%20for%20Federal%20LEAs%20on%20the%20Use%20of%20Protected%20Characteristics_FINAL%205.25.23_508.pdf.

[23] Letter from Legal Defense Fund, Brennan Center for Justice, ACLU, and The Leadership Conference on Civil and Human Rights to Lisa O. Monaco, Deputy Attorney General, U.S. Dep't of Justice, regarding "Concerns about the Department of Justice's 2023 Racial Profiling Guidance," Oct. 21, 2023, https://assets.aclu.org/live/uploads/2023/10/2023.10.22-DOJ-Profiling-Guidance-Letter-FINAL64.pdf.

The second question that I have to consider is what happens when the JTTF seeks to use the NYPD's resources. This is not a situation in which the NYPD sends its officers to be deputized by the JTTF, but rather when the JTTF requests that the NYPD use an un-deputized undercover officer to assist the JTTF. My view is—and the NYPD agrees—that when this happens, the NYPD is obligated to follow the Handschu guidelines.[24] Therefore, if, for example, the FBI requests use of an undercover NYPD officer, that request must be brought before the Handschu Committee and given approval by the Deputy Commissioner of Intelligence and Counterterrorism. I can confirm that I have reviewed these types of requests from other agencies during Handschu Committee meetings.

The last question I have to deal with is what happens when the NYPD receives information from the JTTF—and more specifically, information which may have been obtained in a manner that does not comply with the Handschu guidelines.[25] The NYPD's view is that it may accept and act on this intelligence, even if it was obtained by means that were not compliant with the Handschu guidelines. In that way, it is very similar to when the NYPD receives a tip from the public. All information that could pose a risk to public safety must be vetted out. It is also my view that the public safety should not be put at risk and that the NYPD should not be penalized for using information procured by other agencies that do not have the Handschu process. But because the other agencies do not have such a process in place, in my view, it is incumbent on the public and civil society organizations to demand that the other law enforcement agencies adopt a Handschu-like or another process that safeguards our constitutional rights.

## Conclusion

I would like to reiterate my appreciation for the Court in holding this hearing. As I hope my presentation highlights, there are thorny issues related to the real-world application of the Handschu guidelines, and there may be a need in the future for Your Honor to weigh in on those issues.

---

[24] Sixth Annual Report at 10.

[25] *Id.*