**UNITED STATED DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BARBARA HANDSCHU, *et al.*, | : | |
| Plaintiffs, | : | |
| vs. | : | Case No. 1:71-cv-02203-LJL |
| SPECIAL SERVICES DIVISION*, et al.*, | : | |
| Defendants. | : | |

**WRITTEN REMARKS OF MUHAMMAD U. FARIDI,**
**CIVILIAN REPRESENTATICE TO THE NYPD'S HANDSCHU COMMITTEE,**
**AT PUBLIC HEARING ON OCTOBER 15, 2026**

## Introduction

I would like to begin by thanking the Court for holding this hearing to provide an opportunity to discuss my work as the Civilian Representative to the Handschu Committee. At the outset, I also want to thank my colleagues at Linklaters, Katherine Brisson and Bonita Robinson, for their invaluable assistance. Their thoughtfulness and dedication have been essential to my discharge of this responsibility.

My annual report for this year, which is publicly available on the docket,[1] provides the Court and the public with an overview of the work undertaken during the reporting period and the process followed in reviewing investigations under the Handschu Guidelines.[2] Today, I plan on discussing two things.

*First*, I will focus on concerns raised by members of the community and the various constituents of the Handschu framework. The concerns I'll discuss today are different from the ones I discussed last year, but there is a consistent theme: the public wants assurance that the power to investigate is used to address genuine threats of violence, and not to scrutinize people for who they are, what they believe, or with whom they associate.

*Second*, I would like to do something that neither I nor the prior Civilian Representatives have done in these hearings: walk the Court and the public through three investigations conducted under the Handschu framework that have since become matters of public record through criminal charges. I have chosen these examples not because they are the measure of the Handschu process, but because they are among the few that can be discussed publicly. Most of the work under the Guidelines happens out of public view. These cases offer a rare opportunity to show, in concrete terms, the questions the process asks: what information supports an investigation, how intrusive the methods may be, and when that justification has to be revisited.

## Concerns from the Public

Since the last hearing, I have had multiple conversations with the various constituencies of the Handschu framework, including class counsel, members of City Hall, and civil society. These conversations are an important part of my work. They show me the public's concern about a process that is, by its nature, largely conducted out of public view.

### The First Concern

The first is a concern I hear regularly: that Muslims appear to be the subjects of most investigations. Given the history of law enforcement surveillance of Muslim communities, this concern deserves a substantive response, and, as the Court will recall, I addressed it in some detail at our last hearing.

---

[1] *Handschu et al. v. Special Serv. Div., et al.*, 71-cv-02203-LJL, Dkt. No. 515 (Jan. 6, 2026).

[2] *See id.* at Dkt. No. 502.

This spring, our team undertook a comprehensive look at the investigations then under review. The NYPD does not classify investigations by religion, and I do not think it should. Assigning or inferring religious identity is both inappropriate and unworkable. People can be driven by overlapping and sometimes conflicting beliefs. A person may, for example, be influenced by white supremacist propaganda while also espousing religious views.

We could, however, group the investigations by the nature of the threat. As of spring 2026, (a) about 31% of the investigations related to foreign terrorist organizations; (b) about 8% related to transnational threats or repression carried out by foreign governments, often against diaspora communities living here; (c) about 23% related to racially or ethnically motivated violent extremism, such as white supremacy; (d) about 15% related to anti-government or anti-authority violent extremism; (e) about 8% related to involuntary celibate, or "incel," groups; and (f) about 15% related to intelligence operations conducted by foreign government actors.

These figures give a more concrete picture of the range of matters under review. But they are a snapshot of a single moment, not a fixed profile of who the NYPD investigates. The threat environment changes constantly. It is shaped by world events, by domestic political tensions, by new technologies and online spaces where people radicalize and organize, and by the actions of foreign governments. A breakdown taken a year earlier would likely have looked different, and one taken a year from now almost certainly will.

That is because the Department's investigative work is largely reactive. It responds to the threats that come to its attention, and those threats will keep shifting in directions and ways that are mostly beyond its control. Whatever the mix looks like at any given moment, my responsibility stays the same: to examine whether each investigation has a sufficient factual basis, without treating religious belief or observance as evidence of either wrongdoing or innocence.

<u>The Second Concern</u>

The second concern involves how leads originate. Constituents asked whether the NYPD considers the motives of people who report threats. What if a caller is driven by anti-Muslim or anti-Jewish prejudice? The Department explained that it takes every reported threat at face value. It does not discount a lead based on the caller's perceived motive or on societal bias, to the extent such bias is known when the report comes in. I believe taking every report seriously is the right starting point.

A caller's motive and the accuracy of the report are different questions. Someone with a personal grievance may know about a real plan to commit violence. Motives can also be mixed, and are often impossible to determine at the outset. Requiring the police to resolve a caller's motives first could delay a necessary response without making the information any more reliable. It would also shift attention from the reported threat to the person reporting it, and people who fear being scrutinized for coming forward may stop reporting altogether. That would make everyone less safe.

There is also a question of equal treatment. If officers first decide which callers have acceptable motives, a potential victim's protection may depend on an officer's subjective view of the person reporting the danger, which introduces another source of bias. The public deserves

protection from a credible threat even when the person who reports it is someone we distrust or whose views we find objectionable. What matters is the information actually provided and the circumstances that support or undermine it.

This is where the distinction between receiving a lead and acting on it becomes essential. The Handschu Guidelines speak to how leads are followed up on and how the resulting longer-term investigations that may result from leads must be predicated. That approach guards against people who would use law enforcement to pursue private grievances. The caller does not decide whom the government investigates. The police remain responsible for the factual basis of their actions. Taking threats seriously and guarding against bias are obligations that can be met at once. That's what makes the Handschu framework so critical.

<u>The Third Concern</u>

The third concern involved the use of technology, including artificial intelligence. New York City's "Public Oversight of Surveillance Technology Act," known as the POST Act, requires the NYPD to publish certain policies related to its use of surveillance technologies. Those policies make information about many of the Department's tools public, although some operational details remain undisclosed.

One question was specific: what terms or algorithms does the NYPD use when searching social media for leads, and are those searches aimed at Islam, or at people because of their race or ethnicity? The Department advised me that the searches that it uses are driven by threats and do not target religion, race, or ethnicity. So terms that are tied to particular events and phrases (e.g., bombs)—not terms that relate to a particular religion.

Constituents also asked about predictive analysis of the kind marketed by various tech companies. These tools use algorithms, sometimes incorporating artificial intelligence, to analyze large volumes of a person's online activity, including posts, images, and connections. They claim to infer intentions or identify a risk of future harm based on proprietary methods—but at core, those methods likely include a person's association with others, support for certain political causes, etc. The concern is that an inference drawn from patterns of speech or association could lead to someone being treated as dangerous without adequate evidence of criminal activity.

The NYPD Intelligence and Counterterrorism Bureau told me that it does not use predictive analysis of that kind. The assurance I am conveying concerns predictive use. It should not be understood to mean that the Department does not use other types of technologies that incorporate artificial intelligence—although I note that that question is outside my purview. Meaningful oversight in the Handschu process requires understanding what a tool actually does and how its output shapes investigative decisions. More broadly, it requires understanding how individual judgments are made in practice. That is what takes place in the monthly Handschu Committee meetings. That brings me to the three investigations I would now like to discuss.

**Specific Investigations**

In recent years, as concern has grown that government investigations are being used to retaliate against political speech, I am regularly asked what kind of conduct can justify an investigation under the Handschu framework. That question is central to the Handschu process.

Because I cannot discuss active investigations, though, I usually have to answer it in the abstract. The three investigations I will describe today have become public through arrests and criminal proceedings, so I can discuss them in concrete terms. I hope they show what kind of information can support an investigation as it moves forward. More importantly, I hope they show how law enforcement in our City can pursue serious threats while respecting the freedoms of speech, religion, and association.

The First Investigation

The first investigation concerns Alexander Heifler, a resident of Hoboken, New Jersey, whom the NYPD identified as a member of Jewish Defense League 613. According to the NYPD's account, he came to the Department's attention in February 2026 after discussing possible violent criminal activity targeting a New York City mosque during the Islamic month of Ramadan. The information behind the investigation was not limited to hateful speech, though there was plenty of it, including anti-Arab and anti-Muslim rhetoric spread on social media and through recruitment. What mattered was that the speech came with evidence pointing toward violence, including firearms training and plans to arm others. That was sufficient to trigger an investigation. The investigation later developed evidence of an alleged plan to attack the Staten Island home of Nerdeen Kiswani, an advocate for the Palestinian cause.[3]

The federal complaint describes a series of increasingly concrete steps.[4] Heifler allegedly discussed an incendiary attack with an undercover officer, provided the intended victim's home address, and traveled with the officer to surveil the residence.[5] He also allegedly discussed attacking the home and nearby vehicles and planned to leave the country afterward.[6] On March 26, according to the complaint, Heifler and the undercover officer assembled eight Molotov cocktails at his Hoboken residence.[7] Law enforcement executed a search warrant and recovered the devices.[8] He was arrested, and the next day federal prosecutors announced charges for unlawfully possessing and making destructive devices.[9] Of course, those charges are allegations, and he is entitled to the presumption of innocence.

This case shows why the focus in the Handschu process must stay on evidence of planned criminal conduct. Offensive views about a religion or political cause cannot take the place of the

---

[3] *See generally United States v. Heifler*, 2:26-mj-15052-SDA, Dkt. No. 1 (D.N.J. Mar. 27, 2026).

[4] *See generally id.*

[5] *Id.* at ¶¶ 2–5.

[6] *Id.* at ¶¶ 6, 8.

[7] *Id.* at ¶ 8.

[8] *Id.* at ¶ 9.

[9] *See id.*; *see also* Press Release, U.S. Dep't of Justice, Hoboken, New Jersey Man Charged with Possession and Making of Molotov Cocktails (Mar. 27, 2026), https://www.justice.gov/usao-nj/pr/hoboken-new-jersey-man-charged-possession-and-making-molotov-cocktails.

factual justification an investigation requires. The evidence here involved a desire to use violent means in support of political speech.

<u>The Second Investigation</u>

The second investigation involved Tomas-Kaan Jimenez-Guzel and Milo Sedarat, both of Montclair, New Jersey, and Saed Ali Mirreh, of Kent, Washington, along with individuals overseas.

In June 2025, another law enforcement agency formally asked for the NYPD's help with its investigation of Jimenez-Guzel and his associates. The investigation was based in part on Jimenez-Guzel's statements about carrying out a "Boston-style" attack and on his frequent visits to a shooting range. According to the NYPD's account, the participants used transnational group chats to vet one another and discuss traveling to join ISIS. An NYPD source participated in those chats.

The public record describes an agreement to travel through Turkey to Syria to fight for ISIS[10] and concrete steps to carry it out.[11] Jimenez-Guzel and Mirreh bought airline tickets.[12] Sedarat contributed $500 toward Mirreh's travel and took steps to hide the transfer. After arrests in a related Michigan investigation, Jimenez-Guzel and Mirreh moved up their departures.[13] On November 4, 2025, Jimenez-Guzel was arrested at Newark Airport and Mirreh at his home in Washington.[14] Sedarat was arrested the next day.[15]

The initial charges differed. Jimenez-Guzel and Mirreh were charged with conspiracy and attempt to provide material support to ISIS.[16] Sedarat was first charged with interstate threats, including alleged threats against Jewish individuals.[17] In July of this year, Jimenez-Guzel and Mirreh pleaded guilty to conspiracy to provide material support,[18] and Sedarat pleaded guilty to concealing material support intended for ISIS.[19]

---

[10] *U.S. v. Jimenez-Guzel*, 26-cr-00276-KSH, Dkt. No. 1 at ¶ 5 (Nov. 5, 2025).

[11] *Id.* at ¶¶ 6–7.

[12] *Id.* at ¶¶ 189, 192.

[13] *Id.* at ¶ 198.

[14] *Id.* at ¶ 210–12.

[15] *U.S. v. Sedarat*, 26-cr-00303, Dkt. No. 1 (Nov. 5, 2025).

[16] *U.S. v. Jimenez-Guzel*, 26-cr-00276-KSH, Dkt. No. 1 (Nov. 5, 2025).

[17] *U.S. v. Sedarat*, 26-cr-00303, Dkt. No. 1 (Nov. 5, 2025).

[18] *U.S. v. Jimenez-Guzel*, 26-cr-00276-KSH, Dkt. No. 34 (July 27, 2026).

[19] *U.S. v. Seldarat*, 26-cr-00303, Dkt. No. 19 (July 28, 2026).

The people in this case were separated by state and national borders, but their communications and plans connected them, and the investigation reached well beyond the City. The case also shows why the use of human sources deserves careful scrutiny. Access to private conversations can reveal whether people are making concrete arrangements to commit a crime. It can also expose lawful associations and private expression. The Handschu process is where the justification for using such methods, and for continuing to use them, is examined. Another agency's involvement does not relieve the NYPD of its own obligations, although my role does not extend to overseeing the other agencies involved.

The Third Investigation

The third investigation concerns an individual who made repeated online threats of violence against the LGBTQ+ community, including stating an intent to carry out a mass shooting. After a monthslong investigation that crossed jurisdictional lines, the individual was arrested on charges that include threats of violence against that community. I cannot share further details, but the case shows the kind of threat the Handschu framework must be able to address before violence occurs.

What These Cases Show, and What They Do Not

Taken together, these examples show the range of investigative work that can arise under the Handschu framework. They also show why the standards must be applied the same way, whatever ideology the person under investigation invokes and whoever is at risk. The commitment to equal protection that requires serious attention to an alleged plot against a Palestinian activist also requires serious attention to threats against Jewish people or the LGBTQ+ community.

The officers and analysts who do this work carry serious responsibilities, and these investigations demand considerable effort. Civilian oversight asks them to explain and support the judgments they make. That discipline gives the public a basis for confidence that the power to investigate is used for legitimate reasons and within established limits.

These three cases cannot answer every concern about surveillance, however, and the value of the Handschu process cannot be measured by counting arrests or convictions. An investigation that responsibly resolves a concern and ends without charges can also serve the public. So can a decision to limit an investigative method because the justification for it falls short.

## Conclusion

I am grateful to the Court, to class counsel, whose sustained work made these protections possible, and to the NYPD personnel who take part in this process. New Yorkers are entitled to expect effective protection against violence and meaningful protection against unjustified government intrusion. Handschu provides a concrete framework for meeting both expectations. My responsibility is to help make sure its protections hold up in practice, especially in the many cases the public never hears about.